**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and THE PEOPLE OF THE STATE OF NEW YORK, BY ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL FOR THE STATE OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> RD LEGAL FUNDING, LLC; RD LEGAL FINANCE, LLC; RD LEGAL FUNDING PARTNERS, LP; and RONI DERSOVITZ, <br><br> Defendants. | CASE NO. 1:17-cv-00890 (LAP) <br><br> **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

CALCAGNI & KANEFSKY LLP
ERIC KANEFSKY
  *Eric@ck-litigation.com*
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, NJ 07102

BOIES SCHILLER FLEXNER LLP
DAVID K. WILLINGHAM (*pro hac vice*)
  *dwillingham@bsfllp.com*
MICHAEL D. ROTH (*pro hac vice*)
  *mroth@bsfllp.com*
JEFFREY M. HAMMER (*pro hac vice*)
  *jhammer@bsfllp.com*
725 South Figueroa Street, 31st Floor
Los Angeles, California 90017-5524
Phone: (213) 629-9040 / Fax: (213) 629-9022

Attorneys for Defendants RD LEGAL
FUNDING, LLC; RD LEGAL FINANCE, LLC;
RD LEGAL FUNDING PARTNERS, LP; and
RONI DERSOVITZ

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION .................................................................................................1

II.     THE CFPB IS UNCONSTITUTIONAL AND SHOULD BE STRUCK DOWN.............1

        A.      *Humphrey's* Should Not Be Extended to the CFPB ...............................1

        B.      The CFPB Is Impermissibly Shielded from Congressional Oversight ...................3

        C.      The Appropriate Remedy Is to Strike Down the CFPB as a Whole......................4

III.    THE COURT LACKS SUBJECT MATTER JURISDICTION.....................................4

        A.      The RD Entities Are Not "Covered Persons" Subject to the CFPA ......................4

                1.      The Government Fails to Allege the RD Entities Extend "Credit" ............4

                        (a)     The Proceeds From The Zadroga Fund Are Assignable................5

                        (b)     Proceeds From The NFL Settlement Fund Are Assignable............6

                        (c)     Even if the Assignments Were Invalid, the Transactions
                                Would Not Be Converted into "Extensions of Credit"...................7

                2.      The Plain Language of the CFPA Requires the Government to
                        Allege the RD Entities "Extend[] Credit and Servic[e] Loans" .................8

        B.      The Court Should Decline to Exercise Supplemental Jurisdiction........................9

IV.     THE GOVERNMENT FAILS TO STATE A CLAIM FOR RELIEF............................9

        A.      Counts I, III-V, IX-XI:  The Government Fails to Allege Deceptive
                Conduct ...............................................................................................10

        B.      Count II:  The Government Fails to Allege that Defendants Interfered with
                Consumers' Ability to Understand if the Funds Were Assignable.......................11

        C.      Counts VI and VII:  State Usury Laws Do Not Apply Because the
                Transactions Are True Sales, Not Loans ......................................................11

        D.      Count VIII:  N.Y. General Obligations Law § 13-101 Does Not Prohibit
                the Assignment of Proceeds from a Personal Injury Claim.................................13

        E.      The Complaint Suffers from Other Pleading Deficiencies ...................................14

V.      CONCLUSION...................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. Brock*,
    480 U.S. 678 (1987).................................................................................................4

*Angermeir v. Cohen*,
    14 F. Supp. 3d 134 (S.D.N.Y. 2014)....................................................................14

*Au New Haven, LLC v. YKK Corp.*,
    210 F. Supp. 3d 549 (S.D.N.Y. 2016)....................................................................6

*Billings v. O'Brien*,
    4 Daly 556 (1873) ................................................................................................14

*Bowery Nat'l Bank v. Wilson*,
    122 N.Y. 478 (1890) ............................................................................................14

*C.U. Annuity Serv. Corp. v. Young*,
    722 N.Y.S.2d 236 (N.Y. Sup. Ct. 2001) ...............................................................7

*Clever Ideas v. 999 Rest. Corp.*,
    2007 WL 3234747 (N.Y. Sup. Ct. Oct. 12, 2007) ...............................................12

*Clinton v. City of New York*,
    524 U.S. 417 (1998) (Kennedy, J., concurring)....................................................4

*Dana v. Dana*,
    48 Misc. 2d 717 (1965)........................................................................................14

*Echeverria v. Estate of Lindner*,
    801 N.Y.S.2d 233 (N.Y. Sup. Ct. 2005) .............................................................12

*F.T.C. v. Lights of Am., Inc.*,
    760 F. Supp. 2d 848 (C.D. Cal. 2010) ..................................................................9

*FDIC v. Meyer*,
    510 U.S. 471 (1994)...............................................................................................5

*First Fed. Sav. & Loan Ass'n of Rochester v. United States*,
    58 Fed. Cl. 139 (2003) ...........................................................................................5

*Forman v. City of N.Y.*,
    2017 WL 1167334 (S.D.N.Y. Mar. 27, 2017) ......................................................9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)........................................................................................1, 3

*Gaidon v. Guardian Life Ins. Co. of Am.*,
    94 N.Y.2d 330 (N.Y. 1999) ..................................................................................11

