**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and THE PEOPLE OF THE STATE OF NEW YORK, BY ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL FOR THE STATE OF NEW YORK,<br><br>        Plaintiffs,<br><br>        v.<br><br>RD LEGAL FUNDING, LLC; RD LEGAL FINANCE, LLC; RD LEGAL FUNDING PARTNERS, LP; and RONI DERSOVITZ,<br><br>        Defendants. | CASE NO. 1:17-cv-00890 (LAP)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

CALCAGNI & KANEFSKY LLP
ERIC KANEFSKY
  *Eric@ck-litigation.com*
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, NJ 07102

BOIES SCHILLER FLEXNER LLP
DAVID K. WILLINGHAM (*pro hac vice*)
  *dwillingham@bsfllp.com*
MICHAEL D. ROTH (*pro hac vice*)
  *mroth@bsfllp.com*
JEFFREY M. HAMMER (*pro hac vice*)
  *jhammer@bsfllp.com*
725 South Figueroa Street, 31st Floor
Los Angeles, California 90017-5524
Phone: (213) 629-9040 / Fax: (213) 629-9022

Attorneys for Defendants RD LEGAL
FUNDING, LLC; RD LEGAL FINANCE, LLC;
RD LEGAL FUNDING PARTNERS, LP; and
RONI DERSOVITZ

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

    A.    The Consumer Financial Protection Bureau ...........................................3

    B.    The RD Entities and the Transactions at Issue .......................................4

    C.    Procedural History ..................................................................................6

        1.    The CFPB Refuses to Adjudicate the RD Entities' Jurisdictional Challenge ....................................................................6

        2.    The RD Entities' File Related Declaratory Relief Actions.........................7

        3.    The Government Files this Enforcement Action ..........................7

I.    THE CFPB'S STRUCTURE IS UNCONSTITUTIONAL .................................9

    A.    The CFPB's Director Has Broad Executive Authority That Is Unchecked By the President .................................................................9

        1.    Dodd-Frank Impermissibly Shields the CFPB's Director from Presidential Oversight and Democratic Accountability............................9

        2.    The CFPB Is Unlike Other Independent Agencies Approved by the Courts.....................................................................................11

    B.    The CFPB's Director Is Not Accountable to Congress Through Appropriations .....................................................................................13

    C.    The Court Should Find the CFPB's Structure Unconstitutional and Strike Down the CFPB as a Whole .............................................................14

II.    THE COURT LACKS FEDERAL JURISDICTION UNDER THE CFPA AND THE COURT SHOULD NOT EXERCISE SUPPLEMENTAL JURISDICTION OVER THE RESIDUAL STATE LAW CLAIMS ..........................................16

    A.    Counts I-V:  The CFPA Claims Fail Because the RD Entities Are Not "Covered Persons" Under the Statute .................................................17

        1.    Contracts for the Purchase of Settlement Proceeds Do Not Qualify as Extensions of "Credit" As Defined in the CFPA ...........................18

        2.    The Government Fails to Allege that the RD Entities "Extend[] Credit and Servic[e] Loans" as Required to Qualify as "Covered Persons" ...........................................................................................21

    B.    The Court Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims .....................................................................................23

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF ................................23

i

A.    Counts I, III-V, IX-XI:  The Complaint Does Not Allege Deceptive Conduct .................................................................................................25

    1.    The Government Cannot Recharacterize the Purchase of Legal Receivables as a Loan Rather than a True Sale .................................26

        (a)    The Assignments Are Non-Recourse ...............................................27

        (b)    The Assignments Give the RD Entities the Right to Demand Direct Payment from the Holder of the Funds ...............29

        (c)    The Seller Has No Right of Repurchase .........................................30

        (d)    The Plain Language of the Contracts Demonstrates the Parties' Intent to Enter into True Sales .................................30

    2.    The Fund Proceeds Are Assignable .......................................................32

    3.    "Cut Through the Red Tape" Is Neither Misleading nor Material ...........34

    4.    The RD Entities' Alleged Failure to Make Timely Payments Merely Gives Rise to a Breach of Contract Claim ..................................35

B.    Count II:  Plaintiffs Fail to Allege "Abusive" Conduct ................................36

C.    Counts VI and VII:  State Usury Laws Do Not Apply ..................................37

D.    Count VIII:  N.Y. General Obligations Law § 13-101 Does Not Prohibit the Sales at Issue .................................................................................37

E.    The Government Fails to Differentiate Between the Three "RD" Defendants .................................................................................................38

F.    The Complaint Does Not Allege Facts Sufficient to State a Claim Regarding "Other" Transactions .................................................................39

CONCLUSION .............................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. Brock*,
    480 U.S. 678 (1987) ....................................................................................................15

*Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*,
    752 N.Y.S.2d 400 (N.Y. App. Div. 2002) ...................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................17, 38

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
    721 F.3d 666 (D.C. Cir. 2013) .....................................................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................................17, 39

*In re Bristol-Myers Squibb Securities Litigation*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ..........................................................................17

*Bruesewitz v. Wyeth LLC*,
    562 U.S. 223 (2011) ......................................................................................................22

*Capela v. J.G. Wentworth, LLC*,
    No. CV09-882, 2009 WL 3128003 (E.D.N.Y. Sept. 24, 2009)...........................4, 18, 20, 27

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)....................................................................................4, 33

*Clinton v. Jones*,
    520 U.S. 681 (1997)........................................................................................................9

*Consumer Fin. Prot. Bureau v. IrvineWebWorks, Inc.*,
    No. SACV 14-1967, 2016 WL 1056662 (C.D. Cal. Feb. 5, 2016).........................25

*In re Currie*,
    57 B.R. 224 (Bankr. M.D. La. 1986) ...........................................................................30

*Dean v. United States*,
    556 U.S. 568 (2009)......................................................................................................23

*Delgado v. Ocwen Loan Servicing, LLC*,
    No. 13–CV–4427, 2014 WL 4773991 (E.D.N.Y. Sept. 24, 2014) ..........................24

*Dollar Phone Corp. v. Dun & Bradstreet Corp.*,
   936 F. Supp. 2d 209 (E.D.N.Y. 2013) ................................................................37

*In re Dryden Advisory Grp., LLC*,
   534 B.R. 612 (Bankr. M.D. Pa. 2015) ................................................26, 27, 29, 30

*Eubanks v. Wilkinson*,
   937 F.2d 1118 (6th Cir. 1991) ..........................................................................16

*In re Evergreen Valley Resort, Inc.*,
   23 B.R. 659 (Bankr. D. Me. 1982)......................................................................30

*F.T.C. v. BlueHippo Funding, LLC*,
   No. 08 Civ. 1819, 2015 WL 6830161 (S.D.N.Y. Nov. 6, 2015) ............................35

*F.T.C. v. E.M.A. Nationwide, Inc.*,
   767 F.3d 611 (6th Cir. 2014) ............................................................................34

*Fed. Election Comm'n v. NRA Political Victory Fund*,
   6 F.3d 821 (D.C. Cir. 1993) ..............................................................................16

*Fero v. Excellus Health Plain, Inc.*,
   No. 6:15-CV-06569, 2017 WL 713660 (W.D.N.Y. Feb. 22, 2017) .......................39

*Forman v. City of N.Y.*,
   No. 14-CV-6282, 2017 WL 1167334 (S.D.N.Y. Mar. 27, 2017).........................23

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010).................................................................................. *passim*

*Freytag v. Comm'r of Internal Revenue*,
   501 U.S. 868 (1991)........................................................................................15

*Goshen v. Mut. Life Ins. Co.*,
   98 N.Y.2d 314 (2002) ......................................................................................38

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)..................................................................30

*Grossman v. Schlosser*,
   244 N.Y.S.2d 749 (N.Y. App. Div. 1963) ...........................................................32

*Humphrey's Ex'r*,
   295 U.S. 602 (1935)....................................................................................11, 12

*Ideas v. 999 Restaurant Corp.*,
   No. 0602302/2006, 2007 WL 3234747 (N.Y. Sup. Ct. 2007)..............................27

*India.Com, Inc. v. Dalal,*
    412 F.3d 315 (2d Cir. 2005)................................................................33

*JA Apparel Corp. v. Abboud,*
    568 F.3d 390 (2d Cir. 2009)................................................................33

*In re Joseph Kanner Hat Co., Inc.,*
    482 F.2d 937 (2d Cir. 1973)................................................................30

*Kurtz v. Kimberly-Clark Corp.,*
    No. 14-CV-1142, 2017 WL 1155398 (E.D.N.Y. Mar. 27, 2017)................25

*In re Lemons & Assocs., Inc.,*
    67 B.R. 198 (Bankr. D. Nev. 1986) ......................................................30

*Lobatto v. Berney,*
    No. 98 CIV. 1984, 1999 WL 672994 (S.D.N.Y. Aug. 26, 1999) ..............24

*Lynx Strategies, LLC v. Ferreira,*
    957 N.Y.S.2d 636 (N.Y. Sup. Ct. 2010) ................................................27

*Matsumura v. Benihana Nat'l Corp.,*
    542 F. Supp. 2d 245 (S.D.N.Y. 2008)....................................................24

*Medina v. Bauer,*
    No. 02 Civ. 8837, 2004 WL 136636 (S.D.N.Y. Jan. 27, 2004)................39

*In re Minor,*
    482 B.R. 80 (Bankr. W.D.N.Y. 2012) ...................................................32

*Morrison v. Olson,*
    487 U.S. 654 (1988)................................................................11, 12, 15

*In re Mucelli,*
    21 B.R. 601 (Bankr. S.D.N.Y. 1982) ....................................................32

*New York v. Feldman,*
    210 F. Supp. 2d 294 (S.D.N.Y. 2002)...................................................38

*New York v. United States,*
    505 U.S. 144 (1992)...........................................................................14

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.,*
    No. 12 Civ. 2837, 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012).............38

*Office of Personnel Mgmt. v. Richmond,*
    496 U.S. 414 (1990)...........................................................................14

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
  839 F.3d 1 (D.C. Cir. 2016) .................................................................. 1, 9

*Platinum Rapid Funding Grp. Ltd. v. VIP Limousine Servs., Inc.*,
  No. 604163-15, 2016 WL 4478807 (N.Y. Sup. Ct. June 8, 2016) ............. 26, 28, 31

*Reed v. Val-Chris Investments, Inc.*,
  No. 11cv371, 2011 WL 6028001 (S.D. Cal. Dec. 5, 2011) ..................... 20

*Reese Bros., Inc. v. United States*,
  447 F.3d 229 (3d Cir. 2006) ................................................................. 22

