

**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**
**ERIC T. SCHNEIDERMAN**
**ATTORNEY GENERAL**
120 BROADWAY, NEW YORK, NY 10271



1700 G Street NW, Washington, DC 20552

March 5, 2018

**VIA ECF**

Hon. Loretta A. Preska
United States District Judge
500 Pearl Street, Room 2220
New York, NY 10007

  Re: *CFPB, et al. v. RD Legal Funding, LLC, et al.*, Case No. 1:17-cv-00890

Dear Judge Preska:

  The Consumer Financial Protection Bureau and the New York Attorney General

(collectively, the "Government") submit this response to your February 23 and February 28

orders. You asked the parties to address the following questions:

> If the Court concludes that compensation from the Zadroga Fund is not assignable
> pursuant to 31 U.S.C. § 3727 and that, as such, <u>the assignments</u> in the Purchase
> Agreements pertaining to such compensation are void as to the United States, (1)
> what is the effect of the underlying agreement between the RD Entities and the
> Eligible Claimants as private parties, and (2) how does the effect of the
> underlying agreement impact the Government's assertion of jurisdiction over the
> RD Entities as "covered person[s]" under the CFPA?

  The answer to the first question is that the underlying agreement between the parties is

not an assignment, as RD has contended, but an arrangement under which RD allows the

consumer to "incur debt and defer its payment," making it an extension or offer of credit under

the CFPA.[1] Whether, as a remedy for the violations alleged in the Complaint, the Court should

declare these arrangements void, similar to what Judge Brody did in the *NFL Concussion*

---

[1] While the Court's questions pertain only to the Zadroga Fund, the same analysis applies to
RD's other transactions addressed in the Complaint, including those involving NFL consumers.

*Litigation*, is a separate question to be addressed in this litigation. Under New York law, for example, because the loans are usurious, they should be declared void as a matter of law. And under the CFPA, a number of remedies, including rescission and reformation of the contracts,[2] would be available to address the violations of that statute alleged in the Complaint. Regardless of the ultimate enforceability of the agreements or the appropriate remedy for the violations alleged, the agreements are extensions or at least offers of credit under the CFPA. And that answers the Court's second question: because RD provides or offers credit to consumers, RD is a "covered person" under the CFPA.[3]

I.      **The underlying agreements are extensions or offers of credit under the CFPA and loans under New York law.**

As the Court recognizes, applying the Anti-Assignment Act to invalidate purported assignments in the Purchase Agreements "as to the United States" would not resolve the nature of the underlying agreements between RD and the Eligible Claimants. Several cases have noted that an enforceable obligation may remain between private parties, even when the Anti-Assignment Act applies to disallow the assignee's claim against the United States.[4] RD relies on

---

[2] *See* 12 U.S.C. § 5565. Relatedly, RD suggests that the effect of a conclusion that its purported assignments are invalid would be to void its agreements with consumers entirely and put the parties in their pre-agreement positions, rather than to "transform" the arrangements into extensions of credit. RD Reply in Supp. of Mot. to Dismiss (ECF No. 37) at 7-8. The conclusion that the purported assignments are invalid does not, however, "transform" the agreements; rather, the invalidity of the assignments is consistent with the conclusion that they are not assignments at all. And there is no reason that this or any court would be limited to such a remedy, as RD contends, without considering whether the transactions involve extensions of credit.

[3] *Id.* § 5481(6), (15) (defining "covered person" to include one who "engages in *offering or providing* a consumer financial product or service," such as extending credit) (emphasis added).

[4] *See, e.g.*, *Houston v. Ormes*, 252 U.S. 469, 473-74 (1920); *Saint John Marine Co. v. United States*, 92 F.3d 39, 45-46 (2d Cir. 1996); *In re Ideal Mercantile Corp.*, 244 F.2d 828, 831-32 (2d Cir. 1957) ("'[A]fter payments have been collected . . . assignments [of government claims] (previously made) may be heeded, at all events in equity, if they will not frustrate the ends to which the prohibition was directed.'") (quoting *Martin v. Nat'l Surety Co.*, 300 U.S. 588, 596-97 (1937)).

