

**VIA ECF**

**MICHAEL D. ROTH**
mroth@bsfllp.com

March 12, 2018

The Honorable Loretta A. Preska
United States District Court Judge
United States Courthouse
500 Pearl Street, Room 2220
New York, NY 10007

Re: *CFPB, et al. v. RD Legal Funding, LLC, et al.*, Case No. 17-cv-890

Dear Judge Preska:

I write on behalf of Defendants RD Legal Funding, LLC, RD Legal Finance, LLC, RD Legal Funding Partners, LP, and Roni Dersovitz (collectively, "RD Legal"), in response to the Court's February 23 and February 28 orders (the "Orders"), and the letter brief filed by the Consumer Financial Protection Bureau and New York Attorney General (collectively, the "CFPB") on March 5, 2018 (ECF No. 73).

## I. THE ASSIGNMENT AGREEMENTS ARE OUTSIDE THE SCOPE OF THE CFPA AND THUS THERE IS NO SUBJECT MATTER JURISDICTION

The Court's Orders posed two questions that presupposed the existence of *assignment* agreements that are subject to the federal Anti-Assignment Act:[1]

> If the Court concludes that compensation from the Zadroga Fund is not assignable pursuant to 31 U.S.C. § 3727 and that, as such, the assignments in the Purchase Agreements pertaining to such compensation are void as to the United States, (1) what is the effect of the underlying agreement between the RD Entities and the Eligible Claimants as private parties, and (2) how does the effect of the underlying agreement impact the Government's assertion of jurisdiction over the RD Entities as "covered person[s]" under the CFPA?

[1] RD Legal maintains that, although these transactions are clearly assignments, the Anti-Assignment Act is inapplicable because, among other reasons, a claim to the Zadroga Fund is not "a claim *against* the United States." (*See* ECF No. 37 at 12-13.)





The answers to these two questions are straightforward:

*First*, as RD Legal explained in its Reply in Support of Defendants' Motion to Dismiss (ECF No. 37 at 13), while the Anti-Assignment Act "voids the assignment as against the United States . . . the assignment remains enforceable as between the parties" to the contract. *Saint John Marine Co. v. United States*, 92 F.3d 39, 45 (2d Cir. 1996). Although the CFPB previously took a contrary position (ECF No. 1 (Complaint) & ECF No. 36 (Opposition to Motion to Dismiss))—it now concedes that the Anti-Assignment Act does not affect the agreements between RD Legal and eligible claimants. (ECF No. 73 at 2 & n.4.)

*Second*, the RD Entities are not "covered person[s]" under the CFPA. As an assignee, RD Legal "stands in the shoes of the assignor." *Badiak v. White Plain Kensington, LLC*, 918 N.Y.S.2d 329, 331 (2011). RD Legal acquires "the full risks and benefits of ownership of the Property," (ECF No. 30-2 at 2), and acquires the full "right, title and interest" in the Property. (*Id.* at 1, 11; *see also id.* at 16 (seller acknowledging transfer to RD Legal of "right, title and interest" in the Property).) The transactions do not create a debt. Rather, there is a sale in which RD Legal acquires an ownership interest in intangible property.

Sales and loans are distinct concepts. While there are many cases analyzing the distinction between an assignment and a loan, *no case* supports the CFPB's position that a transaction can be both an assignment (subject to a contractual or statutory anti-assignment provision) and a loan (subject to state usury laws). The CFPB's contradictory positions are equivalent to claiming that a traffic light was simultaneously red and green.





## II. THE CFPB'S RESPONSE TO THE COURT'S QUESTIONS CONTRADICTS ITS PRIOR POSITION AND IS CONTRARY TO LAW

Perhaps recognizing that its theory regarding the Zadroga Fund is flawed, the CFPB revises the Court's questions to be "whether, *apart from application of the Anti-Assignment Act*, an agreement between private parties is properly characterized as an assignment or a loan." (ECF No. 73 at 3 (emphasis added).) But that is not what the Court asked, nor is it consistent with the CFPB's prior contention that "*because* the assignment provisions in the RD contracts are invalid and unenforceable" under the Anti-Assignment Act, the agreements "functionally offer[] or provide[] a credit transaction." (ECF No. 36, at 24.)

Nonetheless, even if the Court entertains the CFPB's new argument, it fails because, as explained below, the transactions are true sales that are not subject to the CFPA.