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)....................................................................13

*Heater v. F.T.C.*,
    503 F.2d 321 (9th Cir. 1974) ...............................................................................2

*Higgins v. Higgins*,
    119 N.Y.S.2d 103 (1952)......................................................................................14

*Houston v. Ormes*,
    252 U.S. 469 (1920)..............................................................................................6

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935).....................................................................................1, 2, 3

*In re Dryden Advisory Grp., LLC*,
    534 B.R. 612 (Bankr. M.D. Pa. 2015) ............................................................11, 12

*In re Ideal Mercantile Corp.*,
    244 F.2d 828 (2d Cir. 1957)..................................................................................6

*In re Lemons & Assocs., Inc.*,
    67 B.R. 198 (Bankr. D. Nev. 1986) .....................................................................13

*In re Minor*,
    443 B.R. 282 (Bankr. W.D.N.Y. 2011) ................................................................14

*In re Minor*,
    482 B.R. 80 (Bankr. W.D.N.Y. 2012) ..................................................................14

*Jarecki v. Shung Moo Louie*,
    700 N.Y.S.2d 152 (1st Dep't 1999), *rev'd on other grounds*, 722 N.Y.S.2d
    784 (2001)..............................................................................................................6

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012)....................................................................................8

*Major's Furniture Mart, Inc. v. Castle Credit Corp.*,
    602 F.2d 538 (3d Cir. 1979)................................................................................12

*McCormack v. Bloomfield*,
    399 F. Supp. 488 (S.D.N.Y. 1974) ......................................................................14

*Medina v. Bauer*,
    2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) ................................................14

*Morrison v. Olson*,
    487 U.S. 654 (1988)............................................................................................2

*Muhlrad v. Mitchell*,
    1997 WL 182614 (S.D.N.Y. Apr. 14, 1997)....................................................9

*Myers v. United States*,
    272 U.S. 52 (1926)..............................................................................................1

*Obermayer Rebmann Maxwell & Hippel LLP v. West*,
    2015 WL 9489791 (W.D. Pa. Dec. 30, 2015).................................................12

*Office of Personnel Mgmt. v. Richmond*,
    496 U.S. 414 (1990)............................................................................................3

*People v. Mid Hudson Med. Grp., P.C.*,
    877 F. Supp. 143 (S.D.N.Y. 1995) ..................................................................15

*PHH Corp. v. Consumer Fin. Protection Bureau*,
    839 F.3d 1 (D.C. Cir. 2016) ..............................................................................2

*Platinum Rapid Funding Group Ltd. v. VIP Limousine Servs., Inc.*,
    2016 WL 4478807 (N.Y. Sup. Ct. Jun. 8, 2016) ...........................................13

*Reid v. Unilever U.S., Inc.*,
    964 F. Supp. 2d 893 (N.D. Ill. 2013) ..............................................................10

*Rubenstein v. Small*,
    273 A.D. 102 (N.Y. App. 1947) ......................................................................12

*Sabo v. United States*,
    127 Fed. Cl. 606 (2016) .....................................................................................5

*Saint John Marine Co. v. United States*,
    92 F.3d 39 (2d Cir. 1996)...................................................................................6

*Singer Asset Fin. Co. v. Bachus*,
    741 N.Y.S.2d 618 (2002)...............................................................................7, 8

*Transmedia Rest. Co., Inc. v. 33 E. 61st St. Rest. Corp.*,
    710 N.Y.S.2d 756 (N.Y. Sup. Ct. 2000) .........................................................12

*Tuition Plan, Inc. v. Zicari*,
    70 Misc. 2d 918 (N.Y. Civ. Ct. 1972)............................................................13

*United States v. Richardson,*
    418 U.S. 166 (1974)...........................................................................................4

*Wiener v. United States,*
    357 U.S. 349 (1958)...........................................................................................2

*Wynder v. McMahon,*
    360 F.3d 73 (2d Cir. 2004)...............................................................................14


**Statutes**

12 U.S.C. § 4502(20) ...........................................................................................2

12 U.S.C. § 5481(6) .............................................................................................8

12 U.S.C. § 5481(12)(M) .....................................................................................9

12 U.S.C. § 5481(15)(A) ......................................................................................8

12 U.S.C. § 5481(15)(A)(i)................................................................................8, 9

12 U.S.C. § 5481(15)(A)(i)-(xi)...........................................................................8

12 U.S.C. § 5481(15)(A)(x) .................................................................................9

12 U.S.C. § 5497(a) .............................................................................................3

12 U.S.C. § 5511(b)(2) ........................................................................................2

12 U.S.C. § 5531..................................................................................................11

12 U.S.C. § 5562-5565 ........................................................................................2

12 U.S.C. § 5581(a)(1)(A) ...................................................................................2

12 U.S.C. § 5581(b) .............................................................................................2

31 U.S.C. 3727..................................................................................................5, 6

31 U.S.C. § 3727(b) .............................................................................................5

49 U.S.C. § 40101 ................................................................................................5

N.Y. Gen. Oblig. Law § 13-101 .........................................................................13

N.Y. Gen. Oblig. Law § 13-101(1) .....................................................................13