*Reid v. Unilever U.S., Inc.*,
  964 F. Supp. 2d 893 (N.D. Ill. 2013) .................................................... 36

*Reithman v. Berry*,
  287 F.3d 274 (3d Cir. 2002) .............................................................. 19, 20

*Robbins v. Oklahoma*,
  519 F.3d 1242 (10th Cir. 2008) ........................................................... 38

*Saca v. Canas*,
  903 N.Y.S.2d 861 (N.Y. Sup. Ct. 2010) ............................................... 38

*Shaumyan v. Sidetex Co., Inc.*,
  900 F.2d 16 (2d Cir. 1990) ................................................................. 20

*Singer Asset Fin. Co., L.L.C. v. Bachus*,
  741 N.Y.S.2d 618 (N.Y. App. Div. 2002) ............................................. 27

*Southerland v. N.Y.C. Housing Auth.*,
  No. 10–CV–5243, 2010 WL 4916935 (E.D.N.Y. Nov. 23, 2010) ............. 39

*Stutman v. Chem. Bank*,
  95 N.Y.2d 24 (2000) ......................................................................... 25

*Sun Forest Corp. v. Shvili*,
  152 F. Supp. 2d 367 (S.D.N.Y. 2001) .................................................. 35

*Transmedia Rest. Co., Inc. v. 33 E. 61st St. Rest. Corp.*,
  710 N.Y.S.2d 756 (N.Y. Sup. Ct. 2000) ............................................... 28

*United States Dep't of Navy v. Fed. Labor Relations Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ........................................................... 14

*United States v. Ganadonegro*,
  854 F. Supp. 2d 1068 (D. N.M. 2012) .................................................. 22

*United States v. Richardson,*
 418 U.S. 166 (1974)..................................................................................13

*Whitman v. Am. Trucking Ass'ns,*
 531 U.S. 457 (2001)..................................................................................15

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC,*
 474 F. Supp. 2d 505 (S.D.N.Y. 2007)........................................................25

**Statutes**

12 U.S.C. § 5302................................................................................................15

12 U.S.C. § 5481(6)(A).........................................................................17, 21, 22

12 U.S.C. § 5481(7)...........................................................................................18

12 U.S.C. § 5481(12)......................................................................................3, 13

12 U.S.C. § 5481(14)..........................................................................................10

12 U.S.C. § 5481(15)(A)...............................................................................21, 22

12 U.S.C. § 5481(15)(A)(i).....................................................................17, 21, 22

12 U.S.C. § 5481(15)(A)(ii)-(ix).........................................................................22

12 U.S.C. § 5491(a).................................................................................4, 9, 16

12 U.S.C. § 5491(c)(1)..................................................................................10, 13

12 U.S.C. § 5491(c)(2)....................................................................................4, 10

12 U.S.C. § 5491(c)(3)....................................................................................4, 10

12 U.S.C. § 5492(b)............................................................................................10

12 U.S.C. § 5492(c)(4)........................................................................................10

12 U.S.C. § 5493(a)(1)........................................................................................10

12 U.S.C. § 5493(a)(2)........................................................................................10

12 U.S.C. § 5497(a)............................................................................................13

12 U.S.C. § 5497(a)(2)(A)(iii)..............................................................................4

12 U.S.C. § 5497(a)(2)(C)...............................................................................4, 13

12 U.S.C. § 5497(a)(4)(E)..................................................................................10

12 U.S.C. § 5512(b)(4)........................................................................................10

12 U.S.C. § 5531(a)................................................................................3, 17, 18

12 U.S.C. § 5531(d)(1).............................................................................8, 36

12 U.S.C. § 5531(d)(2)(B).......................................................................8, 36

12 U.S.C. § 5536.................................................................................................25

12 U.S.C. § 5536(a)......................................................................................17, 18

12 U.S.C. § 5536(a)(1)(B)..................................................................................8

12 U.S.C. §§ 5562-5564..............................................................................10, 15

12  U.S.C. § 5565(a)(2)..................................................................................10, 15

12 U.S.C. §§ 5581(a)(1)(A)...............................................................................10

12 U.S.C. § 5581(b)..............................................................................3, 10, 15

15 U.S.C. § 1602(f)............................................................................................19

15 U.S.C. § 1691a(d).........................................................................................19

28 U.S.C. § 1367(c)(3)......................................................................................23

N.Y. Banking Law § 14-a...............................................................................37

N.Y. Gen. Bus. Law § 349...............................................................................25

N.Y. Gen. Bus. Law § 350...............................................................................25

N.Y. Gen. Oblig. Law § 13-101..................................................................32, 37

N.Y. Gen. Oblig. Law § 13-101(1)..................................................................32

N.Y. Gen. Oblig. Law § 5-501.........................................................................37

N.Y. Penal Law § 190.40..................................................................................37

N.Y. Penal Law § 190.42..................................................................................37

**Other Authorities**

12 C.F.R. § 1080.6(e)...........................................................................................6

12 C.F.R. § 1080.10 ...................................................................................................7

156 Cong. Rec. H5239 (2010) ...............................................................................16

156 Cong. Rec. S5871 (2010) ................................................................................16

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 41 (2010) ..............................................................12

*Brief for The United States as Amicus Curiae*, No. 15-1177, 2017 WL 1035617 (D.C. Cir. Mar. 17, 2017)..................................................................................1

Fed. R. Civ. Proc. 8..........................................................................18, 26, 39, 40

Fed. R. Civ. Proc. 9..............................................................................26, 39, 40

Fed. R. Civ. Proc. 9(b) ...............................................................................23-25

Fed. R. Civ. Proc. 12(b)(6) ...............................................................................16

Recent Legislation, *Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv. L. Rev. 2123 (2011) ...................................................12

S. Rep. No. 111-176 (2010) ..................................................................................16

U.S. Const. art. I, § 9............................................................................................13

U.S. Const. art. I, § 9, cl. 7...................................................................................13

U.S. Const. art. II, § 1, cl. 1 ..................................................................................9

U.S. Const. art. II, § 3 ...........................................................................................9

## INTRODUCTION

In finding the structure of the Consumer Financial Protection Bureau (the "CFPB")
unconstitutional, the Court of Appeals for the District of Columbia Circuit described the CFPB's
single Director, who can only be removed for cause, as "the single most powerful official in the
entire U.S. Government, other than the President," in terms of unilateral power.  *PHH Corp. v.
Consumer Fin. Prot. Bureau*, 839 F.3d 1, 17 (D.C. Cir. 2016) (rehearing *en banc* granted).  The
United States agrees that this structure is unconstitutional.  *See Brief for The United States as
Amicus Curiae*, No. 15-1177, 2017 WL 1035617 (D.C. Cir. Mar. 17, 2017).  And it should come
as no surprise that the enormous unchecked power granted to the CFPB is prone to abuse.  *See
PHH Corp.*, 839 F.3d at 8 ("The CFPB's concentration of enormous executive power in a single,
unaccountable, unchecked Director not only departs from settled historical practice, but also
poses a far greater risk of arbitrary decisionmaking and abuse of power.").

The Complaint in this action is a prime example of how the unchecked authority granted
to the CFPB leads to administrative overreach that has a profound effect on the businesses and
individuals the agency targets.  Defendants RD Legal Funding Partners, LP, RD Legal Finance,
LLC and RD Legal Funding, LLC (collectively, the "RD Entities") are affiliated finance
companies that provide a valuable and lawful service:  for customers who desire and are in need
of immediate liquidity, the RD Entities pay a lump sum payment to purchase the customer's
interest in future proceeds from a legal settlement or judgment.[1]  As is relevant here, these
transactions include the purchase of a portion of customers' proceeds from two settlement funds:
the September 11th Victim Compensation Fund (also known as the Zadroga Fund); and the fund

---

[1]  Defendant Roni Dersovitz is the principal of the RD Entities, or of their controlling
entities, and the allegations against him are entirely dependent on the allegations against the
entities.  (*See, e.g.*, Compl. ¶ 18.)

created in connection with the multi-district litigation entitled *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB, MDL-2323 (E.D. Pa.) (the "NFL Settlement Fund"). Far from engaging in the "deceptive and abusive" practices alleged in this lawsuit, the RD Entities provide customers the information necessary to make informed decisions about whether to sell their settlement proceeds. The RD Entities even encourage customers—in bold type in every contract, above the signature line—to consult with an attorney and other professionals who can assist in determining if the transaction fulfills the customers' financial needs.

This enforcement action by the CFPB and New York Attorney General ("NYAG") (collectively, the "Government") is based on the erroneous theory that—despite clear contractual terms and the weight of legal authority to the contrary—these transactions are not true sales, but instead are "extensions of credit" under the Consumer Financial Protection Act, and therefore the RD Entities deceived consumers by labeling the agreements as sales. The CFPB's overreaching attempt to regulate conduct beyond its statutory authority is a natural consequence of its unconstitutional structure and this action should be dismissed for three distinct reasons.

*First*, the CFPB's unprecedented structure violates fundamental constitutional principles of separation of powers, and the CFPB should be struck down as an unconstitutional administrative agency. *See* Section I, *infra*.

*Second*, as a matter of law, the RD Entities are not subject to the Consumer Financial Protection Act, and therefore the Complaint does not state any federal cause of action and the Court should decline to exercise supplemental jurisdiction over the NYAG's state law claims. *See* Section II, *infra*.

*Finally*, each cause of action in the Complaint individually fails to state a claim for relief, including because the Government is flat out wrong in its contention that the underlying settlement proceeds are not assignable.  *See* Section III, *infra*.

*     *     *

At bottom, the Government here seeks to regulate a company, and the legal finance industry as a whole, not based on the facts or the law but on its subjective disapproval of the transactions at issue.  The Government, however, is not entitled to unilaterally recharacterize those sales transactions as loans in an attempt to wrap them into its jurisdictional sphere and, in the case of the CFPB, to expand its already unconstitutional authority beyond the limits set by Congress.  Accordingly, as explained below, the Court should dismiss the Complaint without leave to amend.

<h2 style="text-align:center">BACKGROUND</h2>

**A.     The Consumer Financial Protection Bureau**

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank").  Title X, known as the "Consumer Financial Protection Act" (the "CFPA") created the CFPB.  Congress transferred to the CFPB the authority to enforce eighteen preexisting consumer-protection laws previously administered by seven different agencies.[2]  12 U.S.C. § 5481(12).  Dodd-Frank also empowered the CFPB to regulate and prosecute acts by certain "covered persons" it considers "unfair, deceptive, or abusive."  *Id.* § 5531(a).