those cases to argue that the assignments in its Purchase Agreements, though barred both by the Zadroga Fund's enabling legislation[5] and by the Anti-Assignment Act, remain valid as between RD and the Eligible Claimants.[6] But none of those cases addressed the nature of the claims between the private parties,[7] and none had to decide what this Court must decide here: whether, apart from application of the Anti-Assignment Act, an agreement between private parties is properly characterized as an assignment or a loan.[8]

   To answer that question, this Court should look past how the "Purchase Agreements" are labeled and see them for what they really are: RD's attempt at regulatory evasion. By disguising its transactions as assignments (that it knows or should know are barred by the Zadroga Fund's enabling legislation and the Anti-Assignment Act), RD hopes to avoid the laws that would apply to loans but to retain the certainty of payment and ability to pursue consumers for non-payment that are characteristic of loans. In truth, RD's contracts do not in any meaningful sense involve the "assignment" or "sale" of consumers' rights to RD. Rather, the agreements' terms and performance demonstrate that RD offers or provides extensions of credit.

   The CFPA defines "credit" as "the right granted by a person to a consumer to defer payment of a debt [or to] incur debt and defer its payment."[9] The CFPA does not define "debt." Black's Law Dictionary defines debt, in relevant part, as "a specific sum of money due by

_____

[5] *See* Air Transportation Safety and System Stabilization Act of 2001, §§ 405(c)(2)(A), 406(a), Pub. L. No. 107-42, 115 Stat. 230, 239, 240 (2001), 49 U.S.C. § 40101, note (authorizing payment only to persons who "suffered physical harm or death as a result of . . . an air crash" related to the September 11, 2001, terrorist attacks); Opp'n to Mot. to Dismiss, ECF No. 36, at 13.
[6] *See* RD Reply in Supp. of Mot. to Dismiss, ECF No. 37, at 6.
[7] *See Saint John Marine*, 92 F.3d at 45-46; *In re Ideal Mercantile*, 244 F.2d at 832.
[8] *See, e.g.*, *United States v Kim*, 806 F.3d 1161, 1174-76 (9th Cir. 2015) (applying state law to interpret underlying contract between private parties after concluding that Anti-Assignment Act voided assignment as against the United States).
[9] 15 U.S.C. § 5481(7).

agreement or otherwise."[10] Well-established case law directs that courts, in construing these terms, should look to the substance, not merely the form, of a transaction in determining whether it constitutes a sale or assignment or, alternatively, an extension of credit.[11] Consistent with this principle, the Court should examine all of the agreements' material terms and how they are performed. This examination, in light of the pertinent legal authority, including the Restatement (Second) of Contracts, reveals that RD's transactions are not, in substance, assignments; rather, they are loans.

The primary factor that courts look to when determining whether a transaction is a sale or a loan is "the allocation of risk."[12] Where the risk falls on the "buyer," a transaction is more likely a "sale" than a "loan"; conversely, where there is no true risk to the purported "buyer," the transaction is properly characterized as a loan.[13]

Under New York law,[14] an agreement is a loan if, at the time it is entered into, it is almost certain that there will be funds to repay the amount advanced.[15] "For a true loan it is essential to

---

[10] *Debt*, Black's Law Dictionary (10th ed. 2014).

[11] *See e.g.*, *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261 (9th Cir. 1993) (finding that purported sale to pawn shop was actually credit under TILA, despite its form); *Clacasieu-Marine Nat'l Bank of Lake Charles v. Am. Emp'rs Ins. Co.*, 533 F.2d 290, 297 (5th Cir. 1976) ("Repeatedly, it has been observed that a loan may exist regardless of the form of a transaction."); *In re Dryden Advisory Grp., LLC*, 534 B.R. 612, 621-22 (Bankr. M.D. Pa. 2015) (holding that the labels used in agreement do not determine its true nature; rather, the analysis is fact-intensive).

[12] *In re Dryden Advisory Grp.*, 534 B.R. at 620 ("To classify a transaction accurately, several attributes must be examined, primarily the allocation of risk.").

[13] *Id.* at 623.

[14] Many of RD's agreements provide that they are governed by New York law, and the Court may appropriately look to New York law in determining whether those transactions have the characteristics of extensions of credit. *See, e.g.*, *Capela v. J.G. Wentworth, LLC*, 2009 WL 3128003, at *10-11 (looking to New York law); *see also Kim*, 806 F.3d at 1174-76 (looking to state law to interpret contract after Anti-Assignment Act barred claim against United States).