### *A. The Assignment Agreements Are True Sales*

"Purchases and sales of future receivables and sales proceeds are common commercial transactions expressly contemplated by the Uniform Commercial Code." *IBIS Capital Grp., LLC v. Four Paws Orlando LLC*, No. 608586/16, 2017 WL 1065071, at *3 (N.Y. Sup. Ct. March 10, 2017). The distinction between sales and loans is significant, as only loans are subject to usury restrictions and only a loan can be genuinely characterized as an "extension of credit" within the scope of the CFPA. *See Seidel v. 18 E. 17th St. Owners, Inc.*, 586 N.Y.S.2d 240 (1992) ("Usury laws apply only to loans or forbearances, not investments.").

Courts consider a number of factors when analyzing whether the sale of receivables or proceeds is a "true sale" or a loan, and as the CFPB acknowledges, "[t]he primary factor . . . is 'the allocation of risk.'" (ECF No. 73 at 4 (quoting *In re Dryden Advisory Grp., LLC*, 534





B.R. 612 (Bankr. M.D. Pa. 2015) ("*Dryden*") (applying New York law).) The critical risk inquiry is thus not *how much* risk exists, but rather *which party holds whatever risk does exist*. *See Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) ("The root of all of these factors is the transfer of risk.").

**1. The Assignment Agreements Allocate Risk to RD Legal**

Several courts have recently surveyed relevant case law and articulated the factors used in a "true sale" analysis to determine how risk is allocated. *See Rapid Capital Fin., LLC v. Natures Mkt. Corp.*, 66 N.Y.S.3d 797, 799-800 (N.Y. Sup. Ct. 2017) (collecting cases and discussing factors considered in true sale analysis); (*see also* ECF No. 30 at 36, ECF No. 37 at 18-20). These factors consider the allocation between the parties of the "if" (collection risk) and "when" (duration risk) of the receipt of proceeds from a transaction:

- "[T]he most important single factor when determining whether a transaction is a true sale is the buyer's right to recourse against the seller." *Dryden*, 534 B.R at 623.

- Another factor is whether the seller is required "to make a minimum . . . payment *irrespective* of the account receivable," which would indicate that the transaction is a loan. *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 57 N.Y.S.3d 625, 633 (N.Y. Sup. Ct. 2017) (citation and internal quotation marks omitted) (discussing also that a clause adjusting the amount due based on receivables indicates a sale).

- An additional factor courts consider "quintessential is whether the agreement has a finite term or not. . . . 'The existence of this uncertainty in the length of the Agreement is an express recognition by the parties of the wholly contingent nature of this Agreement.'" *Id.* (quoting *IBIS Capital*, 2017 WL 1065071, at *5-6); *see also Rapid Capital*, 66 N.Y.S.3d at 801 ("[A] loan has a finite term, . . . whereas the period over which repayment will be made for a receivables purchase agreement is indeterminate.")

Applying these factors, RD Legal's transactions cannot be characterized as loans: the sales are non-recourse (ECF No. 30-2, Ex. A-1, ¶ 6(h)); there is no obligation for the seller to make any payments, let alone periodic payments (*id.*, at ¶¶ 1-2, 6(h)); and the transactions are





not for a finite term (ECF No. 30-2, Ex. A-1).[2] Moreover, while calling a transaction a sale is not dispositive, it also should not be ignored, where, as here, the contractual language stating these are sales is consistent with the substance of the transactions. (*See* ECF No. 30 at 31.)

In analyzing RD Legal contracts that are virtually identical to the ones at issue here, the court in *Peterson v. Islamic Republic of Iran*, Case No. 10-cv-04518 (S.D.N.Y.), adopted the Report & Recommendation of Special Master Kathleen Massey, which concluded that RD Legal's assignment agreements "should not be viewed as loans given, among other considerations, the plain language of the agreements . . ., including that they do not include any references to amounts borrowed, maturity dates or interest, . . . [and] perhaps most significantly, that the transactions were on a non-recourse basis." (ECF No. 872 at 49-50.)

**2. The CFPB Misconstrues the True Sale Doctrine**

After acknowledging the "allocation of risk" standard, the CFPB misapplies that standard by (a) misconstruing the meaning of a recourse transaction, and (b) erroneously focusing on the creditworthiness of the third-party obligor to the underlying obligation, as opposed to the risk allocation between the parties to the assignment agreement.

**(a) The Agreements Do Not Provide Recourse Against the Seller**

Contrary to the CFPB's unsupported assertion that the agreements are recourse transactions that impose a "repayment" obligation on the sellers, the terms of the Assignment Agreements impose on the seller no repayment obligation whatsoever. The sellers' only

---

[2] Courts sometimes look to other factors, like (1) the buyer's ability to demand payment directly from account debtors, and (2) the absence of the seller's repurchase right, and those factors further confirm that these transactions are true sales. (*See* ECF No. 40 at 26-31.)





obligations are to facilitate the direct distribution of the settlement proceeds to RD Legal or, if a seller receives the distribution, to turn it over to RD Legal immediately upon receipt.[3] (*See, e.g.*, ECF No. 30-2, Ex. A-1, ¶ 5(c)(d).) Indeed, the contracts all expressly confirm that, in the event RD Legal is unable to collect the receivable, the seller "will have no obligation to pay RD any portion of the Purchase Price that RD paid to [the seller]." (*Id.*, ¶ 6(h).)