**Other Authorities**

28 CFR § 104.61 .................................................................................................5

28 CFR § 104.63 .................................................................................................5

CFPB Supervision and Examination Manual, UDAAP 5 (Oct. 2012) ........................10

H.R. 4173, 111th Cong., Title IV, § 4002(19)(A)(ii)(II) (1st Sess. 2009)....................9

Paul R. Verkuil, *The Purposes and Limits of Independent Agencies*, 1988 Duke
     L.J. 257 (1988)............................................................................................3

VCF Policies and Procedures, § 3.9 (May 2017)............................................................5

## I.    INTRODUCTION

The structure of the Consumer Financial Protection Bureau (the "CFPB") is unprecedented:  it has broad executive authority, guaranteed funding, and is headed by a single Director who serves a five-year term and can only be removed by the President for cause.  *Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) ("the most telling indication of the severe constitutional problem" with an agency's structure "is the lack of historical precedent for this entity").  The CFPB's unchecked power, which even the Department of Justice believes is unconstitutional, inevitably leads to enforcement actions like this one, where the CFPB and New York Attorney General (collectively, the "Government") have no basis to regulate Defendants under the Consumer Financial Protection Act (the "CFPA"), assert claims outside of this Court's jurisdiction, and fail to state a claim upon which relief can be granted.

## II.    THE CFPB IS UNCONSTITUTIONAL AND SHOULD BE STRUCK DOWN

The Constitution grants the President "the power of appointing, overseeing, and controlling those who execute the laws," *Free Enter.*, 561 U.S. at 492 (citing 1 Annals of Cong. 463 (1789)), which necessarily includes "the exclusive power of removal."  *Myers v. United States*, 272 U.S. 52, 122 (1926).  Accordingly, the Supreme Court has permitted only "limited restrictions" on the President's removal power, and then only under "certain circumstances" that do not apply to the CFPB.  *Free Enter.*, 561 U.S. at 483, 495.

### A.    *Humphrey's* Should Not Be Extended to the CFPB

The Government's assertion that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)—which approved for-cause removal restrictions for the commissioners of the Federal Trade Commission ("FTC")—permits Congress to insulate the CFPB's Director from executive oversight, overlooks the significant differences between the CFPB and the *Humphrey's*-era FTC.

1

*Humphrey's* described the FTC as "predominantly quasi judicial and quasi legislative." *Id.* at 624.  The FTC was created "to serve an educational purpose" by "defin[ing] norms of acceptable business behavior."  *Heater v. F.T.C.*, 503 F.2d 321, 324 (9th Cir. 1974).  In 1935, the FTC could enforce the law only through in-house proceedings, and was empowered only to issue "a cease and desist order"; it could not seek restitution or impose penalties.  *Id.*  While some of those functions may now "be considered 'executive,' at least to some degree," *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988), the FTC's executive authority was quaint compared to the CFPB's.  Dodd-Frank gives the CFPB authority to enforce 18 preexisting consumer-protection laws and impose a wide range of legal and equitable relief for subjectively determined "unfair, deceptive, and abusive acts and practices."  12 U.S.C. §§ 5511(b)(2), 5581(a)(1)(A), 5581(b), 5562-5565.  The "functions" of the two agencies thus are not "remarkably similar."  (Opp. at 3.)

Moreover, that the CFPB has a single Director further distinguishes it from the *Humphrey's*-era FTC.  The Government dismisses the FTC's multi-member commission structure as "constitutionally irrelevant," (Opp. at 5), but *Humphrey's* has long been understood to apply to multi-member commissions.  *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 353 (1958) ("the essence" of *Humphrey's* was to permit limited restrictions on the power to remove "members of a body" exercising judgment).  As a result, independent agencies headed by a single director are rare.  None wields the type of expansive authority vested in the CFPB, and the Government can point to no decision upholding a for-cause provision for a single agency head.[1]

---

[1]  In response to an order in *PHH Corp. v. Consumer Fin. Protection Bureau*, 839 F.3d 1 (D.C. Cir. 2016), the CFPB named only three other agencies headed by a single director:  the Social Security Administration, which "does not possess unilateral authority to bring law enforcement actions against private citizens," *id.* at 18-19; the Office of Special Counsel, which "has a narrow jurisdiction and mainly enforces certain personnel rules against government employers and employees," *id.* at 19; and the Federal Housing Finance Agency, a regulator for specified government-sponsored enterprises and federal mortgage lenders, *id.*; 12 U.S.C. § 4502(20).

The CFPB's structure matters because it impacts whether it will enforce the law consistently with the President's prerogatives. A multi-headed commission with staggered terms generally guarantees the President the opportunity to appoint members, and the bipartisan requirement common to commissions increases the likelihood that at least some members share the President's views. Multi-headed commissions also generally engage in deliberation and collaboration, which promote compromise and guard against extreme positions. *See* Paul R. Verkuil, *The Purposes and Limits of Independent Agencies*, 1988 Duke L.J. 257, 259-60 (1988).

Moreover, at the time of *Humphrey's*, the FTC was to be "nonpartisan . . . charged with the enforcement of *no policy* except the policy of the law." *Humphrey's*, 295 U.S. at 624. In contrast, Dodd-Frank permits a single Director to enforce and implement policies regarding numerous laws that profoundly impact the economy, yet restricts the President's "power [to] appoint[], oversee[], and control[] [the Director]. . . ." *Free Enter.*, 561 U.S. at 492.