---

[2] Specifically, the Board of Governors of the Federal Reserve, the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and select functions of the Department of Housing and Urban Development and the Federal Trade Commission.  12 U.S.C. § 5581(b).

The CFPB is "considered an Executive agency," 12 U.S.C. § 5491(a), and is headed by a single Director who serves a five-year term that may extend indefinitely "until a successor has been appointed and qualified."  *Id.* § 5491(c)(2).  Under the CFPA, the president may remove the Director only "for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 5491(c)(3).

In addition, the Director of the CFPB controls the agency's funding outside the congressional appropriations process.  The Director can unilaterally claim up to 12% of the Federal Reserve System's funds, 12 U.S.C. § 5497(a)(2)(A)(iii), and Congress is prohibited from reviewing the Director's funding of the agency he controls.  *Id.* § 5497(a)(2)(C).

### B.       The RD Entities and the Transactions at Issue

The RD Entities are legal finance companies whose business includes the purchase of portions of plaintiffs' proceeds from legal settlements or judgments.  Those transactions include the following that are at issue in this case:  (a) twenty agreements (with twelve customers) for the purchase and sale of proceeds from the Zadroga Fund; and (b) seven agreements for the purchase and sale of proceeds from the NFL Settlement Fund.[3]  (Compl. ¶¶ 2-3.)

While there are minor variations among the contracts for these transactions, they all are entitled an "Assignment and Sale Agreement," describe the deal in plain language, and reflect the sale of a portion of a settlement award in exchange for an immediate lump sum cash payment:

> [Y]ou [the seller] wish to receive an immediate lump sum cash
> payment in return for selling and assigning a portion of the Award
> to RD. . . .  You hereby sell and assign to RD your interest in [a

---

[3] The Court may consider the Zadroga Fund agreements (attached as Exhibits A-1 – A-20 to the Affidavit of Roni Dersovitz (the "Dersovitz Aff.")) and the NFL Settlement Fund agreements (attached as Exhibit B-1 – B-7 to the Dersovitz Aff.) because the Complaint refers to them extensively and "relies heavily upon [their] terms and effect, which renders the document[s] 'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citation and some internal quotation marks omitted); *accord Capela v. J.G. Wentworth, LLC*, No. CV09-882, 2009 WL 3128003, at *1 n.2 (E.D.N.Y. Sept. 24, 2009).

> portion] . . . of the Award. . . .  In return for the Property, RD will
> pay to you [a lump sum payment].

(*See, e.g.*, Ex. A-1 at 1.)  Importantly, because the RD Entities do not loan any money or extend

credit to these sellers, the agreements make clear that the RD Entities have no recourse against

the customer:

> No Recourse.  RD is purchasing all of your interest in the Property
> without recourse against you (other than for Breach).  This means
> that, in the event RD for any reason (other than your Breach of this
> Agreement) does not receive all of the Property Amount, you will
> have no obligation to pay RD any portion of the Purchase Price
> that RD paid to you.

(*See, e.g.*, Ex. A-1 ¶ 6(h).)  The contracts give the RD Entities the right to demand payment

directly from the fund administrators, and require the seller to turn over the award to the RD

Entities in the event the award is distributed to the seller.  (*See, e.g.*, *id.* ¶ 5(c), (d).)  For each

transaction, the seller's lawyer acknowledged receipt of a Notice of Assignment of the award,

and agreed to hold in escrow for disbursement to the relevant RD Entity any funds that are

subject to the agreement.  (*See, e.g.*, *id.* at 19-20.)

Each agreement also notifies the seller, in bold print above the signature line, that "**This is**

**a complex transaction**," and encourages the seller to consult with an attorney and other advisors:

> **By signing this Agreement, you are assigning your rights to a**
> **portion of the Award that you may receive in regard to the Case.**
> **In return for your assignment, you will receive an immediate cash**
> **payment that is significantly less than the portion of the Award**
> **that you are assigning.  You are strongly encouraged before**
> **signing this Agreement to consult with an attorney and/or trusted**
> **financial advisor of your choice, who can assist you in determining**
> **whether this transaction will best fulfill your financial needs and**
> **objectives and protect your interests in the event you choose to**
> **proceed with this transaction.**

(*See, e.g.*, Ex. A-1 at 11.)  Every seller was then provided with rescission rights during the five-

day period following receipt of the payment from the RD Entities.  (*See id.* at 9.)

C.      **Procedural History**

1.      **The CFPB Refuses to Adjudicate the RD Entities' Jurisdictional Challenge**

On August 26, 2016, RD Legal Funding, LLC ("RDLF") responded to a civil investigative demand ("CID")[4] from the CFPB by producing 218 contracts to the agency, including the contracts at issue in this case.  As described above, the terms of the agreements unambiguously confirm that the transactions they memorialize involve the sale of a legal receivable by the customer—transactions not encompassed by the CFPA that defines and limits the CFPB's jurisdiction.

On October 27, 2016, the CFPB issued another CID to RDLF, which sought to depose a representative of RDLF in connection with its investigation of the company.  In response, RDLF followed the agency's enabling regulations and submitted a petition to set aside the CID, in part, on the grounds the company does not engage in conduct that subjects it to the CFPB's statutory jurisdiction.  *See* 12 C.F.R. § 1080.6(e).

Although the issuance of the CID was predicated on the CFPB's claimed need to conduct an investigation to determine whether it had jurisdiction in the first place, the CFPB made no pretenses about following its own procedures and ruling on RDLF's petition:  The day after RDLF submitted its petition, CFPB staff notified RDLF that it would immediately take steps towards an enforcement action against RDLF, apparently having found, despite its statements justifying the issuance of the CID, that it did in fact have jurisdiction over RDLF's business.  In essence, the CFPB *deliberately avoided* the agency's own regulations, which would have

---

[4] A CID is the equivalent of an administrative investigative subpoena.

required the agency to go to federal court to enforce the CID and, in the case of RDLF, would have necessarily induced a ruling on the CFPB's jurisdictional limits.  *See* 12 C.F.R. § 1080.10.

### 2.    The RD Entities' File Related Declaratory Relief Actions

On January 3, 2017, in order to obtain a jurisdictional ruling, RDLF filed a complaint against the CFPB in this Court seeking, among other relief, a declaration that the purchase of legal receivables from customers are true sales under the terms of the parties' contracts and therefore that RDLF's business is not subject to the CFPB's authority.  *RD Legal Funding, LLC v. Consumer Fin. Prot. Bureau*, No. 1:17-cv-00010-LAP (S.D.N.Y.) (ECF No. 1).  RDLF and RD Legal Funding Partners, LP filed a similar lawsuit against the NYAG in New York state court on January 5, 2017, seeking, among other relief, a declaration that the Zadroga Fund agreements are true sales.  The NYAG removed that case to this Court.  *RD Legal Funding, LLC, et al. v. Schneiderman, et al.*, No. 1:17-cv-00681-LAP (S.D.N.Y.) (ECF No. 1).

### 3.    The Government Files this Enforcement Action

Instead of litigating the threshold jurisdictional issue, on February 7, 2017, more than one month after the RD Entities filed the declaratory relief actions, the CFPB and NYAG filed this enforcement action.[5]  The Government's claims are predicated primarily on a single, flawed theory:  that the contracts for the purchase of awards from (1) the Zadroga Fund and (2) NFL Settlement Fund should be recharacterized as "extensions of credit" under the CFPA, and that the RD Entities misled customers by representing that they were sale agreements.  (Compl. ¶¶ 2-8.)

---

[5]  Soon after this lawsuit was filed, the Court held a status conference after which the RD Entities dismissed their declaratory relief action against the CFPB without prejudice and stayed their action against the New York Attorney General, while preserving the right to raise in this action all claims or arguments that could have been raised in the related lawsuits.

Specifically, the Government alleges that the RD Entities "enter[] into agreements with consumers to pay them a lump sum representing a fraction of the consumers' awards . . . .  In exchange, the consumers agree to repay a far larger amount than the amount advanced."  (Compl. ¶ 24.)  This allegation, however, is directly contradicted by the terms of the contracts, which the Government did not attach and which do not create a repayment obligation on the part of the consumer.  In fact, the customer *sells and assigns* a portion of their interest in the award, which when distributed by the settlement fund is immediately due to the RD Entity.  (*See, e.g.*, Ex. A-1 ¶ 5(c), (d).)  The agreements expressly provide that the consumer "will have no obligation to pay RD any portion of the Purchase Price that RD paid" in the event the funds are not distributed.  (*Id.* ¶ 6(h).)

Based on these and other allegations, the CFPB and NYAG bring four counts for deception under the CFPA, 12 U.S.C. § 5536(a)(1)(B) (Counts I, III-V), and one count for abusive conduct under the CFPA, 12 U.S.C. § 5531(d)(1), 2(B); 12 U.S.C. § 5536(a)(1)(B) (Count II).  In addition, the NYAG brings six state law claims based on the same alleged conduct (Counts VI-XI).  As explained below, the Complaint fails to state a claim for relief and should be dismissed.

## ARGUMENT

This action should be dismissed in its entirety because the CFPB's structure lacks the democratic accountability and checks and balances required by the Constitution, and thus the CFPB lacks authority to bring this enforcement action.  The Complaint should also be dismissed because the RD Entities do not "extend[] credit and servic[e] loans"—a threshold requirement to be subject to the CFPA—and the Complaint otherwise fails to state a claim for relief.

## I.     THE CFPB'S STRUCTURE IS UNCONSTITUTIONAL

Title X of Dodd-Frank, which established the CFPB as an "independent bureau" within the Federal Reserve System, 12 U.S.C. § 5491(a), insulates the CFPB from appropriate checks by the Executive and Legislative branches, and cannot be reconciled with the Constitution's separation of powers principles.  Therefore, the Court should strike down the agency and dismiss each claim brought by the CFPB.[6]

### A.     The CFPB's Director Has Broad Executive Authority That Is Unchecked By the President

#### 1.     Dodd-Frank Impermissibly Shields the CFPB's Director from Presidential Oversight and Democratic Accountability

The Constitution provides that "executive Power shall be vested in a President," U.S. Const. art. II, § 1, cl. 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789)).  "Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary."  *Id.* at 483.  The Framers of the Constitution "consciously decid[ed] to vest Executive authority in one person rather than several.  They did so in order to focus, rather than to spread, Executive responsibility thereby facilitating accountability."  *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring).

---

[6] On October 11, 2016, a three-judge panel of the D.C. Circuit held that the CFPB's structure is unconstitutional under the Supreme Court's separation of powers precedents.  *PHH Corp.*, 839 F.3d 1.  The D.C. Circuit has since granted a petition for rehearing *en banc*, and oral argument is scheduled for May 24, 2017.