[15] Compl. ¶ 56; *see Echeverria v. Estate of Lindner*, No. 018666/2002, 2005 WL 1083704, at *5-8 (N.Y. Sup. Ct. Mar. 2, 2005) (finding "a very low probability that judgment would not be in favor of the plaintiff[,]" the court concluded that the funding agreement constituted a loan subject to the defense of usury).

provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard."[16] Transactions are deemed loans where "there are no reasonable means of non-payment, and accordingly no risk of non-payment."[17] In other words, whether an agreement is a loan depends upon the risk to the lender. The decision in *Echeverria v. Estate of Lindner* demonstrates that the relevant analysis is about lender risk. The court concluded that where the future payment on a litigation claim was a "sure thing," granting an interest in that future payment was a loan, as the lender bore no risk.[18] Two cases with seemingly similar facts also demonstrate this principle. In both *Transmedia Restaurant* and *Clever Ideas*, a funder conveyed money to a restaurant, and the restaurant gave the funder an interest in future income.[19] To determine whether the transactions were loans, each court analyzed lender risk. In *Transmedia Restaurant*, because the funder bore "the risk of not being repaid the advanced funds," the court held that the agreement did "not constitute a loan of money."[20] In contrast, in *Clever Ideas*, the court held that the transaction was not a loan because there was "no risk of non-payment."[21]

Here, at the time RD and the Eligible Claimants entered into the contracts, payment was almost certain. The Zadroga Fund's Special Master had already determined the amount due to

---

[16] *Rubenstein v. Small,* 273 A.D. 102, 104 (N.Y. App. Div. 1947); *Clever Ideas, Inc. v. 999 Rest. Corp.*, No. 0602302/2006, 2007 WL 3234747, at *3 (N.Y. Sup. Ct. Oct. 26, 2007).

[17] *Clever Ideas, Inc.*, 2007 WL 3234747, at *5-6; *see also Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 543–46 (3d Cir. 1979) (finding that transactions at issue were loans and not sales, despite language referring to "sales" and "purchases," because transactions presented "none of the risks present in a true sale").

[18] 2005 WL 1083704, at *8.

[19] *Transmedia Rest. Co., Inc. v. 33 E. 61st St. Rest. Corp.*, 710 N.Y.S.2d 756, 758 (N.Y. Sup. Ct. 2000); *Clever Ideas*, 2007 WL 3234747, at *1-2.

[20] *Transmedia Rest.*, 710 N.Y.S.2d at 760.

[21] *Clever Ideas*, 2007 WL 3234747, at *3-4 (distinguishing *Transmedia*).

each Eligible Claimant.[22] And those amounts were guaranteed by the United States.[23] In short,
when RD and the Eligible Claimants entered into the agreements, there was *no* risk to RD that
the Eligible Claimants would not receive enough funds to repay RD the money that RD lent to
them plus the interest that RD charged.[24] That RD avoided any possibility of risk is especially
clear given that the amounts that RD required the Eligible Claimants to pay back were
significantly less than the amounts they had already been awarded by the Zadroga Fund.

RD is mistaken in its contention that the Government confuses "allocation of risk" with
"degree of risk," and that the Court should only focus on whether agreements claim to be
"recourse" or "non-recourse."[25] The mere existence of a "non-recourse" clause stating that if a
claimant does not receive money from the victim fund, RD cannot sue the claimant, does not
mean that any risk of not receiving the funds is allocated to RD.[26] To the contrary, given the
certainty that the Zadroga Fund will pay out, RD will never need "recourse." RD relies on
*Transmedia Restaurant* and *Clever Ideas* to argue that whether an agreement is on its face a
"recourse" transaction is determinative of whether it is a loan. But neither of those cases analyzes
risk in terms of whether the underlying contract is a recourse agreement. Indeed, neither case
contains any mention of a recourse or non-recourse clause in the agreement.