The CFPB tries to avoid this conclusion by citing *Dryden* to claim that "where there is no true risk to the purported 'buyer,' the transaction is properly characterized as a loan." (ECF No. 73 at 4.) But that is not what *Dryden* says. Rather, *Dryden* recognizes that "the buyer's right to recourse" concerns whether the collection risk is allocated to the buyer or seller, *not* whether the third-party obligor is able to pay. *Dryden*, 534 B.R. at 623. Here, RD Legal accepted from its customers the risks of "if" (collection risk) and "when" (duration risk) the Zadroga Fund would be able to disburse funds. *See infra*, Section II.B.

While the CFPB asserts that the ability to sue a customer for breach of contract "demonstrate[s] that RD Legal construes its agreements as contractually obligating consumers to repay the full amount due," that assertion is false. (ECF No. 73 at 9.) The right to sue a contracting party "in the case of a default or breach" exists in *every* contractual relationship, and does not affect the allocation of risk. *IBIS Capital*, 2017 WL 1065071, at *2-3. Rather, as explained above, the assignment agreements transfer ownership in intangible property to

[3] Of course, in almost every factoring transaction the seller collects the receivables from a third-party obligor, and those receivables are turned over to the factor. That tri-party relationship does not create recourse or dictate that a transaction is a loan, as the CFPB contends. *See Rapid Capital*, 66 N.Y.S.3d at 799-800 (many "decisions have considered and rejected arguments that agreements to purchase receivables were loans").





RD Legal. RD Legal's right to sue a seller claiming a competing ownership right for breach of contract or conversion does not make the transaction a loan.

**(b) The Creditworthiness of the Obligor is Irrelevant**

The CFPB also distorts New York law in an effort to convince the Court that the creditworthiness of the obligor dictates the distinction between a loan and a sale.

*First*, the CFPB relies on *Echeverria v. Estate of Lindner*, No. 018666/2002, 2005 WL 1083704 (N.Y. Sup. Ct. Mar. 2, 2005), to support its contention that the proper analysis focuses on the third-party obligor's ability to pay the underlying receivable, and not on the relationship between the buyer and seller of the receivable. But *Echeverria* is an unpublished trial court order where the court was "not asked to address any issue beyond damages," *id.* at *1, and merely stated in *dicta* that a litigation funding agreement should be considered a loan, as opposed to "legalized gambling," because the strict liability claim at issue was a "sure thing," *id.* at *8. *See Obermayer Rebmann Maxwell & Hippel LLP v. West*, No. 15-81, 2015 WL 9489791, at *4 (W.D. Pa. Dec. 30, 2015) (recognizing *Echeverria*'s "speculation as to whether the transactions were usurious clearly was dicta"), *aff'd*, 2018 WL 1074310 (3d Cir. Feb. 27, 2018) (applying New York law to conclude litigation funding contracts are sales, not loans). *Echeverria*'s discussion of usury has never been cited by a New York state court as a proper statement of New York law, and the CFPB's reliance on it as such should be rejected. (ECF No. 73 at 5 & n.15.)

*Second*, the CFPB's attempt to distinguish *Capela v. J.G. Wentworth, LLC*, No. CV09-882, 2009 WL 3128003 (E.D.N.Y. Sept. 24, 2009), is unpersuasive. *Capela* considered





whether the purchase of future settlement proceeds was an "extension of credit" under TILA or a sale. *Id.* at *11. In holding the assignments "cannot be considered a loan," the court did not rely on the application of New York's structured settlement statute, as the CFPB contends, nor did it consider the likelihood of the third-party obligor (Allstate Life Insurance Company of New York) defaulting. *Id.* at 10. Instead, consistent with New York law, the court held that "[t]he transaction . . . cannot be considered a loan because Capela has no obligation at all to pay the settlement installments if Allstate fails to do so." *Id*.