Extending the *Humphrey's* exception to the CFPB would threaten to swallow the "general" rule against restraining the President's removal power. *Id*. at 513-14. Indeed, there would be no limiting principle restricting the executive authority Congress can vest in an agency's single director. The CFPB's structure thus "subverts the President's ability to ensure that the laws are faithfully executed" and violates the Constitution. *Id.* at 498.

### B.     The CFPB Is Impermissibly Shielded from Congressional Oversight

Additionally, by authorizing the Director to requisition and spend billions in public funds without congressional approval or review, 12 U.S.C. § 5497(a), Congress abdicated its duty to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990). The Government maintains that Congress "remains fully able to oversee the Bureau" (Opp. at 6), but gives no

indication how, without the power of the purse, Congress can do so.  *See United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974) (describing Congress' funding power as its "ultimate weapon of enforcement").  It is not enough that Congress may theoretically pass a *new* law returning to Congress its constitutional authority.  (Opp. at 6.)  "Congress cannot yield up its own powers."  *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring).

### C.      The Appropriate Remedy Is to Strike Down the CFPB as a Whole

Contrary to the Government's assertion (*see* Opp. at 8), Dodd-Frank's legislative history provides strong evidence that Congress intended to create a "completely independent" agency (*see* Mot. at 16), and that merely striking the CFPB's "for cause" termination provision—one of numerous features that shield the agency from oversight—will result in "legislation that Congress would not have enacted."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). While Congress may also have had the goal of creating a single agency responsible for enforcing consumer financial laws (Opp. at 8), insulation from oversight is an essential characteristic of the CFPB, and there is no indication Congress would have created such an agency without this attribute.  Determining how to recalibrate the CFPB's structure should be left to Congress.

## III.     THE COURT LACKS SUBJECT MATTER JURISDICTION

### A.      The RD Entities Are Not "Covered Persons" Subject to the CFPA

The Government fails to show that the RD Entities "extend credit" within the meaning of the CFPA—and are "covered person[s]"—and thus this Court lacks subject matter jurisdiction.

#### 1.      The Government Fails to Allege the RD Entities Extend "Credit"

Instead of explaining how the transactions at issue are extensions of "credit," the Government erroneously claims that the RD Entities' jurisdictional argument "rests on [their] incorrect assumption of valid assignments" and that the assignments here are invalid, which somehow converts the transactions "functionally" into extensions of credit.  (Opp. at 14-15.)

4

This argument fails.  The assignments are valid, but even if they were invalid, it would not convert the transactions into extensions of credit.

### (a)        The Proceeds From The Zadroga Fund Are Assignable

The Government claims that the Zadroga Fund assignments are invalid under the statute creating the Fund and the Fund's written policy.  (Opp. at 13-14.)  The Government is wrong. The Fund's enabling statute, 49 U.S.C. § 40101, directs the Fund's Special Master to "authorize payment to such claimant[s]" who satisfy certain criteria.  The RD Entities never claimed to be "eligible claimant[s]," (Opp. at 13); rather, they purchased proceeds from eligible claimants, which Section 40101 does not prohibit.  And the Fund's written policy—which states, "[f]ederal law prohibits the assignment of claims made against the United States unless done in compliance with Federal law.  31 U.S.C. 3727"[2]—does not invalidate the Zadroga assignments:

*First*, the statute applies only to "a claim *against* the United States Government," *id.* (emphasis added), and the Zadroga Fund was established to compensate claimants for potential claims against third-party obligors, 28 CFR §§ 104.61, 104.63, not the federal government. While the government administers the Fund, these are not claims *against* the United States, which would be barred by sovereign immunity.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

*Second*, § 3727 applies to the "assignment of the underlying substantive claim" against the United States, not "a private contractual right to proceeds of any recovery."  *First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 58 Fed. Cl. 139, 157-58 (2003); *accord Sabo v. United States*, 127 Fed. Cl. 606, 620 (2016).  The transactions at issue assign the claimants' right to proceeds (*see, e.g.*, Ex. A-1 at 1), not any underlying substantive claim.

*Third*, § 3727 permits assignments "after a claim is allowed," 31 U.S.C. § 3727(b), and

---

[2] VCF Policies and Procedures, § 3.9 (May 2017), *available at* https://tinyurl.com/yclv9pwt (last visited June 26, 2017).

each Zadroga transaction was entered only after the Special Master's determination of the amount due to the seller, *i.e.*, after the claim had been allowed.  (*See, e.g.,* Ex. A-1 at 1).

*Finally*, even if § 3727 applied, "the statute voids the assignment as against the United States. . . .  [T]he assignment remains enforceable as between the parties to the assignment." *Saint John Marine Co. v. United States*, 92 F.3d 39, 45 (2d Cir. 1996); *see also In re Ideal Mercantile Corp.*, 244 F.2d 828, 831 (2d Cir. 1957) (assignment remains valid between parties). "[T]he object of Congress in this legislation was to protect the government, not the claimant." *Houston v. Ormes*, 252 U.S. 469, 473-74 (1920).  The Zadroga Fund proceeds thus are assignable.