Dodd-Frank violates these bedrock principles by lodging massive power in one person—the Director—who the President may remove only "for inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c)(3).  Indeed, the CFPB has unprecedented authority to enforce the CFPA and eighteen pre-existing consumer protection laws previously enforced by seven different agencies.[7]  *Id*. §§ 5581(a)(1)(A), 5581(b); *see also id*. § 5481(14).

Moreover, Congress erected additional structural features to insulate the Director from the President's control:  Dodd-Frank limits the President's ability to control the CFPB's "legislative recommendations, or testimony or comments on legislation" submitted to Congress, 12 U.S.C. § 5492(c)(4); prohibits the President from overruling the Director's interpretation of a consumer protection statute where that law is administered by both the Bureau and another agency, *id.* § 5512(b)(4); and precludes the Executive branch from exercising any oversight with respect to the Bureau's financial operating plans and forecasts.  *Id.* § 5497(a)(4)(E).  The Director also has sweeping authority to hire, fire, and compensate CFPB employees, *id.* § 5493(a)(1), (2), to whom he may unilaterally delegate his immense powers.  *Id.* § 5492(b).  The Director exercises all of this power over a lengthy five-year term, which can be extended indefinitely if the Senate does not confirm a successor.  *Id.* § 5491(c)(1), (2).

In *Free Enterprise Fund*, the Supreme Court reaffirmed the general rule that the Constitution forbids Congress from limiting the President's ability to hold executive officers accountable by removing them from office at his discretion.  561 U.S. at 483.  In so doing, the Court addressed the constitutionality of the Public Company Accounting Oversight Board

---

[7] The CFPB may pursue actions to enforce the consumer protection laws in federal court, as well as in administrative actions, *see* 12 U.S.C. §§ 5562-5564; may issue subpoenas requesting documents or testimony in connection with investigations or enforcement actions, *see id.*; and has the power to impose a wide range of legal and equitable relief, including restitution, disgorgement, money damages, injunctions, and civil monetary penalties.  *Id.* § 5565(a)(2).

("PCAOB"), a five-member board with "expansive powers to govern [the] entire" securities industry and whose members could be removed only by the Securities and Exchange Commission—not the President—and even then, only for cause.  *Id.* at 484-86.  The Court noted that the PCAOB presented a "new situation," *id.* at 483, and that "[p]erhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity."  *Id.* at 505 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).  The Court held that the "novel" structure "subverts the President's ability to ensure that the laws are faithfully executed" and therefore is "incompatible with the Constitution's separation of powers."  *Id.* at 496, 498.

The CFPB likewise presents a "new situation" and "novel" structure that lacks historical precedent and unduly limits the President's authority in violation of the Constitution.  Dodd-Frank vests the Director with massive authority over huge segments of the national economy, yet limits the President's ability to remove him.  The President cannot "take Care that" the consumer protection laws "be faithfully executed if he cannot oversee the faithfulness of the officers who execute them."  *Id.* at 484 (internal quotation mark omitted).

## 2.     The CFPB Is Unlike Other Independent Agencies Approved by the Courts

The Supreme Court has recognized only two limited exceptions to the general prohibition against restricting a President's removal power:  (1) a multi-member "body of experts," *Humphrey's Ex'r*, 295 U.S. 602, 624-26 (1935), and (2) certain inferior officers with "limited jurisdiction and tenure," *Morrison v. Olson*, 487 U.S. 654, 691 (1988).  *See also Free Enter. Fund*, 561 U.S. at 483 (discussing exceptions).  Neither exception applies to the CFPB.

**Exception One Does Not Apply.**  In *Humphrey's Executor*, the Court addressed the "good cause" removal provision applicable to the members of the Federal Trade Commission, who held seven-year terms and could not be removed by the President except for "inefficiency, neglect of duty, or malfeasance in office."  295 U.S. at 620 (citing 15 U.S.C. § 41).  The Court upheld the removal provision on the grounds that the FTC is a "non[-]partisan," multimember group acting in a "quasi[-]judicial and quasi[-]legislative" rather than "purely executive" capacity.  *Id.* at 624, 627-29.  The Court's conclusion rested not only on the FTC's functions, but also on its features as an "administrative body" comprised of multiple members "called upon to exercise the trained judgment of a body of experts."  *Id.* at 624, 628.

The CFPB is headed not by a non-executive and non-partisan "body of experts" but by a single, autonomous Director empowered to enforce nineteen consumer protection laws.  Unlike the FTC, the Director is not accountable to a multimember commission, which creates "a built-in monitoring system for interests on both sides."  Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 41 (2010); *see also* Recent Legislation, *Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv. L. Rev. 2123, 2128 (2011) ("presence of dissenters" in agency proceedings "provides new information and forces the proponent to articulate a coherent rationale, thus acting as a constraining force").  *Humphrey's Executor* should not be extended to the CFPB, which lacks the same functions and structural features as the FTC.

**Exception Two Does Not Apply.**  In *Morrison*, the Court upheld a statute that permitted an independent counsel to be removed by the Attorney General only for "good cause" because she had "limited jurisdiction and tenure" and "lack[ed] policymaking or significant administrative authority."  487 U.S. at 691.  Unlike the independent counsel, the Director wields

wide-ranging and unchecked executive power to enforce nineteen consumer protection laws, 12

U.S.C. § 5481(12); serves a lengthy five-year term, *id.* § 5491(c)(1); and, as this case illustrates,

has significant policymaking authority, including the decision to prosecute conduct not

previously prosecuted under novel legal positions.

The circumstances that justify "limited restrictions on the President's removal power" are

not present here. *Free Enter. Fund*, 561 U.S. at 479.

**B.      The CFPB's Director Is Not Accountable to Congress Through Appropriations**

The CFPB also exercises its regulatory and enforcement powers without meaningful

oversight or control from Congress.  Dodd-Frank authorizes the Director to unilaterally

requisition up to 12% of the Federal Reserve System's operating expenses—totaling more than

half a billion dollars[8]—without congressional approval.  12 U.S.C. § 5497(a).  Congress is also

prohibited from reviewing the CFPB's use of these funds.  *Id.* § 5497(a)(2)(C).

By cutting off congressional appropriations oversight of the CFPB's financial resources,

Dodd-Frank removed another critical democratic check on potential abuses of power.  Article I,

Section 9 of the U.S. Constitution provides, in part:  "No Money shall be drawn from the

Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  In

the case of the CFPB, the "power of the purse"—Congress's "ultimate weapon of enforcement,"

*United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974)—is unavailable.  "This power over

the purse may, in fact, be regarded as the most complete and effectual weapon with which any

---

[8] Funding was capped at $618.7 million for the fiscal year 2015, and $631.7 million for the fiscal year 2016.  Consumer Financial Protection Bureau, The CFPB Strategic Plan, Budget, and Performance Plan and Report 9 (2016), available at http://files.consumerfinance.gov/f/201602_cfpb_report_strategic-plan-budget-and-performance-plan_FY2016.pdf (last visited May 2, 2017).

constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *United States Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961)).  It serves the "fundamental and comprehensive purpose" of "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990).

Congress may not abdicate its most important constitutional check against executive power.  *See New York v. United States*, 505 U.S. 144, 182 (1992) (stating that the separation of powers does not depend on "whether or not the encroached-upon branch approves the encroachment").  By insulating the CFPB from congressional appropriations oversight, Congress has impermissibly restrained its ability to hold the Executive branch accountable.

C.   **The Court Should Find the CFPB's Structure Unconstitutional and Strike Down the CFPB as a Whole**

The constitutionality of the CFPB's structure must be examined holistically, without viewing each particular feature in isolation.  "[J]ust because two [or more] structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013), *vacated on other grounds by Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015).  While the Supreme Court has "previously upheld limited restrictions" on particular checks and balances, the combined elements of the CFPB's "novel structure"—a single Director who may only be removed for cause, serves a lengthy five-year term, and establishes his own annual budget of more

than half a billion dollars without congressional oversight—"does not merely add to the [CFPB's] independence, but transforms it." *Free Enter. Fund*, 561 U.S. at 495, 496.

The lack of oversight is more problematic because of the broad powers wielded by the Director. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001) ("the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred"); *see also Morrison*, 487 U.S. at 691 (finding fewer protections necessary where official has "limited jurisdiction and tenure and lack[s] policymaking or significant administrative authority"). The Director exercises "[a]ll consumer financial protection functions" previously exercised by seven agencies, 12 U.S.C. § 5581(b), which includes the power to enforce federal consumer protection laws, pursue actions in federal court as well as in administrative actions, *see id.* §§ 5562-5564, and impose a wide range of legal and equitable relief. *Id.* § 5565(a)(2). The public must be able to "ensure that those who wield[]" power are "accountable to political force and the will of the people." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991). The CFPB's unprecedented insulation from presidential *and* congressional oversight goes too far in undermining constitutionally required democratic accountability.

Given the many undemocratic and unconstitutional features of the CFPB, the proper remedy is to strike down the CFPB in its entirety rather than attempt to rewrite those portions of Dodd-Frank that offend the separation of powers. While Dodd-Frank includes a severability clause, *see* 12 U.S.C. § 5302, it creates only a "presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). The decision to sever an "offensive provision" depends on "whether the statute will function in a manner consistent with the intent of Congress," or will create "legislation that Congress would not have enacted." *Id.* at 685-86.

Here, Congress intended to create an agency that was "completely independent, with an independently appointed director, an independent budget, and an autonomous rulemaking authority." 156 Cong. Rec. H5239 (2010) (Rep. Maloney). The purpose of Title X was to "create a consumer bureau . . . that is independent," 156 Cong. Rec. S5871 (2010) (Sen. Cardin), in order to "improv[e] regulatory independence," S. Rep. No. 111-176, at 24 (2010). The statutory text further reflects Congress's intention of creating "an independent bureau." 12 U.S.C. § 5491(a). The Court cannot sever the offensive provisions without transforming the CFPB into an entity that Congress never intended. Moreover, the "offensive provision" here is not one single feature, but the overall structure of the agency. The Court would need to rewrite Title X of Dodd-Frank—rather than simply "sever[] any problematic portions," *Free Enter. Fund*, 561 U.S. at 508—to render the agency's structure constitutional, a task that should be left to Congress. *See Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) ("[T]he general federal rule is that courts do not rewrite statutes to create constitutionality.").

The CFPB "lacks authority to bring this enforcement action because its composition violates the Constitution's separation of powers," and thus the CFPB's claims should be dismissed. *Fed. Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993).