RD's position is also inconsistent with the principle that a court must examine the
substance, not merely the form, of an agreement. This point is well illustrated in *Oasis Legal
Finance Group v. Coffman*, where the Colorado Supreme Court held that despite the existence of
a non-recourse clause in a litigation-advance transaction (i.e., the plaintiffs would not have to

---

[22] RD Reply in Supp. of Mot. to Dismiss, ECF No. 37, at 4-5.
[23] Compl. ¶ 56.
[24] *Id.*
[25] *See* RD Mem. in Supp. of Mot. to Dismiss, ECF No. 30, at 27-29; RD Reply in Supp. of Mot.
to Dismiss, ECF No. 37, at 11-12.
[26] RD Reply in Supp. of Mot. to Dismiss, ECF No. 37, at 11-12.

repay the lenders if their litigation claims never resulted in recovery), the transactions were loans because of the likelihood that the litigation claims would pay out. In evaluating the transactions, the court "focus[ed] on how [agreements] are designed to work and how they actually work most of the time," rather than on the mere formulaic recitation of a contingency.[27] Likewise, in *Reed v. Val-Chris Investments, Inc.*, where the court held that an advance to be repaid upon a party's receipt of an inheritance was not a loan, the advance also involved a risk of non-payment—the possibility that the party's inheritance would not be enough to cover the advance.[28]

RD suggests that *Capela v. J.G. Wentworth* supports its position. It does not. *Capela* involved a structured-settlement transaction in which a consumer's future payments were transferred to another through a statutory process involving court approval.[29] The court concluded that the transaction was not a loan, as the plaintiff alleged, for a number of reasons. Significantly, the court noted that the statutory structure that governed the transaction—New York's Structured Settlement Protection Act ("SSPA")—expressly allowed assignments such as the plaintiff's and did not treat them as loans.[30] Here, there is no valid assignment to transfer such a repayment obligation. While the *Capela* court also noted that the transaction at issue was distinguishable from transactions involving "recourse"—that is, the plaintiff was not required to

---

[27] 361 P.3d 400, 408 (Colo. 2015); *see also Rancman v. Interim Settlement Funding Corp*., No. 20523, 2001 WL 1339487, at *3 (Ohio Ct. App. 2001) (concluding that, where "no real probability existed that non-payment would occur" at the time of a transaction, the transaction should be treated as a loan, regardless of contract provisions); *Lawsuit Fin., LLC v. Curry*, 683 N.W.2d 233, 239 (Mich. Ct. App. 2004) (concluding that an absolute right to repayment existed where a jury verdict had been reached and a judgment entered in the underlying suit); *cf. Estate of Mixon v. United States*, 464 F.2d 394, 406-07 (5th Cir. 1972) (concluding that advance had indicia of a loan and should be treated as such for tax purposes because the obligation to repay was conditioned on events that were reasonably foreseeable or almost certain to occur).
[28] No. 11-cv-371 BEN (WMC), 2011 WL 6028001, at *2 (S.D. Cal. Dec. 5, 2011).
[29] *See Capela v. J.G. Wentworth*, No. 09-cv-882 (SJF) (WDW), 2009 WL 3128003, at *1-2, 9-10 (E.D.N.Y. Sept. 24, 2009).
[30] *Id.* at *10.

repay the funds because he had effectuated the transfer of his repayment obligation to a third party—it specifically noted the plaintiff's effective assignment of his rights in reaching that conclusion.[31] The SSPA, under which the transfer occurred, provides that under an approved transfer, an obligor (the party making the structured-settlement payments) is discharged from liability to all parties except the transferee (the party that is to the receive structured-settlement payments after the transfer).[32] In contrast, in RD's agreements, the Zadroga Fund continues to be liable to the purported assignees, who then must repay RD directly, assuming the contracts are valid at all.[33] Nor is there any indication in *Capela* that the court considered the transfer to be without risk of non-payment to the transferee. At most, *Capela* stands for the proposition that where (1) a regulatory structure permits assignment and (2) a valid assignment effectively transfers a repayment obligation, a court will not look beyond those facts to assess the risk to the transferee. Absent such circumstances, and when there is simply no risk to be allocated, the "recourse" semantics do not govern.

Other characteristics also indicate that the purported "assignments" of consumers' rights to payment from the Zadroga Fund in RD's contracts are illusory, and that the transactions are properly characterized as loans. The contracts contemplate that the Zadroga Fund will directly pay RD the amounts due under the contract.[34] Indeed, RD itself contends that its right to be paid

---

[31] *See id.* at *10 (noting that cases concluding that transactions were loans involved circumstances where an agreement "required the person who received the funds to pay them back out of their own money, and there was no assignment of their rights with a transfer of repayment obligation to another").