*Third,* the other cases on which the CFPB relies likewise confirm that the proper question is whether the risk of non-payment is transferred from the seller to the buyer, not the degree of risk borne by the buyer based on the creditworthiness of the third-party obligor. In the two cases involving "advanced meal sales" agreements—*Transmedia Restaurant* and *Clever Ideas*—the courts analyzed whether the risk of collection was transferred to the buyer or retained by the seller. *Compare Transmedia Rest. Co., Inc. v. 33 E. 61st St. Rest. Corp.*, 710 N.Y.S.2d 756, 760 (N.Y. Sup. Ct. 2000) (finding a true sale because the funder "bears the risk of not being repaid the advanced funds"), *with Clever Ideas v. 999 Rest. Corp.*, No. 0602302/2006, 2007 WL 3234747 (N.Y. Sup. Ct. Oct. 12, 2007) (finding a loan because the restaurateur "backed up the risk" with his personal guarantee and a security interest in the restaurant's property). In *Clever Ideas*, when noting the buyer bore "no risk of non-payment," the court was *not* referring to certainty of collection—as the CFPB misleadingly asserts (ECF No. 73 at 5)—but to the fact that the risk was not allocated to the buyer.[4] *See id.*

---

[4] The CFPB's other cases confirm that the inquiry into the allocation of risk concerns whether





*Finally*, the CFPB also cites out-of-state cases to try to bolster its position, *see* ECF No. 73 at 6-7 & n.26, but none of those cases apply New York law. In particular, *Oasis Legal Finance Group v. Coffman*, 361 P.3d 400, 409 (Colo. 2015) ("*Oasis*"), involved the application of a unique Colorado statute, and the court reasoned that—contrary to New York law—transactions "need not be recourse" to be considered loans under that statute. *Id.* Moreover, in contrast to the flat purchase prices here, *Oasis* found "it significant that the obligation [of the borrower] increases with the passage of time . . . one of the features of a 'consumer loan' under the" Colorado statute. *Id.* at 409-10 ("The amount to which the companies are entitled . . . grows in predictable intervals fixed by the companies in the agreements."). *Oasis* is inapposite.

***B. The CFPB's Degree of Risk Standard Is Unworkable and Inapplicable***

The CFPB's novel standard for distinguishing between sales and loans—whether a buyer is "almost certain" to collect (ECF No. 73 at 4)—depends on a subjective assessment of the third-party obligor's creditworthiness, among other intangible factors. While New York's factoring cases bely that this is the proper inquiry, the Zadroga transactions involved both collection and duration risk, and are sales even under the CFPB's incorrect standard.

Ten years after 9/11, the James Zadroga 9/11 Health and Compensation Act of 2010 allocated for a five-year period up to $875 million dollars to finance the Zadroga Fund. (Pub.

---

the buyer has a right to recourse against the seller. *See Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 540 (3d Cir. 1979) (receivables sold "with full recourse against [the seller]" and a repurchase obligation *not* a loan); *Rubenstein v. Small*, 75 N.Y.S.2d 483, 485-86 (N.Y. App. Div. 1947) (funding for theatrical production *not* a loan, because sum advanced was to be returned *only* out of any unused portion and profits without any right to recourse if funds were insufficient); *Reed v. Val-Chris Invs., Inc.*, No. 11CV371, 2011 WL 6028001, at *2 (S.D. Cal. Dec. 5, 2011) (non-recourse advance on plaintiff's inheritance *not* a loan "because Plaintiff had no obligation to pay . . . anything if the Estate did not satisfy the amount Plaintiff assigned").





L. No. 111-347, 124 Stat. 3623, Sec. 205.) On January 29, 2013, the Fund estimated that there would be $8.5 billion in claims, and announced that those expected claims far exceeded available funds. *See* https://www.vcf.gov/pdf/VCFExplanationOfFirstPayments.pdf. Even as late as April 8, 2015—more than one year after RD Legal began entering the Zadroga transactions (*see* ECF No. 30, Exs. A-1 – A-20)—the Special Master overseeing the Fund stated: "The [Fund] has a limited amount of funding . . .[and] your combined payments [may] be less than the full amount of your loss calculation." https://www.vcf.gov/blogprogstatsapr2015.html.

While the Fund was ultimately replenished by virtue of the James Zadroga 9/11 Victim Compensation Fund Reauthorization Act (the "Reauthorization Act"), that statute was not enacted until December 18, 2015 (Pub. L. No. 114-113, 129 Stat. 2242), *after RD Legal had executed all of the Zadroga Assignment Agreements*. (ECF No. 30, Exs. A-1 – A-20.)

At the time of the Assignment Agreements there was no guarantee that the Reauthorization Act would pass, that there would be sufficient funds available to replenish the Fund, or that there would not be a judicial challenge to the legislation. The CFPB's contention that payment from the Fund was "*almost* certain" acknowledges, but understates, the existence of risk, and does not transform the transactions from assignments to loans.

## III. CONCLUSION

For all of the foregoing reasons, and for all of the reasons stated in RD Legal's prior submissions, its Motion to Dismiss should be granted without leave to amend.

Sincerely,

/s/ MICHAEL D. ROTH