### (b)    Proceeds From The NFL Settlement Fund Are Assignable

The NFL Settlement Agreement prohibits only the assignment of "rights or claims relating to the *subject matter of the Class Action Complaint*."  (Ex. C at § 30.1 (emphasis added).)  The "subject matter" of the complaint must be read narrowly,[3] and is limited by the allegations of the complaint—*i.e.*, the players' personal injury claims—which necessarily do not include proceeds under a later settlement agreement.  The parties could have expressly prohibited the plaintiffs from assigning rights or claims relating to "the subject matter of the *Settlement Agreement*," but they did not.  Indeed, the parties expressly refer to "the subject matter of this Settlement Agreement" elsewhere in the agreement (Ex. C at §§ 25.5, 30.3), confirming that the parties *deliberately* chose to limit the anti-assignment clause to personal injury *claims*—not future settlement *proceeds*.  *Jarecki v. Shung Moo Louie*, 700 N.Y.S.2d 152, 153 (1st Dep't 1999), *rev'd on other grounds*, 722 N.Y.S.2d 784 (2001) ("the law favors the free assignability of

---

[3] "[A]nti-assignment provision[s]" must be construed "narrowly as dictated by New York law." *Au New Haven, LLC v. YKK Corp.*, 210 F. Supp. 3d 549, 556 (S.D.N.Y. 2016).  They should not, as the Government urges, be given "broad scope."  (Opp. at 11.)

contract rights, and the parties may 'limit the freedom of alienation of rights and prohibit the assignment' only by an express provision to the contrary").

The Government also cannot reconcile its reading with the Amended Final Order and Judgment that approved the Settlement Agreement, which is expressly binding on "the Parties [and] . . . their respective . . . assigns."  (Ex. D, ¶ 19.)  The Government's attempt to limit this term to the NFL (Opp. at 13) is unavailing, as the Order plainly refers to assigns of *all* "Parties" to the Settlement Agreement.  The assignability of the settlement proceeds is further confirmed by the agreement's lien provisions.  The Government notes the legal distinction between liens and assignments (Opp. at 12), but "Liens" is a defined term that refers more broadly to "any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever" (Ex. C at § 2.1(uu)), and confirms the settlement proceeds are fully alienable.  Were it otherwise, even the contingency fee agreements in the underlying action would be prohibited.

**(c)      Even if the Assignments Were Invalid, the Transactions Would Not Be Converted into "Extensions of Credit"**

In any event, the Government provides no legal basis for its novel theory that an invalid assignment is somehow transformed into an extension of credit under the CFPA.[4]  To the contrary, the legal effect of invalidating an assignment is to render the agreement null and void. *See, e.g.*, *Singer Asset Fin. Co. v. Bachus*, 741 N.Y.S.2d 618, 621 (2002) ("the prohibition against assignment in the structured settlement agreement is valid and effective to nullify" the transaction); *C.U. Annuity Serv. Corp. v. Young*, 722 N.Y.S.2d 236, 236-37 (N.Y. Sup. Ct. 2001)

---

[4] The Government argues without legal support that "under the contracts' own express terms, the transaction is to be treated as an extension of credit if the attempted assignment is invalid." (Opp. at 14.)  The referenced contract provision, however, actually provides that the RD Entities may, "at [their] option" file a financing statement under the Uniform Commercial Code, to protect themselves in the event the sale is characterized by a court as a loan.  The Government cannot point to a savings clause meant to protect the RD Entities in the event a court deems the transactions to be loans as evidence in support of a finding that the transactions are indeed loans.

(enforcement of non-assignment clause rendered purported assignment and sale void).

Thus, even if the Government were correct (which it is not) that the proceeds from either fund were not assignable, the effect would be to void the agreements and put the parties in their pre-agreement positions—*i.e.*, require consumers to return the money the RD Entities paid them. *See Singer*, 741 N.Y.S.2d at 621 (where assignment deemed invalid, buyer awarded return of the purchase price, plus interest, less payments received under the assignment).  The agreements, however, still would *not* be "extensions of credit" to confer jurisdiction under the CFPA.

### 2.    The Plain Language of the CFPA Requires the Government to Allege the RD Entities "Extend[] Credit and Servic[e] Loans"

Additionally, to be a "covered person" under 12 U.S.C. § 5481(6) subject to the CFPA, the RD Entities must engage in "extending credit *and* servicing loans," 12 U.S.C. § 5481(15)(A)(i) (emphasis added).  Notwithstanding Congress's use of the conjunctive, the Government urges the Court to read "and" to mean "or" in light of one sentence in the CFPA's legislative history.  (Opp. at 15-16.)  Courts, however, "turn to the legislative history only when the plain statutory language is ambiguous," *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012), and here the plain meaning of the statute is clear:  read in the context of "the statutory scheme as a whole," *id.*, "and" means that a person is required to both extend credit *and* service loans to fit the definition of a "covered person."  Indeed, § 5481(15)(A)(i) is the *only subsection* in § 5481(15)(A) in which the conduct is described with the conjunctive "and" as opposed to the disjunctive "or," which confirms that Congress clearly knew how to use "or" when it intended to signify that satisfaction of only one item in the list would be sufficient.  *See* 12 U.S.C. § 5481(15)(A)(i)-(xi).