## II.     THE COURT LACKS FEDERAL JURISDICTION UNDER THE CFPA AND THE COURT SHOULD NOT EXERCISE SUPPLEMENTAL JURISDICTION OVER THE RESIDUAL STATE LAW CLAIMS

In addition to the fundamental constitutional problems discussed above, the Complaint should be dismissed because it fails to state a claim for relief under any Federal statute, and therefore this Court lacks jurisdiction. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  A court is not required to accept mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id.*; *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a plaintiff has an "obligation to provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

"The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," *In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) (citing *International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995)), which here includes the agreements on which the Government's claims are based.  "The court need not accept as true an allegation that is contradicted by documents on which the complaint relies."  *Id.* (citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001)).

A.    **Counts I-V:  The CFPA Claims Fail Because the RD Entities Are Not "Covered Persons" Under the Statute**

Although the CFPB's statutory authority over economic matters is broad, it is not unlimited.  The CFPA regulates only "covered person[s] or service provider[s]" who are engaged in "unfair, deceptive, or abusive act[s] or practice[s] under Federal law."  12 U.S.C. §§ 5531(a), 5536(a).  A "covered person" is defined as "any person that engages in offering or providing a consumer financial product or service."  *Id.* § 5481(6)(A).  The Government claims that the RD Entities are "covered persons" under 12 U.S.C. § 5481(15)(A)(i), which defines "financial product or service" to include "extending credit and servicing loans . . . ."  (Compl. ¶ 19.)  The CFPA defines "credit" as the right "to defer payment of a debt, incur debt and defer its payment,

or purchase property or services and defer payment for such purchase."  12 U.S.C. § 5481(7).

Because the RD Entities do not "extend[] credit and servic[e] loans" or otherwise offer or

provide a "consumer financial product or service," they cannot be liable under the CFPA, *see id.*

§§ 5531(a), 5536(a), and the CFPA claims thus must be dismissed.

### 1. Contracts for the Purchase of Settlement Proceeds Do Not Qualify as Extensions of "Credit" As Defined in the CFPA

The Government offers conclusory allegations that the RD Entities "engaged in deceptive

and abusive acts and practices in connection with [their] offering or providing extensions of

credit to consumers," (Compl. ¶ 8), but fails to allege any facts demonstrating that a contract for

the purchase of settlement proceeds qualifies as an "extension of credit" within the meaning of

the CFPA.  The allegations thus do not satisfy Rule 8, and all of the CFPA claims must be

dismissed for failure to allege that the RD Entities qualify as "covered persons" under the CFPA.

*See Capela v. J.G. Wentworth, LLC*, No. CV09-882, 2009 WL 3128003, at *9 (E.D.N.Y. Sept.

24, 2009) (dismissing complaint against legal financing company that "repeatedly alleges that

the defendants made loans, but that allegation is a legal conclusion, not a factual allegation.

Indeed, the entire Complaint is based on that legal conclusion").

That the Government fails to adequately allege that the RD Entities "extend credit" is no

surprise given that the contracts do not fit the CFPA's definition of "credit."  The CFPA defines

"credit" as "the right granted by a person to a consumer to [1] defer payment of a debt, [2] incur

debt and defer its payment, or [3] purchase property or services and defer payment for such

purchase."  12 U.S.C. § 5481(7).  The contracts here implicate none of these three rights.

Specifically, the consumer does not incur a debt at all, and certainly has not been granted a right

to defer payment of a debt by the RD Entities.  Moreover, because the consumer is the *seller* of the asset, the consumer does not "purchase property or services."

In a misleading attempt to fit the transactions within the definition of "credit" the Government alleges that the RD Entities "enter[] into agreements with consumers to pay them a lump sum representing a fraction of the consumers' awards . . . .  In exchange, the consumers agree to **repay** a far larger amount than the amount advanced."  (Compl. ¶ 24 (emphasis added).)  But that allegation does not satisfy the definition of "credit" and is not what the contracts say.

Instead, in the agreements at issue, the consumer sells a right to a portion of a legal receivable and incurs *no repayment* obligation whatsoever.  The sellers' only obligations are to facilitate the direct distributions of the proceeds from the holder of the funds to the RD Entities or, if the seller receives the distribution, to turn it over to the RD Entities immediately upon receipt.  (*See, e.g.*, Ex. A-1 ¶ 5(c)(d).)  The contracts all expressly confirm that, in the event that the RD Entities are unable to collect the purchased receivable, the seller "will have no obligation to pay RD any portion of the Purchase Price that RD paid to [the seller]."  (*Id.* ¶ 6(h).)  There is no debt.  There is no repayment obligation.  There is certainly no right granted to defer payment of a debt.

Cases interpreting analogous federal statutory definitions of "credit" confirm that, the "hallmark of 'credit' . . . is the right of one party to make deferred payment."[9]  *Reithman v. Berry*, 287 F.3d 274, 277-79 (3d Cir. 2002) (holding law firm's provision of legal services

---

[9] The definition of "credit" in the CFPA is substantially the same to the definitions in the Truth in Lending Act ("TILA"), *see* 15 U.S.C. § 1602(f) (defining "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment"), and the Equal Credit Opportunity ACT ("ECOA"), *see* 15 U.S.C. § 1691a(d) (defining "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefore").  Therefore, cases analyzing whether a transaction is a loan or a sale under those statutes are instructive here.

without requiring immediate payment from the client did not qualify as an extension of "credit" under ECOA and TILA because the law firm's voluntary delay in collecting fees did not equate to the extension of a unilateral right to the clients to defer payment); *see Shaumyan v. Sidetex Co., Inc.*, 900 F.2d 16, 18 (2d Cir. 1990) ("Absent a right to defer payment for monetary debt, property or services," there is no "credit" transaction and "the ECOA is inapplicable."). Here, under the purchase and sale agreements the seller has not bargained for the right to defer payment of a debt; instead, the seller has sold off the right to a future receivable which, when distributed, is immediately due to the buyer. *See Reithman*, 287 F.3d at 277 ("The key element . . . is whether, under the agreement between the debtor and the creditor, the debtor has a right to defer payment of existing debt or to incur future debt and defer payment at its sole discretion.") (quoting *Reithman v. Berry*, 113 F. Supp. 2d 765, 768 (E.D. Pa. 2000)).

Cases interpreting TILA also confirm that where (like here) there is no repayment obligation, the contract is not an extension of "credit." In *Capela v. J.G. Wentworth, LLC*, No. CV09-882, 2009 WL 3128003 (E.D.N.Y. Sept. 24, 2009), the plaintiff claimed—as the Government claims here—that a legal finance company's purchase of future settlement proceeds was an extension of credit under TILA, not a sale, because the company "provide[d] short-term funds to a consumer in exchange for the right to subsequent payment of a greater sum." *Id.* at *10. The court rejected the plaintiff's conclusory allegations and dismissed the complaint, holding that the purchase agreement "cannot be considered a loan [under TILA] because [the consumer] has no obligation at all to pay the settlement installments if [the third-party obligor] fails to do so." *Id.*; *see also* at *id.* at *11 (stating that recharacterizing transactions would "require[] such stretching of the definitions of loan and credit that . . . TILA simply does not apply"); *Reed v. Val-Chris Investments, Inc.*, No. 11cv371, 2011 WL 6028001, at *2 (S.D. Cal.

Dec. 5, 2011) (holding a non-recourse advance on the plaintiff's inheritance was not a consumer loan subject to TILA "because Plaintiff had no obligation to pay AI anything if the Estate did not satisfy the amount Plaintiff assigned to AI").

Because the seller has no obligation to repay any debt to the RD Entities, let alone the right to defer payment of debt, if the RD Entities ultimately do not receive the purchased receivable from the third-party obligor, the transactions are not within the CFPA's definition of an extension of "credit" and the CFPA claims should be dismissed.

## 2.   The Government Fails to Allege that the RD Entities "Extend[] Credit and Servic[e] Loans" as Required to Qualify as "Covered Persons"

Under the plain language of the CFPA, a "covered person" is defined as one who *both* "extend[s] credit and servic[es] loans."  *See* 12 U.S.C. §§ 5481(6)(A), 5481(15)(A)(i). Accordingly, even if the Government had pled more than a conclusory allegation that the RD Entities "extend credit," which it did not, the Government still has not adequately alleged that the RD Entities are "covered persons" because there is not even an attempt to allege that the RD Entities also "servic[ed] loans."

Section 5481(15)(A) contains a list of conduct that qualifies as a "financial product or service," for purposes of the "covered person" definition.  *See* 12 U.S.C. § 5481(6)(A) ("covered person" is someone who engages in offering or providing a "consumer financial product or service").  The Government alleges (*see* Compl. ¶ 19) that the RD Entities are "covered persons" under 12 U.S.C. § 5481(15)(A)(i), which applies only to: "***extending credit and servicing loans***, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions)." *Id.* (emphasis added).  By using the conjunctive "and" in § 5481(15)(A)(i), Congress signified

that a person is required to both extend credit *and* service loans in order to qualify as someone

"offering or providing a consumer financial product or service" under 12 U.S.C. § 5481(6)(A).

*See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011) (the word "and" is "a coordinating

conjunction" whose job is to "link[] independent ideas"); *United States v. Ganadonegro*, 854 F.

Supp. 2d 1068, 1081 (D. N.M. 2012) ("When terms are connected by a conjunctive term in a

statute—such as the term 'and'—courts normally interpret the statute as requiring satisfaction of

both of the conjunctive terms to trigger application of the statutory provision."); *see also Reese

Bros., Inc. v. United States*, 447 F.3d 229, 235-37 (3d Cir. 2006) ("The usual meaning of the

word 'and,' . . . is conjunctive, and unless the context dictates otherwise, the 'and' is presumed to

be used in its ordinary sense . . . .") (citation and internal quotation marks omitted).

Indeed, Subsection 5481(15)(A)(i) is the *only subsection* in § 5481(15)(A) in which the

conduct is described with the conjunctive "and" as opposed to the disjunctive "or."  *See* 12

U.S.C. § 5481(15)(A)(ii) ("extending *or* brokering leases . . ."), (15)(A)(iii) ("providing real

estate settlement services . . . *or* performing appraisals . . ."), (15)(A)(iv) ("engaging in deposit-

taking activities, transmitting or exchanging funds, *or* otherwise acting as a custodian of funds or

any financial instrument . . ."), (15)(A)(v) ("selling, providing, *or* issuing stored value or

payment instruments . . ."), (15)(A)(vi) ("providing check cashing, check collection, *or* check

guaranty services"), (15)(A)(vii) ("providing payments or other financial data processing

products or services . . ."), (15)(A)(ix) ("collecting, analyzing, maintaining, *or* providing

consumer report information . . .") (emphases added).  Congress thus clearly intended to require

that, to qualify as a covered person under Subsection 5481(15)(A)(i), the person must both

extend credit ***and*** service loans; had Congress required either one or the other, it clearly knew

how to use "or" when it intended to signify that satisfaction of only one item in the list would be

sufficient.  *See Dean v. United States*, 556 U.S. 568, 573 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).