[32] N.Y. Gen. Oblig. § 5-1707(a).

[33] *See* Compl. ¶ 30.

[34] RD Mem. in Supp. of Mot. to Dismiss, ECF No. 30-2, Ex. A-1 at 2 ("The entire Property Amount will be paid to RD from any funds received in . . . satisfaction of the Award . . . before any payment is made from the Award to you or any other person."); *id.* at 16 (giving notice of purported assignment to trustee of Zadroga Fund and directing trustee "to issue a check to RD").

directly by the Fund indicates that its transactions are not loans.[35] But as the Court's orders recognize—and as the Zadroga Fund itself has concluded[36]—the purported assignments are legally prohibited and, as a result, the Fund does not and will not pay RD. That the agreements are extensions of credit is reinforced by the other provisions of RD's contracts. RD's contracts themselves contemplate that the transactions may be deemed loans, and they purport to give RD rights in those circumstances.[37] These provisions demonstrate that RD ensured, through its agreements, that it would be repaid regardless of whether its assignments were deemed invalid, and they contravene RD's suggestion that the agreements would be wholly void in that event.[38] RD also sues consumers for breaching their contracts where the consumers fail to pay RD, demonstrating that RD construes its agreements as contractually obligating consumers to repay the full amount due.[39] In short, RD's contracts are structured to ensure that consumers repay RD, regardless of the reality that the purported assignment has no practical or legal effect.

These factors demonstrate that in substance RD's agreements operate as offers and extensions of credit. Not surprisingly, the characteristics of RD's agreements are also

[35] *Id.* at 29 ("[A] contract that gives the buyer the right to demand direct payment of the receivable by the account debtor is more likely to be considered a true sale than an agreement in which the seller retains control of the receivable. . . . Here, the agreements include just such a right to demand direct payment from a third-party obligor . . . .").
[36] *See* September 11th Victim Compensation Fund, Policies and Procedures, at 61 (May 2017), https://www.vcf.gov/pdf/VCFPolicy.pdf.
[37] RD Mem. in Supp. of Mot. to Dismiss, ECF No. 30-1, Ex. A-1 at 2 (providing RD right to file UCC financing statement in case the transaction is deemed a loan, and security interest within meaning of UCC in amount RD originally conveyed plus interest on that amount). These provisions also suggest that the agreement is not intended be wholly void in that event.
[38] RD Reply in Supp. of Mot. to Dismiss, ECF No. 37, at 7-8.
[39] *See* Compl., *RD Legal Funding Partners, LP v. Santiago*, No. 651831/2016 (N.Y. Sup. Ct. filed Apr. 6, 2016) (alleging that the Zadroga Fund sent award proceeds directly to consumer); Compl., *RD Legal Funding Partners, LP v. Acosta*, No. BER-L-7533-16, at 11-12, 17-19 (N.J. Super. Ct. filed Oct. 28, 2016) (alleging that Zadroga Fund sent award proceeds directly to consumer and asserting contractual and equitable right to entire proceed amount, not just to principal amount initially paid by RD to consumer).

inconsistent with generally accepted definitions of assignments. The Restatement (Second) of Contracts defines an assignment as a transfer in which the "assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."[40] RD's agreements do not extinguish consumers' rights to "performance" by the Zadroga Fund, nor does RD acquire a right to performance by the Fund. Consumers continue to receive payments from the Zadroga Fund, and RD cannot pursue a claim against the Fund. Rather, the only terms of the agreements that are actually carried out are those calling for RD to pay the consumers a sum of money and requiring the consumers to repay a larger amount later. By almost any definition, this is a loan, and the Court should recognize it as a loan.

## II.     The Government has authority to address RD's conduct under the CFPA.

Under the CFPA, a "covered person" is any person that offers or provides a consumer-financial product or service, including "extending credit."[41] RD offered or extended credit to the Eligible Claimants, and is therefore a "covered person" under the CFPA.

Very truly yours,

Eric T. Schneiderman
Attorney General of the State of New York

By: _Jane M. Azia_
        Jane M. Azia

Benjamin Konop
Enforcement Attorney
Consumer Financial Protection Bureau

---

[40] *See* Restatement (Second) of Contracts § 317(1).
[41] 15 U.S.C. § 5481(6), (15)(A)(i).