Even if the Court were to consider the isolated excerpt from the legislative history referring to servicing mortgage loans, it does not support the Government's proffered reading.  (Opp. at 15.)  The CFPB *does* regulate stand-alone loan servicing activities, just not under

§ 5481(15)(A)(i).  The Senate Report, which is discussing a prior version of the statute, appears to acknowledge the CFPB's power to regulate servicing mortgage loans through the Real Estate Settlement Procedures Act, *see* 12 U.S.C. § 5481(12)(M), or debt collection services under § 5481(15)(A)(x), but expresses no views about whether § 5481(15)(A)(i)—which is just one of eleven subsections under the definition of "financial product or service"—should be read conjunctively.  The Government's selective citation from a legislative history that spans thousands of pages also ignores that an earlier version of the definition included a subsection encompassing "extensions of credit *or* servicing loans," H.R. 4173, 111th Cong., Title IV, § 4002(19)(A)(ii)(II) (1st Sess. 2009), which was omitted from the final version, and shows that Congress deliberately used the conjunctive.

### B.      The Court Should Decline to Exercise Supplemental Jurisdiction

The Court should follow "[t]he strong preference in this Circuit . . . to decline to exercise supplemental jurisdiction under § 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial."  *Forman v. City of N.Y.*, 2017 WL 1167334, at *7 (S.D.N.Y. Mar. 27, 2017) (citation omitted).[5]  As explained below, even if the Court were to exercise jurisdiction over this action, the Complaint still fails to state a claim.

## IV.      THE GOVERNMENT FAILS TO STATE A CLAIM FOR RELIEF

The Government does not dispute that its claims are premised on an alleged unified course of fraudulent conduct (Compl. at 9, 10, ¶ 38), and makes no attempt to differentiate their fraud allegations from any non-fraud claims.  (*See* Compl. ¶¶ 61, 70, 78, 85, 92, 99, 106, 111, 119, 123, 127.)  Thus, the Government's claims sound in fraud.  *See, e.g.*, *F.T.C. v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010) (applying Rule 9(b) to claim of deceptive conduct based on

---

[5]  In the lone case the Government cites, the court retained jurisdiction only to dismiss the state law claims with prejudice.  *Muhlrad v. Mitchell*, 1997 WL 182614, at *10 (S.D.N.Y. Apr. 14, 1997).

alleged "unified course of fraudulent conduct").  However, regardless of whether Rule 9(b) or Rule 8 applies, the Complaint fails to state a claim and should be dismissed.

**A.      Counts I, III-V, IX-XI:  The Government Fails to Allege Deceptive Conduct**

**Assignability of Fund Proceeds.**  For the reasons discussed in Section III.A.1.(a)-(b), *supra*, the proceeds from the Zadroga Fund and NFL Settlement Fund are assignable, and thus Defendants could not have deceived consumers by representing them as such.

**Expedited Payments.**  The RD Entities' alleged representations that they could expedite consumers' receipt of funds and "cut through red tape" (*see* Compl. ¶¶ 45, 78-84) are not misleading because they are true:  the RD Entities provided consumers with funding more quickly than they would have through the Zadroga Fund process.  To the extent the Government alleges that these statements are deceptive because they misrepresent *how*, or from what source, the funds are obtained (Opp. at 24), no reasonable consumer—based on his or her course of dealing with the RD Entities—would misunderstand that it was the RD Entities that would provide the funds.[6]  Moreover, the Government agrees it is not the source of payments or how the consumers are paid that is material; rather, consumers desired "to obtain" payments "sooner" and on an "expedited" schedule.  (Opp. at 26.)  That is what the RD Entities provided.

**Timeliness of Payments.**  A consumer fraud claim requires "unfair or deceptive conduct that is distinct from a simple breach of contract."  *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 913-14 (N.D. Ill. 2013).  Although the Government maintains that *Reid* "has no relevance here" because it does not involve a government plaintiff (Opp. at 27), it fails to explain why it should be entitled to a different legal standard than a private litigant.  In the lone case cited by

---

[6]  Contrary to the assertion in the Opposition (Opp. at 24-25), the CFPB's own policies state that representations should not be evaluated "in isolation, but rather in the context of the entire . . . course of dealing . . . ."  CFPB Supervision and Examination Manual, v.2, at UDAAP 5 (Oct. 2012).  *Available at* https://tinyurl.com/yacry69u (last visited June 26, 2017).

the Government, *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330 (N.Y. 1999), the court merely held that a contractual merger provision was not a defense to a consumer fraud claim. *Id.* at 344-45. In contrast, the RD Entities' alleged failure to make timely payments is a textbook claim for breach of contract and does not provide a basis for a consumer fraud claim.