Because the Government has failed entirely to allege that the RD Entities service loans, the CFPA claims should be dismissed.

### B.      The Court Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims

Because the Court should dismiss the Government's federal claims under the CFPA, and there is no other basis for federal subject matter jurisdiction, the Court should decline to exercise supplemental jurisdiction over the NYAG's state law claims—which the NYAG may still file in state court—and dismiss them as well.  28 U.S.C. § 1367(c)(3) ("district courts may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction"); *see also Forman v. City of N.Y.*, No. 14-CV-6282, 2017 WL 1167334, at *7 (S.D.N.Y. Mar. 27, 2017) ("The strong preference in this Circuit is for district courts to decline to exercise supplemental jurisdiction under § 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial.") (quoting *Schiffman v. Epstein*, No. 04 Civ. 2661, 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009)).

### III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

Even if the Court were to find that the CFPB's structure is constitutionally permissible (which it is not), and that the RD Entities are a "covered person" under the CFPA (which they are not), the Complaint should still be dismissed for failure to state a claim.  Federal Rule of Civil Procedure 9(b) requires that claims premised on allegations of fraud be pled "with

particularity," including the following:  "(1) the specific statements or omission; (2) the aspect of the statement or omission that makes it false or misleading; (3) when the statement was made; (4) where the statement was made; and (5) which defendant was responsible for the statement or omission."  *Lobatto v. Berney*, No. 98 CIV. 1984, 1999 WL 672994, at *9 (S.D.N.Y. Aug. 26, 1999).  "Even if fraud is not a necessary element of a particular claim, Rule 9(b) will apply if the plaintiff has alleged a unified cause of fraudulent conduct and relied entirely on that course of conduct as the basis of the claim."  *Delgado v. Ocwen Loan Servicing, LLC,* No. 13–CV–4427, 2014 WL 4773991, at *14 (E.D.N.Y. Sept. 24, 2014) (citation and internal quotation marks omitted) (applying Rule 9(b) to state unfair competition claim).

Here, all of the Government's claims are premised on an alleged comprehensive scheme to defraud consumers.  The Government alleges that Defendants "falsely represent[] to consumers that its products are not an offer of credit but rather assignments of the consumers' interests in their anticipated payments,"  (Compl. ¶ 38), "falsely claim[] to expedite funding and 'cut through red tape,'"  (Compl. at 9), and "misrepresent[] when consumers will receive funds," (Compl. at 10).  The Government has made no attempt to differentiate their fraud allegations from any non-fraud claims; indeed, they have expressly incorporated all allegations as to each cause of action.  (*See* Compl. ¶¶ 61, 70, 78, 85, 92, 99, 106, 111, 119, 123, 127.)  *See also Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) (applying Rule 9(b) to entire complaint where "the wording and imputations of the complaint are classically associated with fraud [and] . . . the plaintiffs have made little, if any, effort to differentiate [non-fraud claims] from the fraud allegations upon which the action is predicated") (citation and internal quotation marks omitted).  Because the entire Complaint sounds in fraud, Rule 9(b) applies to every claim.

The Complaint, however, falls far short of satisfying Rule 9(b)'s heightened pleading standard.  Although the Government identifies certain statements that they allege are false, the Government failed to "set forth the who, what, when, where and how of the alleged fraud," and thus the Complaint should be dismissed.  *Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 516 (S.D.N.Y. 2007) (dismissing complaint that failed to plead fraud with particularity).

### A.        Counts I, III-V, IX-XI:  The Complaint Does Not Allege Deceptive Conduct

The Government's claims for deception under the CFPA (Counts I, III-V) and New York Attorney General's state law claims for deceptive practices (Count IX), false advertising (Count X), and fraud (Count XI), all include false or deceptive conduct as an element of the claim.  *See Consumer Fin. Prot. Bureau v. IrvineWebWorks, Inc.*, No. SACV 14-1967, 2016 WL 1056662, at *12 (C.D. Cal. Feb. 5, 2016) (deceptive practices under 12 U.S.C. § 5536); *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 28-29 (2000) (N.Y. Gen. Bus. Law § 349); *Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (N.Y. App. Div. 2002) (N.Y. Gen. Bus. Law § 350).  To establish that a practice is deceptive, the Complaint must allege "(1) a representation, omission or practice that, (2) was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice was material."  *IrvineWebWorks*, 2016 WL 1056662, at *12 (applying standard under the Federal Trade Commission Act to deceptive conduct claim under the CFPA); *Kurtz v. Kimberly-Clark Corp.*, No. 14-CV-1142, 2017 WL 1155398, at *31 (E.D.N.Y. Mar. 27, 2017) (listing same requirements under N.Y. Gen. Bus. Law §§ 349, 350).

Here, the Government claims that the RD Entities deceived consumers by misrepresenting (1) that the transactions were sales, not loans (Compl. ¶¶ 63-67, 121, 125, 129);

(2) that consumers can assign their awards (*id.* ¶¶ 34-37, 121, 125, 129); (3) that RD could "cut

through the red tape" and expedite the payment of an award (*id.* ¶¶ 79-82, 121, 125, 129); and

(4) the date on which consumers would receive payment from RD (*id.* ¶¶ 86-89, 121, 125, 129).

As discussed below, none of these alleged deceptive representations provides a basis for relief.

### 1.    The Government Cannot Recharacterize the Purchase of Legal Receivables as a Loan Rather than a True Sale

The Government's entire Complaint is premised on the conclusory allegation that the

transactions at issue are loans, not sales as they have always been described in the assignment

agreements.  This core allegation—which does not meet the pleading requirements of Rule 8 or

Rule 9—is contrary to law.  Courts which have addressed this issue in a variety of different

contexts by analyzing a number of common factors, regularly reject attempts to recharacterize

true sale contracts as loans.  These factors include (1) the buyer's right to recourse against the

seller, (2) the buyer's ability to demand that it receive payment directly from account debtors,

(3) the absence of the seller's repurchase right, and (4) the parties' intent as evidenced by the

plain language of the agreement.  *See In re Dryden Advisory Grp., LLC*, 534 B.R. 612, 620-23

(Bankr. M.D. Pa. 2015) (applying New York law).[10]

Each of these factors confirms that the Zadroga Fund and NFL Settlement Fund

agreements are properly characterized as true sales.  Indeed, courts applying these factors to the

purchase of future receivables, including legal receivables, consistently hold that such contracts

do not qualify as loans.  *See, e.g.*, *Platinum Rapid Funding Grp. Ltd. v. VIP Limousine Servs.,*

*Inc.*, No. 604163-15, 2016 WL 4478807, at *3 (N.Y. Sup. Ct. June 8, 2016) (finding that the

---

[10] The Government alleges that the recharacterization of the transactions is governed by New York law.  (Compl. ¶ 7.)  Defendants accept for the purposes of this Motion only that New York law applies.

purchase of future receivables are sale agreements, not loans); *Singer Asset Fin. Co., L.L.C. v. Bachus*, 741 N.Y.S.2d 618 (N.Y. App. Div. 2002) (stating that the purchase of a structured settlement payment "is not a loan but an absolute assignment").

Because these transactions are sales, the RD Entities cannot be held liable for representing them as such to customers who knowingly and willingly sold their entitlement to future settlement proceeds to the RD Entities in exchange for an immediate lump sum payment.

### (a)      The Assignments Are Non-Recourse

"Courts have held that the most important single factor when determining whether a transaction is a true sale is the buyer's right to recourse against the seller." *See In re Dryden*, 534 B.R. at 623.  When the buyer of the receivable has no recourse against the seller, courts generally deem the transaction a true sale as opposed to a loan. *See Lynx Strategies, LLC v. Ferreira*, 957 N.Y.S.2d 636, at *1-2 (N.Y. Sup. Ct. 2010) ("non-recourse advance" to fund legal action in exchange for ownership interest in proceeds for a claim where there was no contractual right to repayment was not a loan).  In contrast, where the seller "backed up the risk with [a] personal guarantee and a security interest in [seller's] property" and "any default of the Agreements . . . would trigger payment," the transaction is considered a loan. *Ideas v. 999 Restaurant Corp.*, No. 0602302/2006, 2007 WL 3234747 (N.Y. Sup. Ct. 2007) (transactions at issue were "clearly payable absolutely, and thus loans").

Different courts use different terminology when discussing the concept of recourse against the seller.  Some courts refer to recourse as whether the buyer can demand repayment from the seller. *See Lynx Strategies*, 957 N.Y.S.2d 636, at *1-2; *Capela*, 2009 WL 3128003, at *10-11 (factoring of structured settlement receivable "cannot be considered a loan because [the consumer] has no obligation at all to pay the settlement installments if [the third-party obligor]

fails to do so").  Others refer to whether the buyer or seller bears the risk of collection.  *See, e.g.,*

*Platinum Rapid*, 2016 WL 4478807, at *3 (holding agreement to purchase future receivables was

a sale rather than a loan because the buyer "took the risk that there could be no daily receipts").

Regardless of the terminology, the courts are asking the same essential question:  Does

the buyer bear the risk (however large or small) that the purchased asset cannot be collected (*i.e.*,

the receivables do not pay off), or does the buyer have a right to demand repayment by the seller

in the event of noncollection?  Where there is no such right to repayment from the seller, the

transaction is not a loan.

Here, far from providing a right to repayment from the seller, the agreements at issue

expressly state that the buyer has ***no recourse*** against the seller in the event that the receivables

do not pay off:

> No Recourse.  RD is purchasing all of your interest in the Property
> without recourse against you (other than for a Breach).  This means
> that, in the event RD for any reason (other than your Breach of this
> Agreement) does not receive all of the Property Amount [i.e., the
> purchased receivable], you will have no obligation to pay RD any
> portion of the Purchase Price that RD paid to you.