### B.     Count II:  The Government Fails to Allege that Defendants Interfered with Consumers' Ability to Understand if the Funds Were Assignable

The claim for abusive conduct should be dismissed because the anti-assignment provisions on which the Government relies do not invalidate the transactions. *See* Section III.A.1.(a)-(b), *supra*. Moreover, the Complaint does not allege how failing to disclose the provisions the Government claims invalidate the assignments was "abusive" within the meaning of 12 U.S.C. § 5531. The RD Entities could not have been aware of the Government's novel, incorrect theory at the time the contracts were entered—the Zadroga Fund's anti-assignment policy did not even exist at the time—and their failure to predict and disclose it was not abusive.

### C.     Counts VI and VII:  State Usury Laws Do Not Apply Because the Transactions Are True Sales, Not Loans

Facing a clear no-recourse provision in the agreements (Ex. A-1, ¶ 6(h)), which "[c]ourts have held [is] the most important single factor when determining whether a transaction is a true sale" or a loan, *In re Dryden Advisory Grp., LLC*, 534 B.R. 612, 620-23 (Bankr. M.D. Pa. 2015), the NYAG seeks to reframe this factor, asserting that instead "[t]he critical factor . . . is the degree of risk." (Opp. at 29.) But courts that articulate the non-recourse factor in terms of "risk" focus on "*allocation* of risk" between parties to the transaction, *In re Dryden*, 534 B.R. at 620 (emphasis added)), not on the *degree* of risk. *Dryden* itself makes this distinction clear:

> An agreement "without recourse" means that the purchaser/factor agreed to assume the full risk of collecting the money owed to the seller, whereas an agreement "with recourse" means that the seller retains the risk of collection. . . .  Generally, if there is a full right

11

> of recourse against the seller, this weighs in favor of the existence
> of a loan because there is no transfer of risk.

*Id.*, 534 B.R. at 623 (internal citations omitted).

By looking to the allocation of risk rather than the degree of risk (especially where, as here, the risk relates to collection *and* timing), courts avoid subjective line-drawing—*i.e.*, when repayment is sufficiently "certain" to make a transaction a loan.  The critical inquiry is not the creditworthiness of the obligor but whether the buyer has a right of recourse against the seller.  If not, the buyer holds the risk of delay and non-payment.  Two cases involving "advanced meal sales" agreements—the advancement of funds to restaurants in exchange for a balance against which diners redeem credits—illustrate this distinction.  *Transmedia Rest. Co., Inc. v. 33 E. 61st St. Rest. Corp.*, held that the agreement between the funder and the restaurant was a true sale because the funder "bears the risk of not being repaid the advanced funds."  710 N.Y.S.2d 756, 760 (N.Y. Sup. Ct. 2000).  *Clever Ideas v. 999 Rest. Corp.*, 2007 WL 3234747 (N.Y. Sup. Ct. Oct. 12, 2007), distinguished *Transmedia* and held that a similar transaction was a loan because the funder had recourse against the restaurant.

The only case in the Opposition that arguably frames the risk as one of *degree* merely stated in dicta that a litigation funding agreement was a loan because the strict liability claim at issue was a "sure thing."[7]  *Echeverria v. Estate of Lindner*, 801 N.Y.S.2d 233, at *8 (N.Y. Sup. Ct. 2005).  Other courts, however, have questioned *Echeverria*.  *See Obermayer Rebmann Maxwell & Hippel LLP v. West*, 2015 WL 9489791, at *4 (W.D. Pa. Dec. 30, 2015) ("[T]he court's speculation as to whether the transactions were usurious clearly was dicta.").

---

[7] The Opposition's other cases confirm that the factor looks to *allocation* of risk.  *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 540 (3d Cir. 1979) (sale of accounts receivable deemed a loan because the accounts were sold "with full recourse against [the seller]" and the seller retained the risk); *Rubenstein v. Small*, 273 A.D. 102, 104 (N.Y. App. 1947) (production funding *not* a loan where lack of recourse meant the *buyer* "r[an]the risk of losing all that he ha[d] advanced").

The NYAG also ignores other factors that support a finding that the transactions are true sales, including the buyer's right to demand direct payment from the holder of the funds (Ex. A-1 ¶ 5(d)), and the absence of the seller's right to repurchase (Ex. A-1 ¶ 5(e)).  (*See* Mot. at 29-30.) Instead, the NYAG focuses only on the final factor relating to the plain language of the contracts, arguing simply that "calling an agreement an 'assignment and sale' is not dispositive."[8]  (Opp. at 29.)  Defendants, however, have demonstrated that the plain language of the contracts is consistent with the non-recourse nature of the transactions (*see* Ex. A-1 at 1-2, 4-6), and thus manifests the parties' intent to enter into a true sale contract.  *See In re Lemons & Assocs., Inc.*, 67 B.R. 198, 210 (Bankr. D. Nev. 1986); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998).  The Court should respect the parties' stated intention to enter into true sale contracts that cannot be usurious.  *See Platinum Rapid Funding Group Ltd. v. VIP Limousine Servs., Inc.*, 2016 WL 4478807, at *3 (N.Y. Sup. Ct. Jun. 8, 2016)  (rejecting "request for the Court to convert the Agreement to a loan" where it "would contradict the explicit terms of the sale of future receivables in accordance with the [] Agreement").