(*See* Ex. A-1 ¶ 6(h).)  This language establishes that each Assignment and Sale Agreement

imposes no obligation on the seller to repay the buyer, to repurchase non-performing receivables,

or to otherwise guarantee their collectability.  While the RD Entities may sue to enforce the

terms of the contract—such as when a seller receives the funds but wrongfully fails to transmit

those funds to the buyer—but a contractual right to demand performance of the terms of a sale

agreement and to seek relief in response to a breach *does not* constitute recourse against the

seller for the purpose of determining whether the transaction is a loan.  *See Transmedia Rest.*

*Co., Inc. v. 33 E. 61st St. Rest. Corp.*, 710 N.Y.S.2d 756, 760 (N.Y. Sup. Ct. 2000) (holding that

an agreement does not constitute a loan of money because, "*[e]xcept in the case of a default or*

*breach of the April Agreement,* [the buyer] bears the risk of not being repaid the advanced funds") (emphasis added)).  Otherwise, every sale of property could be recharacterized as a loan.

Even where contracts include terms that give the seller some form of recourse, courts have found the transaction to be a true sale.  *See, e.g.*, *In re Dryden*, 534 B.R. at 623 (recognizing that although contractual provisions may "limit [the buyer's] risk and provide some forms of recourse, they are insufficient to support recharacterization of the transaction as a loan"). Because the Zadroga Fund and NFL Settlement Fund agreements have *no recourse* terms at all, the agreements cannot be recharacterized as loans.

> **(b)** **The Assignments Give the RD Entities the Right to Demand Direct Payment from the Holder of the Funds**

While the non-recourse nature of the agreements at issue is sufficient to establish that the transactions are true sales, and not loans, other less determinative factors further confirm that conclusion.  Courts have held, for example, that a contract that gives the buyer the right to demand direct payment of the receivable by the account debtor is more likely to be considered a true sale than an agreement in which the seller retains control of the receivable.  *See In re Dryden*, 534 B.R. at 622 ("The ability of a buyer to demand that it receive payment directly from account debtors supports the finding that the transaction is a sale.").  Here, the agreements include just such a right to demand direct payment from a third-party obligor:

> At RD's request, you will notify the accounting firm or attorney responsible for distribution of the funds to satisfy the Award (and RD may also notify that person or firm) of the terms of this Agreement and will direct that person or firm to pay the Property Amount to RD instead of (and not to) you.

(*See* Ex. A-1 ¶ 5(d).)  This language reflects an intention by the parties to sell the receivables rather than to use them as collateral for a secured loan.

(c)      **The Seller Has No Right of Repurchase**

Courts also recognize that a right by the seller to repurchase the receivable it sells to the buyer supports a determination that the transaction was not a true sale.  *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937, 940 (2d Cir. 1973) (finding a pledge of a security rather than the assignment of an asset when the asset was returned upon repayment of the advanced funds); *In re Currie*, 57 B.R. 224, 225 (Bankr. M.D. La. 1986) (finding that an assignment was more properly characterized as a pledge "because the assignment terminated upon payment of the underlying indebtedness"); *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982) ("A security interest is also indicated when the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source.").

Here, the agreements do not give customers any right to repurchase the receivables.  (*See* Ex. A-1 ¶ 5(e) ("You understand that you are giving up all of your interest in the Property.").)  That fact, considered in combination with all of the other factors discussed above, provides further confirmation that the transactions are true sales.

(d)      **The Plain Language of the Contracts Demonstrates the Parties' Intent to Enter into True Sales**

Finally, courts look to the plain language of the agreements to help determine whether the parties intended the transactions in question to be true sales.  *See In re Dryden*, 534 B.R. at 620 (identifying "the language of the agreement and the conduct of the parties" as factors that "[m]ost courts" consider in determining whether the transaction is a loan or a true sale); *In re Lemons & Assocs., Inc.*, 67 B.R. 198, 210 (Bankr. D. Nev. 1986) (finding that "the objective indications of an intended sale manifested by the [contract] documents" rendered the transaction a sale notwithstanding that it gave the buyer the right to full recourse against the seller); *Granite*

*Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998) ("The key to the inquiry as to whether the repos in this case should be characterized as purchase and sale agreements or secured loans [under Uniform Commercial Code] lies in the intention of the parties. . . .  Where the parties' intention is clearly and unambiguously set forth in the agreement, effect must be given to the expressed intent.").

As described above, the agreements at issue all have clear and unambiguous language confirming that the transactions were intended by the parties to be true sales rather than loans. Not only is each contract entitled "Assignment and Sale Agreement," they also have express language confirming the intended nature of the transactions:

- "[Y]ou [the customer] wish to receive an immediate lump sum cash payment in return for ***selling and assigning*** a portion of the Award to RD."

- "You hereby ***sell and assign*** to RD your interest . . ." in a portion of the Award.

- "***This transaction is a true sale and assignment of the Property*** **to RD and provides RD with the full risks and benefits of ownership of the Property.**"

- "***[Y]ou and we intend that this Agreement is a true sale*** . . . ."

- "Upon RD's payment to you of the Purchase Price, ***RD will own the Property free and clear*** of any Adverse Interests."

- "You understand that ***you are giving up all of your interest in the Property***."

- "No Recourse.  ***RD is purchasing all of your interest in the Property*** without recourse against you (other than for Breach).

(*See* Ex. A-1 at 1-2, 4-6 (emphases added).)  Because this language is entirely consistent with the non-recourse nature of the transactions, the Court should respect the parties' characterization of those transactions as true sales.  *See Platinum Rapid*, 2016 WL 4478807, at *3 (rejecting "request for the Court to convert the Agreement to a loan" where it "would contradict the explicit terms of the sale of future receivables in accordance with the [] Agreement").

### 2. The Fund Proceeds Are Assignable

The Government's additional claim that proceeds from the Zadroga Fund and NFL Settlement Fund are not assignable is flat out wrong. (*See* Compl. ¶¶ 7, 34-43, 93, 112-18.)

The Government relies on General Obligations Law § 13-101 to claim that the assignment of proceeds from the Zadroga Fund is not permitted under New York law (Compl. ¶¶ 93, 112-18, 121, 129), but that statute prohibits only the transfer of a "*claim or demand* . . . to recover damages for a personal injury," N.Y. Gen. Oblig. Law § 13-101(1) (emphasis added), not *proceeds* from the claim. "Under [] section 13-101 an assignment or transfer of a personal injury is prohibited . . . [but] [u]nder New York State law the proceeds of a personal injury claim are assignable and transferable." *In re Mucelli*, 21 B.R. 601, 603 (Bankr. S.D.N.Y. 1982); *accord In re Minor*, 482 B.R. 80, 84 (Bankr. W.D.N.Y. 2012) (assignment of litigation proceeds does not violate section 13-101). Courts have "recognized as valid the distinction between the assignment of a cause of action for personal injury and the assignment of its proceeds." *Grossman v. Schlosser*, 244 N.Y.S.2d 749 (N.Y. App. Div. 1963). The Government's assertion that section 13-101 prohibits the transactions is a blatant misapplication of the statute.

The statute that established the Zadroga Fund also does not prohibit the assignment of proceeds from the Fund. (*See* Compl. ¶ 36.) The provision the Government cites states only that "the Special Master shall authorize payment to [a] claimant of the amount determined with respect to the claimant." (*Id.* (citing 49 U.S.C. § 40101).) The statute does not mention and in no way prohibits a claimant from assigning or otherwise transferring rights to proceeds from the Fund.

Nor does the NFL Settlement Fund agreement itself prohibit assignment of the funds. The Government relies on a selective and misleading excerpt from the agreement to argue that it prohibits "an assignment or attempted assignment of a class member's rights" (Compl. ¶ 35), but

the full provision—entitled "No Assignment of Claims"—is a representation that no class member "has assigned, will assign, or will attempt to assign, to any person or entity other than the NFL Parties any rights or claims *relating to the subject matter of the Class Action Complaint*."  (Ex. C (Class Action Settlement Agreement, As Amended, § 30.1, in *Turner v. Nat'l Football League*, No. 2:12-md-2323-AB, MDL No. 2323, ECF No. 6481-1 (E.D. Pa. filed Feb. 13, 2015)) (emphasis added).)[11]

By assigning their settlement proceeds to the RD Entities, the class members assigned their awards under the Settlement Agreement, not their rights and claims in the "Class Action Complaint."  If the parties intended to broadly prohibit NFL retirees from assigning a portion of their entitlement to the settlement proceeds, and not just to the rights and claims in the "Class Action Complaint," the Settlement Agreement could have made that clear simply by stating that the class members were prohibited from assigning any of their "rights and claims under this Settlement Agreement."  Instead, the Settlement Agreement expressly confirms that the settlement proceeds are fully alienable.  The agreement states that each class member "will be solely responsible for the satisfaction and discharge of all Liens," (Ex. C § 11.1(b)), and devotes more than four pages to the "Identification and Satisfaction of Liens."  *Id.* at Article XI.[12]  In order to give "effect and meaning . . . to every term of the contract," and to "harmonize all of its terms," *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005); *accord JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009), the non-assignment provision cannot be read to

---

[11] The settlement agreement, which is attached as Exhibit C to the Dersovitz Affidavit, is "integral" to the Complaint and may be considered by the Court.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

[12] "Liens" is defined to include "any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever . . . ."  (Ex. C, § 2.1(uu).)

prohibit the assignment of proceeds, which is expressly contemplated under the agreement and would even bar a contingency fee agreement.

In any event, the Amended Final Order and Judgment that approved the Settlement Agreement—and which is incorporated into the Settlement Agreement, (Ex. C at 3)—expressly ordered that "[t]he terms of the Settlement Agreement . . . are forever binding on the Parties, as well as on their respective . . . assigns," (Ex. D, Amended Final Order and Judgment ¶ 19), which necessarily means that certain assignments are permitted.  Accordingly, the Government's expansive and unsupported reading of the non-assignment provision must be rejected.

### 3.   "Cut Through the Red Tape" Is Neither Misleading nor Material

Even viewing the allegations in the Complaint in a light most favorable to the Government, the RD Entities alleged statement that it "cuts through red tape" in order to provide funds to a consumer more quickly is not misleading to a reasonable consumer.  A specific representation must be read in the context of the entire advertisement, transaction, or course of dealing, to determine whether "the overall net impression" is misleading or deceptive.[13]  *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014) (citing *F.T.C. v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1995 WL 767810, at *3 (N.D. Ohio Oct. 24, 1995)).  Read in the context of the entire transaction, no reasonable customer would understand "cut through the red tape" to mean that the RD Entities would cause the holder of the funds to disburse them to the customer more quickly.  The idiom obviously means that the RD Entities will provide an

---

[13] The CFPB Supervision and Examination Manual adopts this standard for evaluating whether a statement is deceptive:  "It is necessary to evaluate an individual statement, representation, or omission not in isolation, but rather in the context of the entire advertisement, transaction, or course of dealing, to determine whether the overall net impression is misleading or deceptive."  CFPB Supervision and Examination Manual, v.2, at UDAAP 5 (Oct. 2012), *available at* https://www.consumerfinance.gov/policy-compliance/guidance/ supervision-examinations (last visited May 15, 2017).

immediate source of funding.  Indeed, "a signatory to a contract is presumed to have read, understood and agreed to be bound by all terms . . . in the documents he or she signed." *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 382 (S.D.N.Y. 2001) (citation omitted).  The contracts between the RD Entities and the individual sellers make clear that the RD Entities—not the administrators of the Zadroga Fund or the NFL Concussion Fund—will pay the individual seller.  (*See* Ex. A-1 ¶ 1(b) ("RD will pay to you").)