### D.     Count VIII:  N.Y. General Obligations Law § 13-101 Does Not Prohibit the Assignment of Proceeds from a Personal Injury Claim

The plain language of Section 13-101(1) prohibits only the transfer of a "*claim or demand . . . to recover damages for a personal injury,*" N.Y. Gen. Oblig. Law § 13-101(1) (emphasis added), not the transfer of *proceeds* from the claim.  (*See* Mot. at 32.)  Without any legal basis, the NYAG claims that because the transactions at issue are non-recourse, they somehow give

---

[8] The NYAG cites a number of cases in which the parties agreed that a transaction was a loan, but disputed whether certain payments should be considered interest for purposes of the usury statutes.  (Opp. at 32 (citing cases)).  Only one of these cases questioned whether the transaction was a loan or a sale, and the court held it was not a sale because the contract lacked consideration.  *Tuition Plan, Inc. v. Zicari*, 70 Misc. 2d 918, 919-21 (N.Y. Civ. Ct. 1972).

Defendants "legal title to a portion of the consumers' claims," not their proceeds.[9]  (Opp. at 33.) The face of the contracts, however, shows that the RD Entities acquired an interest in the customers' fund proceeds, not any personal injury claims.  (Ex. A-1 at 1; Ex. B-1 at1.)

The NYAG also fails to show the assignments violate public policy and instead relies on two cases from the 1800s that held the assignment of a public official's salary is void because it removes the official's incentive to competently perform his duties and subjects him to influence. *See Bowery Nat'l Bank v. Wilson*, 122 N.Y. 478, 483 (1890) (assignment of compensation gives official "less interest in the punctual and efficient performance of his duties"); *Billings v. O'Brien*, 4 Daly 556 (1873) (assignment gives "purchaser of public pay an influence" over official).  But New York's interest in ensuring the competence and independence of its officials is not implicated here, nor is any other public policy,[10] and the NYAG's claim should be dismissed.

## E.     The Complaint Suffers from Other Pleading Deficiencies

***The Government Must Give Each Defendant the Basis for Its Claims.***  Rule 8 requires that a complaint must provide a plausible factual basis to distinguish between multiple defendants.  *Medina v. Bauer*, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004).  The Government claims its failure to follow this rule is justified (Opp. at 35), but cites only to cases where plaintiffs "explicitly tied" each defendant to the allegations, *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004), and "specifically allege[d] the role each" defendant played in the alleged scheme, *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 143-44 (S.D.N.Y. 2014).  The

---

[9] *In re Minor*, 482 B.R. 80, 84 (2012), and *In re Minor*, 443 B.R. 282, 288 (2011), recognized that assignments of proceeds are valid and merely addressed the legal effect of such assignments.

[10] The transactions also do not implicate the public policies at issue in the other cases cited in the Opposition.  *McCormack v. Bloomfield*, 399 F. Supp. 488, 491 (S.D.N.Y. 1974) (policy against assignment that allows party to "unilaterally nullify an agreement to arbitrate"); *Dana v. Dana*, 48 Misc. 2d 717 (1965) (assignment of personal injury claim for medical care provided at public hospital); *Higgins v. Higgins*, 119 N.Y.S.2d 103, 107 (1952) (assignment of future alimony).

Complaint does not allege facts distinguishing among Defendants, and thus is deficient.[11]

**_Claims Regarding "Other" Transactions Must Be Dismissed._**  Remarkably, the Government does not dispute that its stray reference to the purchase of award proceeds from "other sources" was an attempt to include claims involving transactions _other_ than the Zadroga and NFL Settlement contracts.  Instead, it claims the standards of Rules 8 and 9 do not apply to a "government enforcement action."  (Opp. at 38.)  But the cases on which the Government relies in no way excuse it from complying with fundamental pleading requirements.  _See, e.g._, _People v. Mid Hudson Med. Grp., P.C._, 877 F. Supp. 143, 147 (S.D.N.Y. 1995) (affirming NYAG's standing to sue in _parens patriae_ capacity to protect interests of citizens).  The Government's failure is not a mere technical deficiency.  The Complaint does not allege, for example, any basis for concluding these "other" assignments are invalid and thus—under the Government's theory—extensions of credit subject to the CFPA.  The Complaint fails to meet basic pleading standards, and any claim predicated on "other" transactions (including any relating to _Peterson v. The Islamic Republic of Iran_) must be dismissed.

## V.   CONCLUSION

For these reasons, the Court should dismiss the Complaint without leave to amend.

Dated this 26th day of June, 2017.                    Respectfully submitted,

/s/ Michael D. Roth
BOIES SCHILLER FLEXNER LLP

---

[11]  Similarly, the NYAG's statement that it has jurisdiction because the transactions occurred "in New York," (Compl. ¶¶ 57, 104, 109) is deficient.  None of the NFL contracts have any connection at all to New York:  they involve non-New York residents; include non-New York choice of law provisions; were signed outside of New York; and RD Legal Finance, LLC—a New Jersey company with its place of business in New Jersey (Compl. ¶ 16)—is the purchaser in each contract.  (Exs. B-1 to -7.)  Similarly, 6 of the Zadroga agreements involve non-New York parties, non-New York choice of law provisions, and were signed outside of New York.  (Exs. A-12 to -15, A-17 to -18.)