The statement "cuts through red tape" does not provide a basis for relief for the additional reason that it is not material.  "A 'material' misrepresentation or practice is one that is likely to affect a consumer's choice of or conduct regarding a product." *F.T.C. v. BlueHippo Funding, LLC*, No. 08 Civ. 1819, 2015 WL 6830161, at *3 (S.D.N.Y. Nov. 6, 2015) (quoting *In re Thompson Med. Co., Inc.*, 104 F.T.C. 648, 816 (1984)).  The Government makes a single allegation of materiality:  that claims regarding accelerating disbursement "are material to consumers, especially, for example, consumers who are severely disabled and may have large medical costs."  (Compl. ¶ 81.)  This alleges why the *timing* of the payment is material to sellers, but not why the *source* of the payment (*i.e.*, from the RD Entities rather than directly from the fund) would possibly be material to sellers.  The Government does not allege that the source of payment is material to consumers, because—not only is it obvious to consumers that the RD Entities would directly provide the payment—it is also obvious that the customer enters the transaction for the primary purpose of receiving an immediate payment, regardless of its source.

### 4.    The RD Entities' Alleged Failure to Make Timely Payments Merely Gives Rise to a Breach of Contract Claim

The Government also alleges that the RD Entities deceived consumers by failing to make timely payments to consumers pursuant to the assignment agreements.  (Compl. ¶¶ 86-88.)

Failing to make timely payment may give rise to a breach of contract claim, but "to set forth an action under a consumer protection law, a party must allege unfair or deceptive conduct that is distinct from a simple breach of contract." *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 913-14 (N.D. Ill. 2013).  "Were it otherwise, a plaintiff could convert any suit for breach of contract into a consumer fraud action, as all breach of contract actions involve a promise and a subsequent failure to perform." *Id.*  In addition, the Government must—at a minimum—provide Defendants fair notice of its claim by identifying *which* of the 27 contracts the RD Entities allegedly breached by failing to make timely payment.  The Government's claim for deceptive practices based on the RD Entities' alleged late payments must be dismissed.

**B.    Count II:  Plaintiffs Fail to Allege "Abusive" Conduct**

In Count II, the Government claims that the RD Entities engaged in "abusive" conduct, which is defined under the CFPA as conduct that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service."  12 U.S.C. § 5531(d)(1), (d)(2)(B).  The Government alleges that, by "misrepresent[ing] that its contracts are for valid and enforceable assignments" (Compl. ¶ 72), the RD Entities (a) "undermine[] consumers' understanding of the offer of credit, and in particular prevents consumer from understanding the terms, costs, and conditions" of the transaction, and (b) "prevent[] consumers from meaningfully evaluating the cost of" the transaction and comparing it "to other alternatives that may be available to the consumers."  (Compl. ¶ 73.)

The claim fails for the same reason the Government's other claims fail:  the contracts at issue are true sale agreements—not loans or the offer of credit—thus the RD Entities'

36

representations were truthful.  In addition, far from "undermin[ing] consumers' understanding" or "prevent[ing] consumers from meaningfully evaluating" the transactions, the contracts state in bold print that "**[t]his is a complex financial transaction**" and advise consumers to consult with an attorney or financial advisor for assistance in evaluating the transaction.  (*See, e.g.*, Ex. A-1 at 11.)

The sellers had an independent "obligation to exercise ordinary diligence to inquire and, if necessary, to seek proper assistance . . . to ascertain and understand the [contractual] terms." *Dollar Phone Corp. v. Dun & Bradstreet Corp.*, 936 F. Supp. 2d 209, 214 (E.D.N.Y. 2013) (quoting *Hotel 71 Mezz Lender LLC v. Falor*, 882 N.Y.S.2d 414, 415 (N.Y. App. Div. 2009)). The RD Entities affirmatively encouraged consumers to seek professional advice and disclosed to consumers the precise issue that—according to the Government—the RD Entities "concealed" in order to "mislead" consumers.  The Government's allegations of abusive conduct must be rejected in light of the plain contractual terms.

### C.     Counts VI and VII:  State Usury Laws Do Not Apply

As discussed in Section III.A.1, *supra*, the transactions at issue are sales, not loans. Accordingly, the NYAG's claims for violation of state civil and criminal usury laws (Counts VI-VII)—which set interest rate limits on loans, N.Y. General Obligations Law § 5-501; N.Y. Banking Law § 14-a; N.Y. Penal Law §§ 190.40, 190.42—must also be dismissed.

### D.     Count VIII:  N.Y. General Obligations Law § 13-101 Does Not Prohibit the Sales at Issue

In Count VIII, the Government alleges that the transactions at issue "constitute an unlawful assignment of individual claims to recover for personal injuries under New York General Obligations Law § 13-101."  (Compl. ¶ 115.)  As discussed above, Section 13-101 prohibits only the transfer of a "*claim or demand* . . . to recover damages for a personal injury," *id.* (emphasis

added), not *proceeds* from the claim.  *See* Section III.A.2, *supra*; *Saca v. Canas*, 903 N.Y.S.2d 861, 868 (N.Y. Sup. Ct. 2010) ("an agreement to share proceeds, wherein neither the demand nor the claim is transferred does not run afoul of General Obligations Law § 13–101 [1]").

### E.    The Government Fails to Differentiate Between the Three "RD" Defendants

Throughout the Complaint, the Government refers to the three corporate Defendants— RD Legal Funding, LLC, RD Legal Finance, LLC, and RD Legal Funding Partners, LP— collectively as "RD" and nowhere differentiates between the three distinct entities.  "Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants.  A plaintiff cannot merely lump all the defendants together in each claim and provide no factual basis to distinguish their conduct." *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 Civ. 2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) (internal citations and quotation marks omitted).  That is just what the Government has done here:  they lumped together all three corporate Defendants and provided no factual basis to distinguish between their alleged conduct.  The Government failed to provide adequate notice of the distinct factual basis for each claim as to each Defendant, and thus the Complaint should be dismissed.[14]  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (holding that "the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable

---

[14]  Similarly, while the Complaint repeatedly alleges that the transactions occurred "in New York" (Compl. ¶¶ 57, 104, 109), such "[t]hreadbare recitals," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), are insufficient to establish the NYAG's jurisdiction over the transactions at issue—especially considering that the RD Entities' principal place of business is in New Jersey (Compl. ¶¶ 15-17) and the NYAG has not made any allegations regarding the residences of the customers who entered the transactions at issue.  *See Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 325 (2002) ("to qualify as a prohibited act under [§ 349], the deception of a consumer must occur in New York"); *New York v. Feldman*, 210 F. Supp. 2d 294, 303 (S.D.N.Y. 2002) (§ 63(12) applies to "wrongdoing that occurred in New York").

to whom" failed to satisfy Rule 8); *Southerland v. N.Y.C. Housing Auth.*, No. 10–CV–5243, 2010 WL 4916935, at *3 (E.D.N.Y. Nov. 23, 2010) (dismissing complaint that "fails to distinguish defendants' conduct or allege facts against any individual defendant"); *Medina v. Bauer*, No. 02 Civ. 8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8.").

### F.    The Complaint Does Not Allege Facts Sufficient to State a Claim Regarding "Other" Transactions

Although the Complaint focuses on the Zadroga Fund and NFL Settlement Fund transactions, the Complaint also makes vague reference to the RD Entities' purchase of award proceeds from "other sources."  (Compl. ¶ 20; *see also id.* ¶ 8 (generally referencing "sources such as a statutory compensation fund or a settlement fund").  To the extent the Government intends to state a claim as to transactions other than the Zadroga and NFL Settlement Fund contracts, the allegations in the Complaint utterly fail to satisfy Rule 8's requirement to "provid[e] . . . fair notice of the nature of the claim [and] grounds on which the claim rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007) (citation and internal quotation marks omitted), let alone Rule 9's particularity requirement.

Fair notice is particularly important given the CFPB's CIDs prior to the filing of this lawsuit encompassed a third category of transactions:  the purchase of portions of judgments in the case *Peterson v. The Islamic Republic of Iran*, Nos. 01-cv-2094(RCL), 01-cv-2684(RCL) (D.D.C.) (ECF No. 228).  The RD Entities "should not have to guess whether this claim is alleged against them," *Fero v. Excellus Health Plain, Inc.*, No. 6:15-CV-06569, 2017 WL 713660, at *35 (W.D.N.Y. Feb. 22, 2017) (dismissing claim).  To the extent the Government

intended the Complaint to state a claim as to the *Peterson* transactions or any other transactions other than those related to the Zadroga Fund and NFL Settlement Fund, the Court should dismiss the claims because they fail to meet the threshold pleading requirements of Rules 8 and 9.

## CONCLUSION

For the reasons stated above, Defendants respectfully requests that the Court dismiss the Complaint without leave to amend.

Dated this 15th day of May, 2017.

Respectfully submitted,

/s/ Michael D. Roth

| | |
|---|---|
| CALCAGNI & KANEFSKY LLP | BOIES SCHILLER FLEXNER LLP |
| ERIC KANEFSKY | DAVID K. WILLINGHAM (*pro hac vice*) |
| Eric@ck-litigation.com | dwillingham@bsfllp.com |
| One Newark Center | MICHAEL D. ROTH (*pro hac vice*) |
| 1085 Raymond Blvd., 14th Floor | mroth@bsfllp.com |
| Newark, NJ 07102 | JEFFREY M. HAMMER (*pro hac vice*) |
| | jhammer@bsfllp.com |
| | 725 South Figueroa Street, 31st Floor |
| | Los Angeles, California 90017-5524 |
| | Telephone: (213) 629-9040 |
| | Facsimile: (213) 629-9022 |
| | |
| | Attorneys for Defendants RD LEGAL FUNDING, LLC; RD LEGAL FINANCE, LLC; RD LEGAL FUNDING PARTNERS, LP; and RONI DERSOVITZ |