UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



CONSUMER FINANCIAL PROTECTION
BUREAU and THE PEOPLE OF THE
STATE OF NEW YORK, BY ERIC T.
SCHNEIDERMAN, ATTORNEY GENERAL
FOR THE STATE OF NEW YORK,

                        Plaintiffs,

        -against-

RD LEGAL FUNDING, LLC; RD LEGAL
FINANCE, LLC; RD LEGAL FUNDING
PARTNERS, LP; and RONI
DERSOVITZ,

                    Defendants.

17-cv-890 (LAP)

OPINION & ORDER

Attorneys and Law Firms

BENJAMIN KONOP, HAI BINH T. NGUYEN, Bureau of Consumer Financial
Protection, Washington, DC, JANE M. AZIA, MELVIN L. GOLDBERG,
People of the State of New York by Eric T. Schneiderman,
Attorney General for the State of New York, New York, NY, for
Plaintiffs.

MICHAEL D. ROTH, JEFFREY M. HAMMER, DAVID K. WILLINGHAM, Boies
Schiller Flexner LLP, Los Angeles, CA, ERIC T. KANEFSKY,
Calcagni & Kanefsky LLP, Newark, NJ, for Defendants.

CAROLINA A. FORNOS, Pillsbury Winthrop Shaw Pittman, LLP, New
York, NY, for Amicus Curiae American Legal Finance Association.

CHRISTOPHER A. SEEGER, TERRIANNE BENEDETTO, Seeger Weiss LLP,
New York, NY, DIOGENES P. KEKATOS, Seeger Weiss LLP, Ridgefield
Park, NJ, for Proposed Amicus Curiae Plaintiff Settlement Class
in In re National Football League Players' Concussion Injury
Litigation.

Table of Contents

I. Factual Background ......................................... 2

  a. The NFL Class Members..................................... 4

  b. September 11, 2001 James Zadroga Victims Compensation Fund
  Eligible Claimants ........................................ 5

  c. The Purchase Agreements................................... 6

  d. Claims Against the RD Entities............................ 7

    i. CFPA Claims ........................................... 7

    ii. Claims Arising Under New York Law ..................... 9

II. Procedural History ...................................... 10

III. Legal Standard......................................... 15

IV. Discussion............................................. 16

  a. Federal Jurisdiction.................................... 17

    i. The RD Entities as "Covered Persons" Under the CFPA .... 17

      1. The NFL Concussion Litigation Settlement Agreement
      Claims............................................. 19

        a. The NCLSA's Anti-Assignment Provision.............. 20

        b. Legal Standard Regarding the Scope of the Anti-
        Assignment Provision .............................. 21

        c. Assignability of "Settlement Proceeds" Versus
        "Monetary Claims" ................................. 24

        d. Interpretation of the New York UCC ............... 27

        e. The NFL-related Purchase Agreements Are Void....... 29

      2. 31 U.S.C. § 3727 Invalidates the Assignment of
      Compensation Awards from the VCF...................... 29

        a. The Anti-Assignment Act, 31 U.S.C.   § 3727 ....... 30

          i. "Claim Against the United States" ............... 31

          ii. Statutory Purpose ............................. 36

          iii. .. The VCF-related Purchase Agreements Do Not Comply
          With the Anti-Assignment Act's Requirements ......... 40

      3. Eligible Claimants and NFL Class Members "Incur[red]
      Debt" Through the Purchase Agreements.................... 41

        a. The RD Entities Extend "Credit" and "Service[]
        Loans" ............................................ 54

      4. The RD Entities Are "Covered Persons" Under the CFPA . 56

ii

b. Failure to State a Claim Fed. R. Civ. P. 12(b)(6)........ 56

  i. Rule 9(b)'s Heightened Pleading Standard Does Not Apply to Non-Fraud Claims .................................................. 57

    1. "Substantial Assistance" Claims Under the CFPA ....... 62

    2. Specificity of Allegations Against Each Defendant Under Rule 8(a)................................................. 63

  ii. "Substantial Assistance" Liability Under the CFPA...... 67

  iii. Deceptive and Abusive Conduct Under the CFPA ........ 70

    1. Counts I, III, IV, V:  Deceptive Acts or Practices Under the CFPA................................................. 70

      a.  Count I ............................................ 71

        i.  "Substantial Assistance" Claim Against Roni Dersovitz Under Count I ............................. 72

      b.  Count III........................................... 75

        i.  "Substantial Assistance" Claim Against Roni Dersovitz Under  Count III ......................... 76

      c.  Count IV........................................... 77

        i.  "Substantial Assistance" Claim Against Roni Dersovitz Under  Count IV .......................... 79

      d.  Count V............................................ 80

        i.  "Substantial Assistance" Claim Against Roni Dersovitz Under  Count V ........................... 81

    2. Count II: Abusive Acts or Practices Under the CFPA ... 83

      a.  "Substantial Assistance" Claim Against Roni Dersovitz Under Count II ....................................... 85

  iv. State Law Claims ..................................... 86

    1. NYAG's Jurisdiction Over the Purchase Agreements ..... 88

    2. Count VI: Claims Under New York Civil and Criminal Usury Laws...................................................... 89

    3. Count VIII: Violation of New York General Obligations Law § 13-101............................................. 91

    4. Count IX: Violation of New York General Business Law § 349.................................................... 93

    5. Count X: Violation of New York General Business Law § 350.................................................... 96

    6. Count XI: New York Executive Law § 63(12) Fraud ...... 98

c. Constitutional Claims.................................... 99

  i. History, Liberty, and Presidential Authority........... 99

ii. CFPB's Notice of Ratification .......................... 100

d.  Conclusion........................................... 104

Loretta A. Preska, Senior United States District Judge:

This is an action by Plaintiffs Consumer Financial Protection Bureau (the "CFPB") and the People of the State of New York, by Eric T. Schneiderman, Attorney General for the State of New York ("NYAG" or the "Attorney General") (collectively, the "Government"), against Defendants RD Legal Funding, LLC; RD Legal Finance, LLC; RD Legal Funding Partners, LP (collectively, the "RD Entities"); and Roni Dersovitz, the founder and owner of the RD Entities (together with the RD Entities, the "Defendants").   The Government asserts that the Defendants violated certain provisions of the Consumer Financial Protection Act ("CFPA" or the "Act").   NYAG independently asserts that the RD Entities are liable under New York law for the same actions and events that form the basis of the CFPA claims.   Defendants move to dismiss the Complaint (ECF No. 1) on three principal grounds.   First, Defendants argue that the CFPB is unconstitutionally structured and therefore lacks the authority to bring claims under the CFPA.   Second, Defendants contend that the Court lacks federal jurisdiction because the RD Entities are not "covered persons" under the CFPA and therefore do not come within the Act's jurisdictional purview.   Third and finally, the RD Entities move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

As set out below, because the CFPB's structure is unconstitutional, it lacks the authority to bring claims under the CFPA and is hereby terminated as a party to this action. The NYAG, however, has independent authority to bring claims under the CFPA.  The Court concludes that NYAG has alleged plausibly claims under the CFPA and under New York law. Accordingly, Defendants' motion to dismiss the Complaint is denied.  (ECF No. 39.)

I.   Factual Background

The following facts are drawn from the Complaint, (Complaint ("Compl."), ECF No. 1), the Assignment and Sale Agreements (hereinafter the "Purchase Agreements") attached as exhibits to the Affidavit of Roni Dersovitz, (Affidavit of Roni Dersovitz ("Dersovitz Aff."), Exs. A-1 to A-20, B-1 to B-5, ECF No. 41-1), and the National Football League ("NFL") Concussion Litigation Settlement Agreement ("NCLSA"), (Dersovitz Aff. Ex. 6), which Defendants attached to their motion to dismiss.  The allegations in the Complaint are accepted as true for purposes of the instant motion.[1]

---

[1] As Defendants note in their motion to dismiss, "[t]he Court may consider the Zadroga Fund agreements [(Dersovitz Aff. Exs. A-1 to A-20)], and the NFL Settlement Fund agreements [(Dersovitz Aff. B-1 to B-5)], because the Complaint refers to them extensively and 'relies heavily upon [their] terms and effect, which renders the document[s] integral to the complaint.'" Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citation and some internal quotation marks omitted);

The CFPB and NYAG bring this action against the RD Entities and their founder and owner, Roni Dersovitz.  (Compl. ¶¶ 15-19.) The RD Entities are companies that offer cash advances to consumers waiting on payouts from settlement agreements or judgments entered in their favor.  The Government alleges that Defendants misled these consumers into entering cash advance agreements that the Defendants represented as valid and enforceable sales but, in reality, functioned as usurious loans that were void under state law.  (Compl. ¶ 19.)

At issue in this case are two specific groups of consumers (collectively, the "Consumers") with which the RD Entities transacted: (1) class members in the National Football League ("NFL") Concussion Litigation class action ("NFL Class Members" or "Class Members") and (2) individuals ("Eligible Claimants")

---

accord Capela v. J.G. Wentworth, LLC, No. CV09-882, 2009 WL 3128003, at *1 n.2 (E.D.N.Y. Sept. 24, 2009).  Furthermore, according to Defendants, the Purchase Agreements attached as exhibits to Defendants' motion to dismiss were among the 218 contracts that Defendants produced to the CFPB pursuant to a civil investigative demand ("CID").  (Defendants' Mot. to Dismiss ("Def. Br.") 6, ECF No. 49.)  Therefore, it is reasonable to assume that the CFPB relied on these Purchase Agreements in drafting the Complaint.  The Court also notes that, all at once, the Government objects to the inclusion of the Purchase Agreements in deciding the instant motion to dismiss (Plaintiff's Opp'n ("Pl. Opp.") 36 n.13, ECF No. 36) but in the same breath relies on the Purchase Agreement exhibits in support of its arguments in its opposition briefing.  (Pl. Opp. 35-36.)  For these reasons, the Court concludes that the Purchase Agreements are "integral" to the Complaint and therefore may be considered for purposes of deciding the instant motion.  Chambers, 282 F.3d at 152-53.

who qualify for compensation under the September 11th Victim Compensation Fund of 2001 ("VCF").  49 U.S.C. § 40101.

### a. The NFL Class Members

On January 31, 2012, a federal multidistrict litigation was created in United States District Court for the Eastern District of Pennsylvania for lawsuits on behalf of former NFL players who suffer from mild traumatic brain injury due to playing professional football.  See Settlement Agreement (hereinafter "Settlement Agreement") Preamble, In re NFL Players' Concussion Injury Litig., MDL No. 2323 (E.D. Pa. Feb. 13, 2015) (ECF No. 6481-1).  Defendants in that case, the NFL and NFL Properties LLC, ultimately agreed that settlement of the claims in that complex putative class action was appropriate.  Id. Recitals (K).  Accordingly, on February 13, 2015, a federal district court in the Eastern District of Pennsylvania approved the NFL Concussion Litigation Settlement Agreement ("NCLSA") between the Class Members, by and through class counsel, and defendants NFL and NFL Properties LLC.  Id. Preamble.

The NFL Class Members at issue in this case are former NFL players who have been diagnosed with neurogenerative diseases such as chronic traumatic encephalopathy ("CTE"), Alzheimer's, or Parkinson's disease and who have received notification of their entitlement to a settlement award under the NCLSA for these injuries. (Compl. ¶¶ 22-23.)

4

b. September 11, 2001 James Zadroga Victims Compensation Fund
   Eligible Claimants

In January 2011, President Obama signed the James Zadroga
9/11 Health and Compensation Act of 2010 ("Zadroga Act"), which
served to renew the September 11th Victim Compensation Fund of
2001 (the "VCF").  49 U.S.C. § 40101.  Congress created the VCF
to provide compensation to individuals and personal
representatives of deceased individuals who suffered physical
injury or were killed as a result of the September 11, 2001
terrorist attacks or were harmed during the removal of debris
immediately following those attacks.  Proposed Rule, Federal
Register, Vol. 76 No. 119 (Jun. 21, 2011).  The Zadroga Act
authorizes a Special Master appointed by the Attorney General to
carry out the administration of the VCF by enacting substantive
and procedural rules, including making determinations as to what
award amount an eligible individual ("Eligible Claimant") is
entitled to under the VCF.  28 C.F.R. § 104.51.

According to the Complaint, the Eligible Claimants with
whom the RD Entities transact have received an award letter from
the VCF's Special Master indicating the amount of compensation
to which they are entitled under the VCF.  (Compl. ¶¶ 22-23); 49
U.S.C. §§ 405(b)(1), 405(c), 406(a).  Eligible Claimants who are
entitled to compensation include individuals who suffer from
respiratory illnesses and cancers related to their exposure to

dust and debris at the World Trade Center site as well as from post-traumatic stress disorder, depression, anxiety disorder, and memory loss following the September 11th, 2001 terrorist attacks.  (Compl. ¶ 22.)

   c. The Purchase Agreements

     According to the Complaint, after a Consumer has received final approval and a notice of the award amount to which he or she is entitled, the RD Entities offer to take a security interest in the Consumer's settlement award or a portion thereof (the "Property" or "Property Amount").  (Compl. ¶ 20.)  In the contracts that Defendants enter into with Consumers, the RD Entities purport to "acquire the full risks and benefits of ownership of the Property and acquire the full right, title and interest in the Property."  (Def. Br. Ex. 1.)  In exchange, the RD Entities offer Consumers an immediate "lump sum" cash payment that represents a portion of the total award to which the Consumer is entitled.  (Compl. ¶ 24.)  In return, the Consumer agrees to repay a larger amount, i.e., the Property Amount, to the RD Entities after receiving its settlement payment.  (Id.)  The Purchase Agreements contain a no recourse provision that relieves the Consumer of his or her obligation to repay the RD Entities in the event that the RD Entities are unable to recover the settlement award from the Consumer's third-party obligor, i.e., the NFL Settlement Fund or the VCF.  (Def. Br. Ex. 1.)

6

The RD Entities enter into two types of contracts with Consumers.  Under the first, the RD Entities advance a lump sum of cash to the Consumer.  The repayment amount that the Consumer owes to RD remains the same, regardless of when the Consumer receives the award from the VCF or the NFL Settlement Fund. (Compl. ¶ 31.)  Under the second type of contract, the amount the Consumer repays turns on when the claims administrator disburses the Consumer's award.  The longer it takes for the Consumer to receive his or her settlement payment, the more the Consumer owes to the RD Entities.  (Id.)

After entering into the Purchase Agreement, Consumers are obligated immediately to forward any monies received from the NFL Claims Administrator or the VCF to the RD Entities until the Consumer has paid off the agreed-upon amount.  (Compl. ¶ 26.) After the amount due under the agreement has been paid to the RD Entities, the Consumer is entitled to keep any balance in excess of that amount that he or she receives from the NFL Settlement Fund or VCF Claims Administrator.  (Id.)

d. Claims Against the RD Entities

i.  CFPA Claims

The Complaint alleges five CFPA claims against the RD Entities: (1) Count I alleges that the RD Entities engaged in deceptive acts or practices, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), by misrepresenting that the Purchase Agreements

constituted valid and enforceable assignments and that Dersovitz
knowingly or recklessly provided substantial assistance to the
RD Entities in carrying out these violations, 12 U.S.C.
§ 5536(a)(3) (Compl. ¶ 63); (2) Count II alleges that the RD
Entities engaged in abusive acts or practices, 12 U.S.C.
§§ 5531(d), 5536(a)(1)(B), by misrepresenting that the Purchase
Agreements constituted valid and enforceable assignments and
that Dersovitz knowingly or recklessly provided substantial
assistance to the RD Entities in carrying out these violations,
12 U.S.C. § 5536(a)(3) (Compl. ¶¶ 72-73); (3) Count III alleges
that the RD Entities engaged in deceptive acts or practices, 12
U.S.C. §§ 5531(a), 5536(a)(1)(B), by misrepresenting that they
could "cut through red tape" and expedite a Consumer's award
payment when in fact they could not and that Dersovitz knowingly
or recklessly provided substantial assistance to the RD Entities
in carrying out these violations, 12 U.S.C. § 5536(a)(3) (Compl.
¶ 79); (4) Count IV alleges that the RD Entities engaged in
deceptive acts or practices, 12 U.S.C. §§ 5531(a),
5536(a)(1)(B), by misrepresenting when the RD Entities would
deliver Consumers' cash payments because, in some instances, the
RD Entities made payment after the promised payment date, and
that Dersovitz knowingly or recklessly provided substantial
assistance to the RD Entities in carrying out these violations,
12 U.S.C. § 5536(a)(3), (Compl. ¶ 86); and (5) Count V alleges

that the RD Entities engaged in deceptive acts or practices, 12
U.S.C. §§ 5531(a), 5536(a)(1)(B), by collecting on contracts
that functioned as loans with usurious interest rates under
state law and on which no payment was due, and that Dersovitz
knowingly or recklessly provided substantial assistance to the
RD Entities in carrying out these violations, 12 U.S.C.
§ 5536(a)(3).  (Compl. ¶ 93.)

ii.   <u>Claims Arising Under New York Law</u>

The NYAG brings independently various claims arising under
New York law, each of which is asserted against each of the
named Defendants:  Count IX asserts a claim of deceptive
practices under New York General Business Law ("NY GBL") § 349
against all of the named Defendants based on the same alleged
deceptive conduct underlying Counts I, III, IV, and V of the
Complaint, (Compl. ¶¶ 119-22); Count X asserts a claim of false
advertising against all of the named Defendants under NY GBL
§ 350 based on the RD Entities' alleged misrepresentations that
the transactions at issue were sales, not loans, and that the RD
Entities had the ability to expedite payment of Consumers'
awards when in fact they did not, (Compl. ¶¶ 123-26); Count XI
asserts a claim under New York Executive Law § 63(12) for
fraudulent conduct based on the same factual allegations
underlying Counts I-V of the Complaint (Compl. ¶¶ 127-30);
Counts VI and VII allege that, through the Purchase Agreements,

9

Defendants charged Consumers rates of interest that violated New York's civil and criminal usury laws, N.Y. Banking Law § 14-a, and N.Y. Penal Law §§ 190.40 and 190.42, respectively (Compl. ¶¶ 99-105, 106-10); and finally, Count VIII alleges that Defendants violated New York General Obligations Law ("NY GOL") § 13-101 because they entered into contracts that constituted an unlawful assignment of individual claims to recover for personal injuries under New York law.  N.Y. Gen. Oblig. Law § 13-101; (Compl. ¶¶ 111-18.)

II.  Procedural History

The instant case has a circuitous history in this Court. In January 2017, RD Legal Funding, LLC filed a complaint against the CFPB in the Southern District of New York seeking relief in the form of, inter alia, a declaration that the purchase of legal receivables from customers are true sales and that, therefore, RD Legal Funding, LLC's business is not within the CFPB's jurisdiction.  RD Legal Funding, LLC v. Consumer Fin. Prot. Bureau, No. 17-cv-00010 (LAP) (S.D.N.Y.) (ECF No. 1); (Def. Br. 7.)  According to Defendants, RD Legal Funding, LLC filed that action in response to civil investigative demands ("CID") that the CFPB served on RD Legal Funding, LLC as well as a formal request from the CFPB to depose an RD Legal Funding, LLC representative in connection with the CFPB's investigation of the RD Entities.  (Def. Br. 6.)

Two days after filing suit in federal court against the
CFPB, RD Legal Funding Partners, LP and RD Legal Funding, LLC
filed a similar suit in New York state court against NYAG
seeking a declaration that the VCF Purchase Agreements are true
sales.  RD Legal Funding, LLC, et al. v. Schneiderman, et al.,
No. 17-cv-00681 (LAP) (S.D.N.Y.) (ECF No. 1).

Following RD Legal Funding, LLC and RD Legal Funding
Partners, LP's actions against the CFPB and NYAG in this Court
and New York state court, the CFPB and NYAG filed this
enforcement action against the RD Entities on February 7, 2017.
(ECF No. 1.)  On May 15, 2017, the RD Entities moved to dismiss
the Complaint on several grounds, including lack of federal
jurisdiction due to the CFPB's unconstitutional structure, the
CFPB's lack of jurisdiction over the RD Entities as "covered
persons" under the CFPA, and for failure to state a claim on
which relief can be granted pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure.  (ECF No. 39.)

In July 2017, class counsel for the NFL Class Members
requested that this Court allow it to file an amicus brief in
opposition to the RD Entities' motion to dismiss or, in the
alternative, that determination of the validity of the
assignment provisions in the NFL Purchase Agreements be referred
to United States District Court for the Eastern District of
Pennsylvania.  (ECF No. 45.)  Class counsel stated that it

11

believed referral of this question to the Eastern District of
Pennsylvania would be appropriate because that court has
continuing jurisdiction over the administration and
interpretation of the NCLSA.  (Id.); see also Settlement
Agreement § 27.1 ("The Court retains continuing and exclusive
jurisdiction over this action including jurisdiction over . . .
all Settlement Class Members . . . .").  Class counsel explained
that referral of this question would ensure uniformity of
adjudication through "a single up-or-down ruling that [would]
apply not only to Defendants in this action but also to other
potential lenders to class members who might assert the same
defense."  (Id.) Because interpretation of the NCLSA's terms
falls squarely within "the administration and interpretation of
the [NCLSA]" and referral would promote judicial economy, this
Court concluded that referral of the anti-assignment clause
question to the Eastern District of Pennsylvania was
appropriate.  (ECF No. 59.)  On September 15, 2017, this Court
referred the assignment question to the Honorable Anita B. Brody
in the Eastern District of Pennsylvania, who was presiding over
the NFL Concussion Litigation. (ECF No. 60.)

On December 8, 2017, Judge Brody issued an Explanation and
Order which concluded that the anti-assignment clause in the NFL
Concussion Litigation Settlement Agreement "unambiguously
prohibits" NFL class members "from assigning or attempting to

12

assign any monetary claims [under the NFL Settlement Agreement]," thereby rendering "any such purported assignment . . . void, invalid and of no force and effect" under New York law. See Explanation and Order (hereinafter, "Explanation and Order"), In re NFL Players' Concussion Injury Litig., No. 2:12-md-2323-AB (E.D. Pa. Dec. 8, 2017) (ECF No. 9517) (citing Neuroaxis Neurosurgical Assocs., P.C. v. Costco Wholesale Co., 919 F. Supp. 2d 345, 352 (S.D.N.Y. 2013)).  In New York, an anti-assignment clause is enforceable only if it contains "clear, definite and appropriate language" restricting the assignment of money due under the contract.  Allhusen v. Caristo Constr. Corp., 103 N.E.2d 891, 893 (N.Y. 1952); Neuroaxis Neurosurgical, 919 F. Supp. 2d at 352.  Under this framework, Judge Brody concluded that the term "relating to" in the NCLSA's anti-assignment clause, which prohibits Class Members from assigning claims "relating to the subject matter of the Class Action Complaint," encompassed assignment of Class Members' claims to settlement awards under the NCLSA.  See Explanation and Order at 3, 4 n.6.  In reaching this conclusion, Judge Brody concluded that the phrase "relating to" in the NCLSA's anti-assignment clause was "sufficiently express" under New York law to include assignment of Class Members' claims to settlement awards under the NCLSA.  Explanation and Order at 3-4.

13

As a result of this finding, Judge Brody held that Class Members' Purchase Agreements with the RD Entities were void. Explanation and Order at 5-6.  Accordingly, she ordered the NFL Class Members to return to the RD Entities any amount that the RD Entities had already paid them.  Id.

On August 1, 2017, after Defendants filed the instant motion to dismiss, the American Legal Finance Association ("ALFA") moved for leave to file an amicus curiae brief in opposition to Defendants' motion to dismiss.  The Court granted ALFA's request, and ALFA filed its amicus curiae brief on August 15, 2017.  (See Br. for ALFA as Amicus Curiae ("ALFA Br."), ECF No. 56.)

After receiving briefing from all parties on Defendants' instant motion to dismiss, the Court requested supplemental briefing from the parties on February 23 and 28, 2018, on two legal questions pertaining to the VCF Purchase Agreements.  (ECF Nos. 71, 72.)  The first question asked what the effect of the underlying agreement between the Defendants and Eligible Claimants would be if the Court were to conclude that the assignments in the VCF Purchase Agreements were impermissible pursuant to the Anti-Assignment Act, 31 U.S.C. § 3727.  As a follow-on to the first inquiry, the Court also asked how the effect of any such underlying agreement between Defendants and Eligible Claimants would impact the Government's assertion of

14

jurisdiction over the RD Entities as "covered persons" under the CFPA.  (ECF No. 72.)

On March 5, 2018, the Government filed a letter in response to the Court's February 23 and 28 orders.  (ECF No. 73.)  On March 12, 2018, Defendants filed a letter in response to the Government's March 5, 2018 letter addressing these issues.  (ECF No. 74.)

III. <u>Legal Standard</u>

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must "accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 184 (2d Cir. 2002) (citation and internal quotation marks omitted). Though a court must accept all factual allegations as true, it gives no effect to "legal conclusions couched as factual allegations." <u>Stadnick v. Vivint Solar, Inc.</u>, 861 F.3d 31, 35 (2d Cir. 2017) (quoting <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."
Iqbal, 556 U.S. at 678.  This "plausibility standard is not akin
to a 'probability requirement,' but it asks for more than a
sheer possibility that a defendant has acted unlawfully."  Id.
(citations omitted).  Deciding whether a complaint states a
claim upon which relief can be granted is "a context-specific
task that requires the reviewing court to draw on its judicial
experience and common sense."  Rahman v. Schriro, 22 F. Supp. 3d
305, 310 (S.D.N.Y. 2014) (quoting Iqbal, 556 U.S. at 679).

> In certain circumstances, the court may permissibly
> consider documents other than the complaint in ruling on a
> motion under Rule 12(b)(6). Documents that are attached to
> the complaint or incorporated in it by reference are deemed
> part of the pleading and may be considered.  In addition,
> even if not attached or incorporated by reference, a
> document "upon which [the complaint] solely relies and
> which is integral to the complaint" may be considered by
> the court in ruling on such a motion.

Tolliver v. Lilley, No. 12-cv-971, 2014 U.S. Dist. LEXIS 184770,
at *21-*22 (S.D.N.Y. Oct. 24, 2014) (citing Roth v. Jennings,
489 F.3d 499, 509 (2d Cir. 2007)).

IV.  Discussion

In addressing the various arguments that Defendants assert
in support of dismissal, the Court first addresses Defendants'
contention that this Court lacks federal jurisdiction to hear
the CFPA claims because the RD Entities are not "covered
persons" and thus do not come within the CFPA's jurisdictional
reach.  Next, the Court addresses Defendants' argument that the

16

Complaint fails to state a claim on which relief can be granted pursuant to Rule 12(b)(6).  In line with the doctrine of constitutional avoidance, the Court addresses Defendants' constitutionality argument last.

  a. Federal Jurisdiction

       i.  The RD Entities as "Covered Persons" Under the CFPA

The CFPA regulates "covered person[s] or service provider[s]" who are engaged in "unfair, deceptive, or abusive act[s] or practice[s] under Federal law." 12 U.S.C. §§ 5531(a), 5536(a).  The Act defines "covered person" as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A).  The term "financial product or service" is defined in relevant part as "extending credit and servicing loans."  Id. § 5481(15)(A)(i).  The CFPA defines "credit" as "the right granted by a person to a consumer to [1] defer payment of a debt, [2] incur debt and defer its payment, or [3] purchase property or services and defer payment for such purchase."  Id. § 5481(7).

The Government asserts four claims of deceptive acts or practices and one claim of abusive acts or practices under the CFPA against the RD Entities.  Id. §§ 5531(a), 5536(a)(1)(B); Id. § 5531(d)(1), (2)(B).  Defendants move to dismiss the CFPA deceptive and abusive acts or practices claims on the grounds

that the RD Entities are not "covered person[s]" under the CFPA, Id. § 5481(6)(A), and therefore do not come within the Act's jurisdictional reach.  (Def. Br. 17.)

The Government asserts that the RD Entities are "covered persons" under the CFPA because they extend "credit" and service loans.  The Government alleges that the RD Entities engage in this activity because the assignments in the Purchase Agreements are void.  See N.Y. U.C.C. § 9-408(d)(1); 31 U.S.C. § 3727; (Compl. ¶¶ 19, 43, 52-54, 61-69, 70-77.)  In turn, these agreements do not constitute valid sales of Consumers' interest in their settlement awards.  (Compl. ¶¶ 19, 43, 61-69, 70-77.) The Government argues that the effect of this is to encumber Consumers with "debt" and an obligation to repay the RD Entities in spite of what the Purchase Agreements say.  (Compl. ¶¶ 19, 34-43.)

The RD Entities reject this characterization.  They argue that the assignments are legally permissible and therefore effectuate true sales of Consumers' interest in their settlement awards.  (Def. Reply 5-6.)  Under this approach, the Consumer incurs no repayment obligation in the event that the RD Entities are unable to collect the purchased receivable.  (Def. Br. 19.) Therefore, the RD Entities assert that the consumer incurs "no debt," "no repayment obligation," and that "[t]here is certainly

18

no right granted to defer payment of a debt" to the Consumer.
(Id.)

Both parties' arguments as to the Government's jurisdiction
over Defendants as "covered persons" turns on the validity of
the assignments.  If the assignments are valid, as Defendants
suggest, the entire basis of the Government's jurisdictional
theory under the CFPA would fall apart.

Accordingly, in deciding whether the RD Entities are
"covered persons" under the CFPA, the Court must first determine
whether the assignments embodied in the NFL Purchase Agreements
and the VCF Purchase Agreements are valid.  12 U.S.C.
§ 5481(6)(A).

1. The NFL Concussion Litigation Settlement
Agreement Claims

Following the issuance of Judge Brody's Explanation and
Order that found the assignments in the NFL Purchase Agreement
void based on the NCLSA's anti-assignment provision, Defendants
filed a letter in this Court objecting to Judge Brody's
conclusion.  (See ECF No. 62.)  As explained below, the Court
rejects Defendants' arguments in support of these objections in
all respects.  Accordingly, the Court adopts the Explanation and
Order's finding that the NCLSA's anti-assignment provision is
valid, thereby rendering the assignments in the NFL-related
Purchase Agreements void.

a. The NCLSA's Anti-Assignment Provision

The express terms of the NCLSA restrict Class Members'
ability to assign their rights or claims "relating to the
subject matter of the Class Action Complaint," Explanation and
Order at 2 (citing Settlement Agreement (hereinafter "Settlement
Agreement") § 30.1, In re NFL Players' Concussion Injury Litig.,
MDL No. 2323 (E.D. Pa. Feb. 13, 2015) (ECF No. 6481-1)):

> Section 30.1  No Assignment of Claims. Neither the
> Settlement Class nor any Class or Subclass Representative
> or Settlement Class Member has assigned, will assign, or
> will attempt to assign, to any person or entity other than
> the NFL Parties any rights or claims relating to the
> subject matter of the Class Action Complaint. Any such
> assignment, or attempt to assign, to any person or entity
> other than the NFL Parties any rights or claims relating to
> the subject matter of the Class Action Complaint will be
> void, invalid, and of no force and effect and the Claims
> Administrator shall not recognize any such action.

Settlement Agreement § 30.1 (emphasis added).

The Government asserts that the assignments in the NFL
Purchase Agreements are void because the NCLSA's express terms
prohibit class members from assigning "any rights or claims
relating to the subject matter of the Class Action Complaint,"
which include their interest in their settlement award (or a
portion thereof) under the NCLSA.  (Compl. ¶ 35) (emphasis
added).  In response, the RD Entities contend that the NCLSA's
anti-assignment provision violates New York's general

prohibition of contractual anti-assignment clauses[2] and, therefore, does not prevent the NFL Class Members from assigning their rights to settlement compensation under the NCLSA.  (Def. Br. 18-21.)

b. Legal Standard Regarding the Scope of

the Anti-Assignment Provision

First, Defendants contend that Judge Brody did not construe the anti-assignment language "narrowly" when interpreting the phrase "relating to" as required under New York law.  In particular, they note that the anti-assignment provision does not specifically prohibit Class Members from assigning their right to a settlement award under the NCLSA, and therefore is not "sufficiently express" to be upheld under New York law. (ECF No. 62-4 at 10-17); C.U. Annuity Serv. Corp. v. Young, 722 N.Y.S.2d 236, 236 (N.Y. App. Div. 2001). Defendants also assert that the anti-assignment provision's reference to "the subject matter of the Class Action Complaint" limits assignment only of Class Members' personal injury claims, not Class Members' rights to settlement awards stemming from a later-dated settlement agreement.  (ECF No. 62-1 at 10; ECF No. 62-4 at 12-15; ECF No. 62.)

---

[2] The NFL Concussion Litigation Settlement Agreement contains a New York choice-of-law provision.

As a matter of policy, New York generally permits parties to assign their interests unless "the relevant provision of the contract contains 'clear, definite, and appropriate language declaring an assignment invalid.'" Au New Haven, LLC v. YKK Corp., 210 F. Supp. 3d 549, 554 (S.D.N.Y. 2016) (quoting Purchase Partners, LLC v. Carver Fed. Sav. Bank, 914 F. Supp. 2d 480, 505 (S.D.N.Y. 2012)). To this end, New York law requires that courts construe contractual anti-assignment language "narrowly." (ECF No. 62) (quoting Au New Haven, 210 F. Supp. 3d at 556).

It is well-settled that, in interpreting a contract's terms, courts must give effect to the plain meaning of its words or terms. This basic principle encompasses phrases, including "relating to." State v. Philip Morris Inc., 813 N.Y.S.2d 71, 75 (N.Y. App. Div. 2006) ("The terms 'arising out of,' and most particularly 'relating to,' certainly evince a broad arbitration clause"), aff'd, 869 N.E.2d 636 (N.Y. 2007).

In relevant part, the term "relate to" is defined as "to have relationship or connection." Relate, Merriam Webster (May 24, 2018), https://www.merriam-webster.com/dictionary/relate. In accord with its dictionary definition, courts in New York have given effect to the plain meaning of the phrase "relating to" when interpreting contracts in the past. See, e.g., Coregis Ins. Co. v. Amer. Health Found., Inc., 241 F.3d 123, 128-29 (2d

Cir. 2001) ("The term 'related to' is typically defined more broadly."); Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (discussing that, in the context of arbitration clauses, the phrase "'arising out of or relating to th[e] agreement,' is the paradigm of a broad clause").

Rights to settlement awards under the NCLSA indisputably "relat[e] to the subject matter of the Class Action Complaint." As the Explanation and Order correctly notes, monetary awards under the NCLSA would not exist but for the events giving rise to the Class Action Complaint. Explanation and Order at 3-4. The "relationship" or "connection" between rights to settlement awards under the NCLSA and the "subject matter of the Class Action Complaint" is straightforward.

Defendants' repeated reliance on Au New Haven, LLC v. YKK Corp., 210 F. Supp. 3d 549 (S.D.N.Y. 2016), does not help them. There, the Court analyzed the term "hereunder" in interpreting the scope of a contractual anti-assignment provision. Id. at 554-56. In conclusion, the Court gave effect to the "plain-language definition" of the word "hereunder" in finding that a patent, though the subject of the licensing agreement at issue, did not originate from the licensing agreement and therefore was not subject to the bar on assignments of any interest "hereunder." Id. 554-55. Similarly here, the Explanation and Order gives effect to the plain meaning of the term "relating

to" by employing the same "narrow" interpretation that the Court invoked in Au New Haven.  No incongruity exists between the standard that Judge Brody used in interpreting the term "relating to" and the standard in Au New Haven.

In sum, Judge Brody's interpretation of the term "relating to" complies with New York contract law and basic principles of contract interpretation by giving meaning to the plain meaning of the phrase.  Accordingly, the Court agrees with the Explanation and Order's conclusion.  The NCLSA's terms state clearly that the anti-assignment provision validly applies to the assignment of Class Members' claims to settlement awards under the NCLSA.

c. Assignability of "Settlement Proceeds" Versus "Monetary Claims"

Defendants also assert that Judge Brody's Explanation and Order refers to the assignment of "monetary claims," while the Purchase Agreements at issue purport to assign Class Members' right to "settlement proceeds."  (ECF No. 62.)  Defendants argue that the Explanation and Order's use of the term "monetary claims" rather than "settlement proceeds" shows that Judge Brody conflated legally distinct concepts under New York law. Specifically, Defendants note that although New York law prohibits the assignment of claims, it does not similarly prohibit the assignment of settlement proceeds.  For this

reason, Defendants argue that the Explanation and Order's
findings, which use the term "monetary claims," are inapplicable
to the assignment of "settlement proceeds" at issue in the NFL-
related Purchase Agreements.  (ECF No. 62); Explanation and
Order at 3-4.

Defendants' argument is a combination of mere word mincing
and misconstruction of the law.  As to misconstruction of the
law, the assignments in the NFL-related Purchase Agreements
purport to effectuate a transfer of Class Members' full
ownership rights and interest in the Property Amount to RD Legal
Finance, LLC.  (Dersovitz Aff. Exs. B-1 to B-7.)  Through these
Purchase Agreements, RD Legal Finance, LLC purports to "step
into the shoes of the assignor" and obtain the full right to
demand direct payment of the Property Amount from NFL Monetary
Award Fund through a limited irrevocable power of attorney.
(See Dersovitz Aff. Ex. B-5 at 12.)  Defendants fail to note
that the right to demand direct payment from the NFL Monetary
Award Fund in itself is a "claim" that "clearly encompasses a
cause of action for nonpayment."  Renfrew Ctr. v. Blue Cross
Blue Shield of Central N.Y., Inc., No. 94-cv-1527 (RSP/GJD),
1997 WL 204309, at *4 (N.D.N.Y. Apr. 10, 1997).  Although the
NCLSA does not define the word "claim," the assignment attempts
to transfer all of the Class Members' rights and interests in
the Property Amount to RD Legal Funding, LLC.  (See, e.g.,

Dersovitz Aff. Ex. B-5.)  The RD Entities provide no basis for believing that this bundle of ownership rights includes anything less than the full benefits of ownership, and that includes the right to sue the NFL Monetary Award Fund in the event of nonpayment.  Accordingly, Judge Brody's Explanation and Order addresses squarely the scenario at issue in the NFL Purchase Agreements by analyzing the assignment of "monetary claims" under it.

Defendants' assertion that the NFL Purchase Agreements are assignments of the "right to settlement proceeds" under the NCLSA is unavailing.  Defendants cite Grossman v. Schlosser, 244 N.Y.S.2d 749, 749-50 (N.Y. App. Div. 1963), in an attempt to illustrate that the NFL Purchase Agreements involve the assignment of "settlement proceeds," a concept that is legally distinct from the assignment of a "claim" for settlement proceeds in New York.  In Grossman, the court held that the "assignment of proceeds of a [cause of action for personal injury], prior to its settlement or adjudication, [is] valid and effectual as an equitable assignment against the assignor and his attaching creditor."  Id. (emphasis added).  This arrangement gives an equitable assignee "no legal estate or interest in the fund" but rather "constitute[s] an equitable lien on the property."  Matter of Hoffman, 435 N.Y.S.2d 235, 237 (N.Y. Surr. Ct. 1980); see also In re Mucelli, 21 B.R. 601, 603

(S.D.N.Y. 1982); <u>United States v. Colby Academy</u>, 524 F. Supp. 931, 934 (E.D.N.Y. 1981) (holding that settlement proceeds are assignable as "an equitable interest only" and "d[o] not become a legal assignment until the proceeds have come into existence") (applying New York law).

Thus, New York law permits, at most, the creation of an equitable lien on future settlement proceeds. <u>Id.</u> "An equitable lien is 'a right . . . to have a fund, specific property, or its proceeds, applied in whole or in part to the payment of a particular debt.'" <u>Bank of India v. Weg & Myers</u>, 691 N.Y.S.2d 439, 445 (N.Y. App. Div. 1999). This framework, however, still does not permit the transfer of an individual's present ownership interest in future receivables for damages to recover for personal injury, which is what the NFL Purchase Agreements attempt to do, albeit unsuccessfully. <u>Id.</u>

In sum, Defendants' arguments that assignments of claims to settlement award funds under the NCLSA are valid are without merit.

d. <u>Interpretation of the New York UCC</u>[3]

New York Uniform Commercial Code ("NY UCC") § 9-408(d)(1) establishes a general bar on anti-assignment clauses limiting

---

[3] The Court notes that this argument was raised for the first time in Defendants' letter objecting to the Explanation and Order's findings, after the instant motion to dismiss was fully briefed. (ECF No. 62.)

the transfer of "general intangibles."  N.Y. U.C.C.
§ 9-408(d)(1).  This provision also enumerates certain
exceptions to the general rule against such clauses.  Id.  One
such exception applies to "the right to receive compensation for
injuries or sickness as described in 26 U.S.C. § 104(a)(1) and
(2), as amended from time to time."  Id.  Section 104(a) of the
Internal Revenue Code excludes certain types of compensation
from gross income, including "the amount of any damages (other
than punitive damages) received (whether by suit or agreement
and whether as lump sums or as periodic payments) on account of
personal physical injuries or physical sickness[.]"  26 U.S.C.
§ 104(a)(2).

    The RD Entities contend that because the NCLSA does not
specify whether compensation from it qualifies as excludable
income under Section 104, the NY UCC's exception for
restrictions on assignments of monetary claims for personal
injury settlements does not save the anti-assignment provision
as it relates to "proceeds" from settlement of personal injury
claims.  Id. § 104(a); (ECF No. 62.)

    It is beyond peradventure that compensation from the NFL
Settlement Agreement constitutes "damages . . . received . . .
on account of personal physical injuries" under Section 104 of
the Internal Revenue Code.  Id. § 104(a)(2).  The NCLSA is
rooted in the physical injuries resulting from repeated brain

28

injuries that retired NFL players experienced while active in professional football.  <u>See</u> Explanation and Order at 4 n.6.

Accordingly, the NY UCC does not invalidate the NFL Settlement Agreement's anti-assignment provision.

### e. <u>The NFL-related Purchase Agreements</u> <u>Are Void</u>

In sum, the NCLSA validly prohibits the assignment of NFL Class Members' monetary claims.  Therefore, the assignments in the NFL Purchase Agreements are void.

### 2. <u>31 U.S.C. § 3727 Invalidates the</u> <u>Assignment of Compensation Awards from the</u> <u>VCF</u>

The RD Entities and the Government disagree over whether federal law prohibits the assignment of compensation that the VCF awards to an Eligible Claimant.  On the one hand, the Government argues that the Anti-Assignment Act, 31 U.S.C. § 3727, prohibits assignment of Eligible Claimants' rights to their award amount under the VCF.  <u>See</u> 31 U.S.C. § 3727 ("Section 3727" or the "Anti-Assignment Act"); (Pl. Opp. 13-14.) On the other hand, the RD Entities assert that because the Anti-Assignment Act bars only the assignment of a substantive claim against the United States, not the assignment of settlement proceeds, the assignments in the Purchase Agreements are permissible.  (Def. Reply 5-6.)

Neither of the parties has cited to, and this Court has not been able to identify, a case addressing whether the Anti-Assignment Act applies to the VCF structure instituted by the Air Transportation Safety and System Stabilization Act, codified at 49 U.S.C. § 40101.  For the reasons that follow, the Court concludes that it does.

a. <u>The Anti-Assignment Act, 31 U.S.C.</u>

<u>§ 3727</u>

Congress initially enacted the Assignment of Claims Act, now known as the Anti-Assignment Act, in 1853.  <u>United States v. Kim</u>, 806 F.3d 1161, 1169 (9th Cir. 2015).  The Anti-Assignment Act was intended to:

> "(1) [T]o prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government, (2) to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant, and (3) to save to the United States defenses which it has to claims by an assignor by way of set-off, counter claim, etc., which might not be applicable to an assignee."

<u>In re Ideal Mercantile Corp.</u>, 244 F.2d 828, 831 (2d Cir. 1951) (quoting <u>United States v. Shannon</u>, 342 U.S. 288, 291-92 (1952)).

To this end, the Anti-Assignment Act, 31 U.S.C. § 3727, imposes restrictions on the assignment of claims against the United States Government.  The statute defines an assignment as "a transfer or assignment of any part of a claim against the

30

United States Government or of an interest in the claim" or "the authorization to receive payment for any part of the claim." Id.  Section 3727 permits assignments of a claim against the United States only after "[1] [the] claim is allowed, [2] the amount of the claim is decided, and [3] a warrant for payment of the claim has been issued."  Id.

                      i.   "Claim Against the United States"

The Anti-Assignment Act restricts the assignment of "claims against the United States."  Id.  As an initial matter, therefore, the Court must determine whether an Eligible Claimant's entitlement to a monetary award from the VCF is a "claim against the United States." Kim, 806 F.3d at 1170.

Although the Anti-Assignment Act does not define the term explicitly, "[w]hat is a claim against the United Stated is well understood.  It is a right to demand money from the United States." Hobbs v. McLean, 117 U.S. 567, 575 (1886).  This interpretation accords with the term's dictionary definition, which is "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional . . . [a] demand for money, property, or a legal remedy to which one asserts a right." Claim, Black's Law Dictionary (10th ed. 2014).

Applying this definition here, an Eligible Claimant's monetary award from the VCF is a "claim against the United States" because it creates a "right to demand money from the United States" upon Eligible Claimants' receipt of their award letter. Hobbs, 117 U.S. at 575; see also Kim, 806 F.3d at 1171 ("An award of statutory attorney's fees is, at base, a right to demand money from the United States."). Although the VCF is a unique, if not unprecedented, legal creature, the Court sees no reason why a monetary award under the VCF is not a "claim against the United States." Hobbs, 117 U.S. at 575; see also Kim, 806 F.3d at 1171 (quoting United States v. Gillis, 95 U.S. 407, 413 (1877)) ("No language could be broader or more emphatic than these enactments. The words embrace every claim against the United States, however arising, of whatever nature it may be, and wherever and whenever presented") (internal quotation marks omitted).

Defendants argue that the Anti-Assignment Act only restricts the assignment of substantive claims against the United States. (Def. Rep. 5.) Applying this principle here, the RD Entities contend that the VCF Purchase Agreements assign Eligible Claimants' right to proceeds from the VCF rather than Eligible Claimants' substantive claims. Therefore, they say, Section 3727 does not bar these assignments. (Def. Reply 5); (ECF No. 74.)

32

In the same way that the RD Entities misconstrue the legal distinction between the assignment of "claims" and the assignment of "proceeds from claims" with the NFL-related Purchase Agreements, they do so once more here.  Courts have held uniformly that an individual's right to receive payment directly from the United States Government is a substantive claim that may not be assigned under the Anti-Assignment Act. See Kim, 806 F.3d at 1170-71 (citing United States v. Transocean Air Lines, Inc., 386 F.2d 79, 81 (5th Cir. 1967); Kearney v. United States, 285 F.2d 797, 800 (Ct. Cl. 1961); Pittman v. United States, 116 F. Supp. 576, 580 (Ct. Cl. 1953)).

Consistent with this interpretation, the Anti-Assignment Act does not restrict a would-be assignor's ability to create a legal obligation to pay a would-be assignee after the United States Government has paid the would-be assignor.  In this situation, the would-be assignee could then "enforce[]" the agreement "by suit" if the would-be assignor did not "recognize" this agreement "after collection of the money." Nutt v. Knut, 200 U.S. 12, 20 (1906) (emphasis added).  Anti-Assignment Act jurisprudence establishes clearly that a party is free to enter into an agreement that legally obligates it with respect to a future payment from the United States Government after the party has received the funds.  See, e.g., Martin v. Nat'l Sur. Co., 300 U.S. 588, 595 (1937) (emphasis added) ("After payments have

33

been collected and are in the hands of the contractor or
subsequent payees with notice, assignments may be heeded, at all
events in equity, if they will not frustrate the ends to which
the [statute] was directed."); First Fed. Sav. & Loan Ass'n of
Rochester v. United States, 58 Fed. Cl. 139, 157-58 (Ct. Cl.
2003) ("The assignee has no claim against the government. The
assignments were of a right to proceeds – a contractual
arrangement between private parties."); Saint John Marine Co. v.
United States, 92 F.3d 39 (2d Cir. 1996) (holding contractual
obligations between private parties regarding proceeds from the
United States Government enforceable but assignment as against
the United States void); In re Ideal Mercantile Corp., 244 F.2d
at 832 (citing McKenzie v. Irving Tr. Co., 323 U.S. 365, 369
(1945)) (emphasis added) ("[I]t seems clear that an assignment
of a claim against the United States is enforceable in many
cases as between parties to that assignment, or their successors
in interest, after the Government has paid the claim.").

Defendants cite to Saint John Marine for the proposition
that the Purchase Agreements are valid because while "the Anti-
Assignment Act 'voids the assignment as against the United
States, the assignment remains enforceable as between the
parties to the contract." (ECF No. 74) (citing Saint John
Marine, 92 F.3d at 45)) (emphasis added). It is nose-on-the-
face plain that the Court of Appeals did not mean that

assignments like the ones at issue here, which purport to
transfer all of Eligible Claimants' present rights and interests
in a portion of their VCF award, including the right to demand
payment directly from the United States Government, are
permissible under the Anti-Assignment Act. (See Def. Br. Sec.
III(A)(1)(b)) ("The Assignments Give the RD Entities the Right
to Demand Direct Payment from the Holder of the Funds.").
Rather, the Court of Appeals was reiterating a well-established
legal principle in Anti-Assignment Act case law: an assignment
that is void as against the United States under the Anti-
Assignment Act "may amount to the creation of an equitable lien
when the subject matter of the assignment has been reduced to
possession and is in the hands of the assignor." Martin, 300
U.S. at 597. This general principle comports with the Anti-
Assignment Act's underlying purpose. "The United States has no
need to worry about fraud or any of the other evils associated
with the assignment of claims against it once the proceeds of
the claims have been reduced to the possession of the purported
assignor." Kim, 806 F.3d at 1176-77. After the United States
Government has remitted payment to the purported assignor, the
Act's protective purpose "is not implicated." Id. at 1177.
Therefore, an equitable lien on funds to be received in the
future from the United States Government is permissible, but

assignment of a right to collect payment directly from the
United States Government is not.

   In sum, the RD Entities' argument shows too much by arguing
that Defendants purport to contract for a full ownership
interest in a portion of Eligible Claimants' award, which
plainly includes the right to demand payment for that portion
directly from the United States Government.  (Dersovitz Aff. Ex.
A-1 at 16) (letter from RD Entities to VCF Claims Processing
Center demanding payment be made directly to RD Entities
pursuant to Purchase Agreement); (Def. Br. Sec. III(A)(1)(b))
("The Assignments Give the RD Entities the Right to Demand
Direct Payment from the Holder of the Funds.").  "From the
beginning . . . the Anti-Assignment Act has been concerned with
<u>direct</u> payment of claims."  <u>Kim</u>, 806 F.3d at 1176.  The Purchase
Agreements purport to transfer Eligible Claimants' right to
receive payment directly from the United States Government to
the RD Entities.  This is precisely what the statute governs,
and this is not allowed.

### ii.   <u>Statutory Purpose</u>

   Having concluded that an award of compensation under the
September 11th VCF constitutes a "claim" within the meaning of
the Anti-Assignment Act, the Court must next determine whether
application of the Anti-Assignment Act to the VCF's enabling
statute would advance the statute's stated objectives before

applying it.  Saint John Marine, 92 F.3d at 49; See N.Y. Guardian Mortgagee Corp. v. Cleland, 473 F. Supp. 422, 434 (S.D.N.Y. 1979) ("[T]here must be some congruence between the Act and its purposes before it is applied.").

In passing the Anti-Assignment Act, Congress sought to protect the United States Government by restricting the assignment of claims against it.  See Martin, 300 U.S. at 594 ("The provisions of the statute making void an assignment or power of attorney by a Government contractor are for the protection of the Government.").  As noted above, Congress sought to limit the United States Government's exposure to three potential liabilities:

> "(1) [T]o prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government, (2) to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant, and (3) to save to the United States defenses which it has to claims by an assignor by way of set-off, counter claim, etc., which might not be applicable to an assignee."

In re Ideal Mercantile Corp., 244 F.2d at 831 (quoting Shannon, 342 U.S. at 291-92).

In spite of the Anti-Assignment Act's broad language, courts have held the statute inapplicable where enforcement would not advance its underlying purposes.  See N.Y. Guardian, 473 F. Supp. at 433-34 ("Despite the broad language of the Act, numerous exceptions to it have been recognized when [its]

37

purposes would not be served."). For example, the Anti-Assignment Act does not bar involuntary assignments that occur by operation of law, Saint John Marine, 92 F.3d at 48, which courts have interpreted to include "corporate mergers, consolidations, and reorganizations," First Fed. Sav. & Loan Ass'n of Rochester, 58 Fed. Cl. at 158. Voluntary assignments for the benefit of creditors, transfers imposed by judicial order, subrogation, and corporate reorganizations that result in a transfer of assets are also situations in which courts have found the Anti-Assignment Act to be inapplicable. Saint John Marine, 92 F.3d at 49 (citing Goodman v. Niblack, 102 U.S. 556 (1880); Keydata Corp. v. United States, 504 F.2d 1115 (Ct. Cl. 1974); United States v. Aetna Cas. & Sur. Co., 338 U.S. 366 (1949)).

After weighing the relevant factors, the Court concludes that application of the Anti-Assignment Act to 49 U.S.C. § 40101 would further Congress's intent in passing the Act. See N.Y. Guardian, 473 F. Supp. at 434.

First, applying the Anti-Assignment Act to awards under the VCF would allow the United States Government the opportunity, if ever necessary, to set off an Eligible Claimant's award amount against preexisting debts owed to the United States. See Shannon, 342 U.S. at 291-92; Kim, 806 F.3d at 1172.

38

More significantly, however, application of the Anti-Assignment Act to 49 U.S.C. § 40101 limits the possibility of multiple payments of claims, preserves United States Government resources by eliminating the need for diligence to validate an alleged assignment, and streamlines the VCF's administration by requiring the United States Government to interact with only the original claimant.  See In re Ideal Mercantile Corp., 244 F.2d at 831.  The Special Master of the VCF has previously stated that the potential for fraud is a primary concern in the administration of the Fund.  See September 11th Victim Compensation Fund, First Annual Status Report, at 4 (Oct. 2012), https://www.vcf.gov/pdf/VCFStatusReportOct2012.pdf ("As with any government program involving compensation, it is crucial that we implement key protocols to prevent fraud.").  As the Special Master has noted, "[t]hese efforts are particularly important given the cap on the total amount of money available for the Fund."  Id.  Limiting the number of individuals to whom the United States Government makes award payments under the VCF would undoubtedly minimize the potential for fraud.

Accordingly, application of the Anti-Assignment Act to 49 U.S.C. § 40101 and, more specifically, to monetary awards issued under the VCF would further the purposes of the Act.  Therefore, the Anti-Assignment Act applies to claims arising under 49 U.S.C. § 40101.

39

iii.   The VCF-related Purchase
       Agreements Do Not Comply With
       the Anti-Assignment Act's
       Requirements

The Anti-Assignment Act allows a party to assign a claim against the United States only if it is made after "[1] a claim is allowed, [2] the amount of the claim is decided, and [3] a warrant for payment of the claim has been issued."  31 U.S.C. § 3727(b).

The RD Entities appear to argue that because they entered into the Purchase Agreements with Eligible Claimants only "after the Special Master's determination of the amount due to the seller, i.e., after the claim had been allowed," (Def. Rep. 6), Defendants have complied with Section 3727's requirements and the assignment is therefore permissible.

Oddly, the RD Entities do not address their compliance with the Anti-Assignment Act's two other technical requirements.  31 U.S.C. § 3727(b); Kim, 806 F.3d at 1176.  However, this is of no event.  The Court of Appeals for the Ninth Circuit has noted that compliance with Section 3727's third requirement, which allows for assignment of claims only after "a warrant for payment of the claim has been issued," is almost impossible given that "the Treasury no longer uses warrants."  See 31 U.S.C. § 3727(b); Kim, 806 F.3d at 1169.  Because the Government

40

may, at its choosing, "waive coverage of the Anti-Assignment
Acts," Kim, 806 F.3d at 1169 (quoting Riviera Fin. of Tex., Inc.
v. United States, 58 Fed. Cl. 528, 530 (2003)), the warrant's
anachronistic character, coupled with Congress's inaction in
updating the statute's language, gives the Government "the power
to pick and choose which assignments it will accept and which it
will not."  Kim, 806 F.3d at 1169-70.  Here, there is no
indication that the United States Government has waived coverage
of the Anti-Assignment Act to 49 U.S.C. § 40101.  In addition,
neither party has argued that the RD Entities complied with the
Anti-Assignment Act's three requirements under Section 3727(b).

Accordingly, because neither the RD Entities nor the
Government have argued or alleged facts that the VCF Purchase
Agreements comply with Section 3727's requirements, these
assignments are void as against the United States under 31
U.S.C. § 3727.

> 3. Eligible Claimants and NFL Class Members
> "Incur[red] Debt" Through the Purchase
> Agreements

After addressing the preliminary issue of whether the VCF
and NCLSA permit the assignment of Consumers' claims to
settlement awards, which they do not, the Court is able to turn
to the crux of the jurisdictional question presented here:
whether the Purchase Agreements cause Consumers to incur "debt"

such that the RD Entities "extend[] credit" within the meaning
of a "covered person" under the CFPA.  12 U.S.C. §§ 5481(6)-(7).
The RD Entities argue that, even if the assignments are invalid,
this fact merely renders the Purchase Agreements void and would
not "transform" the Purchase Agreements into extensions of
"credit."  (Def. Br. 18-21.)  In its rather sparse response to
this contention, the Government asserts that because the
Purchase Agreements are invalid, Defendants functionally offer
or provide a credit transaction in which consumers incur debt
and defer the right to repay.  (Compl. ¶ 19.)

    In spite of the puzzling paucity of case law addressing
facts similar to those at issue here, the Court agrees
ultimately that the assignments in the Purchase Agreements are
void as against the third-party obligors, i.e., the VCF Claims
Administrator and the NFL Settlement Fund, but give rise to a
relationship between Defendants and Consumers in which the RD
Entities "extend[] credit" and the Consumer incurs "debt" within
the meaning of 12 U.S.C. § 5481(6)-(7).

    The CFPA defines "credit" as "the right granted by a person
to a consumer to [1] defer payment of a debt, [2] incur debt and
defer its payment, or [3] purchase property or services and
defer payment for such purchase."  12 U.S.C. § 5481(7).
Although the CFPA does not define the term "debt," Black's Law
Dictionary defines debt, in relevant part, as "a specific sum of

money due by agreement or otherwise." Debt, Black's Law
Dictionary (10th ed. 2014).  Both parties rely on case law
interpreting whether a transaction constitutes an extension of
"credit" under the CFPA or other statutes that have
substantially similar definitions of the term "credit."  See 15
U.S.C. § 1602(f) (Truth in Lending Act ("TILA")); 15 U.S.C. §
1691(d) (Equal Credit Opportunity Act ("ECOA")).  None of those
cases, however, involves an assignment that a court has declared
invalid as a matter of law, as is the situation here.

      In Capela v. J.G. Wentworth, LLC, the court held that a
transaction involving a party's sale and assignment of its right
to structured settlement payments for a personal injury claim
from Allstate Settlement Corporation in exchange for an upfront,
lump sum cash payment from a structured settlement company was a
sale, not an extension of "credit" under TILA.  No. CV09-882,
2009 WL 3128003, at *9, 10 (E.D.N.Y. Sept. 24, 2009) (citing 15
U.S.C. § 1601 et seq.).  The court found that the transaction
was not properly classified as a loan because the assignor
"ha[d] no obligation at all to pay the settlement installments
if Allstate fail[ed] to do so" under the terms of the agreement.
Id.  Similarly, in Reed v. Val-Chris Invs., Inc., the court
found that a party's assignment of his future interest in his
father's estate to a company called Advance Inheritance, LLC
("AI") in exchange for an immediate lump sum cash payment from

43

AI was not an extension of "credit" under TILA because, under
the transaction's terms, AI "had no recourse against Plaintiff
if his potential inheritance was not sufficient to cover his
assignment."  No. 11cv371, 2011 WL 6028001, at *2-3 (S.D. Cal.
Dec. 5, 2011).

Capela and Reed present facts that are fundamentally
different from those at issue here because the assignments in
those cases were not declared invalid as a matter of law.  In
Capela, the purchaser of the receivables petitioned for and
obtained judicial approval of the transaction pursuant to New
York's Structured Settlement Protection Act, N.Y. Gen. Oblig.
Law § 5-1701, et seq., in New York Supreme Court, Suffolk
County.  Id. at *1.  Similarly, in Reed, the assignment
agreement was "filed with the state probate court" and, although
not mentioned specifically in the case, would have been subject
to judicial approval pursuant to California Probate Code §
11604.5(d)(1)-(h)(1) (West) (amended 2015).  Unlike here, a
court reviewed and approved the assignments at issue in Capela
and Reed prior to those plaintiffs filing suit against the
structured settlement companies.  Rather, plaintiffs in Capela
and Reed sought to have the disclosure and protection
requirements of TILA and ECOA applied to their structured
settlement agreements by having them classified as extensions of
"credit" without challenging the validity of the underlying

44

assignment.  <u>Capela</u>, 2009 WL 3128003, at *2; <u>Reed</u>, 2011 WL 6028001, at *2.  Because the assignments at issue in the NFL and VCF purchase agreements are invalid as a matter of law, the analyses in <u>Capela</u> and <u>Reed</u> have limited transferability to this case.

Here, the Court has concluded that the assignments in the VCF Purchase Agreements and the NFL Purchase Agreements are void as against the third-party obligors.[4]  The relevant question thus becomes whether, looking beyond the gloss of the "assignment and sale" label that the RD Entities have affixed to the Purchase Agreements, these transactions constitute an extension of "credit" under the CFPA as between the Consumers and the RD Entities.

It is well-established that contract interpretation is the domain of state law.  <u>See Capela</u>, 2009 WL 3128003, at *10 (looking to state law to determine nature of agreement between parties); <u>Kim</u>, 806 F.3d at 1175 (applying California law to determine nature of underlying agreement between parties).  Therefore, the Court looks to New York law in interpreting the

---

[4] The assignability of an individual's future interest in an estate is an evolving area of law in both California and New York.  <u>See</u> David Horton & Andrea Cann Chandrasekher, <u>Probate Lending</u>, 126 Yale L. J. 102, 108 (2016) (analyzing empirical evidence on 594 probate lending transactions in California and concluding in part that the practice "raise[s] serious fairness concerns" and "violat[es] . . . [California's] usury laws on a massive scale").

nature of the agreement between Consumers and the RD Entities after peeling away the invalid assignments and the "assignment and sale" labels from these transactions.[5]  Id.

Under New York law, an assignment of litigation proceeds takes effect as an equitable lien in favor of the "assignee." In re Minor, 482 B.R. 80, 84 (Bankr. W.D.N.Y. 2012) (quoting Williams v. Ingersoll, 89 N.Y. 508, 519 (N.Y. 1882)).  "An equitable lien is 'a right . . . to have a fund, specific property, or its proceeds, applied in whole or in part to the payment of a particular debt'."  Arbor Realty Funding, LLC v. East 51st St. Dev. Co., 907 N.Y.S.2d 98 (Sup. Ct. 2009) (quoting Bank of India v. Weg & Myers, 691 N.Y.S.2d 439, 445 (N.Y. App. Div. 1999)) (emphasis added).

Here, because the assignments are void, no ownership rights are transferred to the RD Entities under the Purchase Agreements.  Rather, the RD Entities are creditors with a security interest in Consumers' future – but already determined – settlement award amounts under the VCF or NCLSA.  In re Minor, 482 B.R. at 85.  By any measure, therefore, the lump sum cash advance that the RD Entities provide causes Consumers to "incur a debt and defer its payment" because it is a specific sum of

---

[5] Defendants accept for purposes of this motion only that New York law applies for purposes of characterizing the transactions as sales or loans.  (Def. Br. 26 n.10.)

money due by agreement.  See Debt, Black's Law Dictionary (10th ed. 2014).  The idea that the Consumer's repayment obligation is legally "triggered" only upon receipt of settlement funds from the settlement administrator is illusory.  (Def. Br. 19.)  The repayment obligation is always with the Consumer from the moment the RD Entities disburse the lump sum cash payment to the Consumer.  To that end, the Consumer "defers" payment of this debt unilaterally, in spite of Defendants' contentions to the contrary.  (Def. Br. 19) ("Cases interpreting analogous federal statutory definitions of 'credit' confirm that, the 'hallmark of credit . . . is the right of one party to make deferred payment.'") (quoting Reithman v. Berry, 287 F.3d 274, 277-79 (3d Cir. 2002)).  The RD Entities' lump sum cash advance is "'an extension of credit, an advance, or loan . . . with the assignment held over the [Consumer] as a sort of club or collateral security'" regardless of whether the third-party obligor remits payment to the Consumer or not.  Missouri ex rel. Taylor v. Salary Purchasing Co. Inc., 358 Mo. 1022, 1028 (1949) (quoting McWhite v. State, 226 S.W. 542, 543 (Tenn. 1921)).

Bankruptcy courts frequently face the question of whether a transaction is properly characterized as a loan or a sale where the purchaser of a receivable must defend its rights against other creditors in the seller's bankruptcy proceeding.  Peter V. Pantaleo et al., Rethinking the Role of Recourse in the Sale of

47

Financial Assets, 52 Bus. Law. 159, 160 (1996).  To that end,
bankruptcy courts weigh the presence or absence of certain
factors in determining whether a transaction is a sale or a loan
under New York law.  (Def. Br. 19, 27.)  Among the factors that
these courts consider in this analysis is the existence of
recourse.  If a buyer retains recourse against the seller, this
indicates that the buyer has assumed less than all of the
ownership rights in a purported sale, thereby indicating that
the transaction is more likely a loan.  See In re Dryden
Advisory Group, LLC v. Beneficial Mut. Sav. Bank, 534 B.R.612,
620-23 (Bankr. M.D. Pa. 2015) (applying New York law); Pantaleo,
52 Bus. Law. at 159 (explaining that "an issue can arise over
whether to view [a] transaction as a sale or a secured loan"
where recourse against the seller exists because it indicates
that "less than all the risks of ownership [have been]
transferred" from seller to buyer).

      Courts also look to other factors in making this
determination.  For example, an assignee's right to demand
direct payment from the seller's account debtor tends to
indicate that a true sale has taken place.  See In re Dryden
Advisory Grp., 534 B.R. at 622.  Conversely, a seller's right of
repurchase from the buyer tends to weigh in favor of classifying
the transaction as a loan because it indicates that the seller
has not fully alienated his ownership rights in the property.

48

See In re Joseph Kanner Hat Co., 482 F.2d 937, 940 (2d Cir. 1973) (finding pledge of security rather than true sale where underlying asset serving as security was returned upon repayment of the advanced funds).  In addition, courts may also look to the intent of the parties in effectuating a sale or a loan as indicated by the language of the contract.  See Platinum Rapid Funding Grp. Ltd. v. VIP Limousine Servs., Inc., No. 604613-15, 2016 WL 4478807 (N.Y. Sup. Ct. June 8, 2016).

Bearing all of these factors in mind, Defendants urge that the paramount factor in determining whether a transaction is a sale or a loan under New York law is whether the "risk of non-payment is transferred from the seller to the buyer, not the degree of risk borne by the buyer." (Def. Rep. 11-12.)  Because the RD Entities purport to assume all of the risks of nonpayment in the Purchase Agreements, they argue that the Agreements are non-recourse and therefore are true sales.  (Id.)

Contrary to the RD Entities' assertions, the instant case is not a line-drawing exercise.  The assignments in the Purchase Agreements are void and thus do not transfer a single right of ownership from Consumers to the RD Entities in their monetary claims.  This constitutes the beginning and end of the story.  Because the assignments are invalid, the RD Entities retain recourse against the Consumer in the event of nonpayment.

In spite of the lack of case law classifying structured
settlement transactions as loans or sales where a court deems
the assignment void as a matter of law against the third-party
obligor, a single Missouri state court case contains significant
factual parallels to the case at hand.  In Missouri ex rel.
Taylor v. Salary Purchasing Co. Inc., the Missouri Attorney
General brought charges against a salary advance company that
offered consumers a cash advance on their unearned wages.  358
Mo. 1022, 1024-25 (1949).  At that time, the Missouri
legislature had made transactions amounting to "payday loans"
illegal.  Id. (citing Mo. Rev. Stat. §§ 3226, 3227 (1939)
(capping allowable interest rate at six percent if no rate
specific and eight percent if stated in contract,
respectively)).  To circumvent this prohibition, the salary
advance company structured the transactions as "sales" in which
consumers would "assign" their future unearned wages to the
salary advance company.  Id.  The assignment agreements
contained exorbitant repayment terms that dictated repayment of
the amount advanced plus fees that, in reality, functioned as
usurious interest rates.  Id.  Additionally, although the salary
advance company was authorized to notify and collect from the
consumer's employer, it never attempted to do this.  Id.
Ultimately, the Missouri Attorney General brought charges under
state civil and criminal usury laws against the salary advance

company, arguing that the assignments were actually loans with usurious interest rates.  Id.  In response, the salary advance company argued that the assignments were not loans subject to state usury laws, but valid sales.  Id.  In the alternative, the salary advance company asserted that the effect of a state statute invalidating assignments of unearned wages would not convert the assignments into loans but would only render the assignments null and void.  Id. at 1026.

In rejecting the salary advance company's argument, the Supreme Court of Missouri, sitting en banc, noted that the void assignments "could be nothing but loans" because they "transferred no right or title in the unearned wages which they purported to assign."  Id.  In spite of the assignments' terms to the contrary, the transactions imposed a repayment obligation on the consumer because the salary advance company "did not intend to donate to the applicants the money which it advanced on such void assignments.  It intended to create the relationship of debtor and creditor."  Id.  "The assignment was . . . taken as a security for the money advanced, and as something to be held over a customer who did not make prompt settlement. . . . this is clearly an extension of credit, an advance, or loan, to the employee, with the assignment held over the employee as a sort of club or collateral security."  Id. at 1028 (quoting McWhite v. State, 226 S.W. 542, 543 (Tenn. 1921)).

51

In sum, because the assignments in the Purchase Agreements are void, the RD Entities obtain, at most, an equitable lien on Consumers' future settlement award proceeds that establishes a creditor-debtor relationship.  Id.  Accordingly, Defendants "extend[] credit," and Consumers "incur[] debt" under the Purchase Agreements, and the RD Entities are therefore "covered persons" under the CFPA.

Defendants argue that the legal effect of invalidating an assignment is to "render the agreement null and void."  (Def. Rep. 7) (citing Singer Asset Fin. Co. v. Bachus, 741 N.Y.S.2d 618, 621 (N.Y. App. Div. 2002)).  As discussed, the Court has determined that the assignment is void as against the third-party obligors in this case, i.e., the NFL Settlement Fund and the VCF Claims Administration.  However, the remaining contractual arrangement between the RD Entities and Consumers created a creditor-debtor relationship separate and apart from the void assignments.  To that end, although the assignment is "null and void" as against the third-party obligors, the Court refuses to look the other way when evaluating the true nature of the transactions.  Therefore, to the extent these extensions of credit did not comply with state regulatory requirements governing loans at the time they were offered, the RD Entities will not be allowed simply to return to their pre-agreement positions without any penalties.  See, e.g., Bouffard v. Befese,

LLC, 976 N.Y.S.2d 510, 514 (N.Y. App. Div. 2013) (explaining that transaction must be "considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it" in determining whether it is a usurious loan).

The pre-settlement legal funding transactions referenced in ALFA's amicus curiae brief differ in a crucial respect. (See ALFA Br.)  In those transactions, the pre-settlement legal funding agreements are entered into before the claim is resolved.  The ALFA Member's right to repayment is contingent on the consumer's ultimate success on his or her claim.  (ALFA Br. 5.)  ALFA notes that Regulation Z's definition of "credit" expressly excludes "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced."  12 C.F.R. § 1026.2(a)(14) (Supp. I 2017).  The transactions that the RD Entities offer present no such risk of loss because, as a prerequisite, the RD Entities require Consumers to have a settlement award letter stating the amount to which they are entitled from their respective settlement fund.  (Compl. ¶¶ 20, 24-26.)

Applying this framework here, the Court concludes that the Government has alleged plausibly that the transactions at issue here functioned as extensions of "credit" in practice.

a. The RD Entities Extend "Credit" and

"Service[] Loans"

Under the CFPA, a "covered person" is one who "extend[s] credit and servic[es] loans." 12 U.S.C. §§ 5481(6)(A); 5481(15)(A)(1). Having established that the Complaint alleges adequately that the Purchase Agreements at issue extend "credit," the issue remains whether the RD Entities also "servic[e] loans." The RD Entities argue that even if they extend "credit," the Government has not alleged plausibly that they also "servic[e] loans." 12 U.S.C. § 5481(15)(A)(1); (Def. Reply 8.)

Under 12 U.S.C. § 5481(6), a "covered person" is "any person that engages in offering or providing a consumer financial product or service." Id. (emphasis added). Adoption of the RD Entities' interpretation of "financial product or service" to cover only entities that both "extend[] credit and servic[e] loans" would result in rendering the "or" in "financial product or service" inconsistent with the term's definition because it would ascribe the same definition, "extend[ing] credit and servic[ing] loans," to two distinct concepts that are separated by the term "or." 12 U.S.C. §§ 5481(6)(A), 5481(15)(A)(1).

It is well-established that courts may interpret the term "and" to have a disjunctive effect in interpreting a statute's

54

meaning.  See Peacock v. Lubbock Compress Co., 252 F.2d 892, 894
(5th Cir. 1958) (holding that "and" was disjunctive in the
context of a statute that required an employer to pay overtime
wages to employees "engaged in the ginning and compressing of
cotton").  Here, interpreting the term "and" disjunctively does
not defy common sense.  Not infrequently, the party that
originates or makes a loan is different from the party that
services that loan.  Given this fact, it would make little sense
for Congress to grant the CFPA jurisdiction only over loan
originators that service their own loans.  Such an
interpretation would not capture a large section of the market
that the CFPA expressly seeks to regulate.

Even if Congress did not intend the term "and" to be
interpreted disjunctively, the Government has adequately pleaded
that the RD Entities "servic[e] loans."  The CFPA defines the
term "service provider" as one who "provides a material service
to a covered person in connection with the offering or provision
by such covered person of a consumer financial product or
service."   12 U.S.C. § 5481(26)(A).  Drawing from this
statutory definition of the term "service," which appears in the
same section as the term "financial product or service," the
Court concludes that the Government has alleged adequately that
the RD Entities "servic[e] loans" because they carry out
"material service[s] . . . in connection with the offering or

provision . . . of a consumer financial product or service."  12
U.S.C. § 5481(26)(A).  For one, the Complaint alleges that Roni
Dersovitz has made phone calls to collect from Consumers and
that Dersovitz has authority to determine whether RD should
collect.  (Compl. ¶ 54.)  Collection on loans is a "material
service" relating to the provision of a loan because, without
collection, the loan would be a nullity.

Accordingly, the Government need only plead that the RD
Entities "extend[ed] credit" or "servic[ed] loans" to allege
plausibly that they are "covered persons" under the CFPA.  In
the alternative, the Court concludes that, even if the
Government had to allege that the RD Entities also "servic[e]
loans," the Complaint also alleges adequately that the RD
Entities, by and through their founder and owner Roni Dersovitz,
engaged in such activities by collecting on loans and making the
decision to collect on loans.

4. The RD Entities Are "Covered Persons"

Under the CFPA

For the reasons stated above, the Court concludes that the
Government has pleaded adequately that the RD Entities are
"covered persons" under the CFPA.  12 U.S.C. § 5481(6)(a).

b. Failure to State a Claim Fed. R. Civ. P. 12(b)(6)

Defendants next argue that, even if the RD Entities are
"covered persons" within the meaning of the CFPA, the Complaint

should be dismissed for failure to state a claim under Rule
12(b)(6).

> i.   Rule 9(b)'s Heightened Pleading Standard Does Not
>      Apply to Non-Fraud Claims

Before addressing the substantive allegations in the
Complaint, Defendants argue that because the Government's claims
are all premised on an alleged unified course of fraudulent
conduct and the Complaint fails to distinguish between fraud and
non-fraudulent claims, Rule 9(b)'s heightened pleading standard
should apply to all of the claims alleged in the Complaint.
(See Def. Br. 24.)  Proceeding under this assertion, the RD
Entities argue that the Government's claims fail under Rule
9(b)'s heightened pleading standard and should be dismissed.
(Id.)  In response, the Government asserts that fraud and
deception are separate legal concepts and that Rule 9(b)'s
heightened pleading standard does not apply to the Government's
deceptive conduct claims.  (Pl. Opp. 19-21.)

Rule 9(b) of the Federal Rules of Civil Procedure imposes a
heightened pleading standard and requires that "[i]n all
averments of fraud or mistake, the circumstances constituting
fraud or mistake shall be stated with particularity."  Fed. R.
Civ. P. 9(b).  Specifically, Rule 9(b)'s heightened pleading
standard requires pleadings to "(1) specify the statements that
the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and
(4) explain why the statements were fraudulent." <u>Rombach v.
Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004) (quoting <u>Mills v. Polar
Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)) (internal
quotation marks omitted).

At least two courts addressing this specific issue have
concluded that Rule 9(b)'s heightened pleading standard does not
apply to claims of unfair, deceptive, or abusive acts or
practices under the CFPA for three reasons. <u>See CFPB v.
Frederick J. Hanna & Assocs., P.C.</u>, 114 F. Supp. 3d 1342, 1372
(N.D. Ga. 2015) (concluding that claims for deception under the
Fair Debt Collection Practices Act ("FDCPA") and the CFPA should
not be subject to Rule 9(b)); <u>CFPB v. Navient Corp.</u>, 17-CV-101,
2017 WL 3380530, at *24 (M.D. Pa. Aug. 4, 2017) (same). First,
"Rule 9(b) expressly applies only to claims alleging 'fraud or
mistake,' and as the Tenth Circuit and several district courts
have reasoned, consumer protection claims are not claims of
fraud, even if there is a deceptive dimension to them."
<u>Navient</u>, 2017 WL 3380530, at *24 (quoting <u>Frederick J. Hanna</u>,
114 F. Supp. 3d at 1372). "Second, 'the United States Supreme
Court has consistently cautioned against extending this
heightened pleading standard beyond claims for fraud or
mistake.'" <u>Id.</u> Finally, application of Rule 9(b) "to consumer
protection claims is not only inconsistent with some of the

policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes." Navient Corp., 2017 WL 3380530, at *24 (quoting Frederick J. Hanna & Assocs., 114 F. Supp. 3d at 1373-74).  In Navient, the court elaborated on this last reason by explaining that "unlike a fraud claim, the [CFPA] does not have an intent element" such that "requiring the CFPB to plead in conformity with Rule 9(b) would graft an intent requirement onto the claims under the FDCPA and [CFPA] that is not otherwise present." Navient Corp., 2017 WL 3380530, at *25.

The Court has identified no case in which this Court or the Court of Appeals has applied Rule 9(b)'s heightened pleading standard to claims of deceptive or abusive acts or practices under the CFPA.  See, e.g., CFPB v. NDG Fin. Corp., No. 15-cv-5211 (CM), 2016 WL 7188792, at *14-15 (S.D.N.Y. Dec. 2, 2016) (applying Rule 8 to claims under CFPA).  Furthermore, the Court finds the Navient court's reasoning as to why Rule 9(b)'s heightened pleading standard should not be applied to deceptive acts or practices claims under the CFPA to be persuasive. Navient, 2017 WL 3380530, at *24-25.  Accordingly, the Court declines to apply Rule 9(b)'s heightened pleading standard to deceptive or abusive acts or practices claims under the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B); Fed. R. Civ. P. 9(b).

Similarly, the Court of Appeals has stated clearly that Rule 9(b)'s heightened pleading standard does not apply to New York General Business Law § 349.  In so holding, the Court of Appeals has noted that "[Section] 349 extends well beyond common-law fraud to cover a broad range of deceptive practices" and that Section 349 claims "[do] not require proof of the same essential elements (such as reliance) as common-law fraud." Pelman ex rel. Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005).  Accordingly, Rule 8(a)'s less stringent pleading standard applies to NYAG's claim under N.Y. Gen. Bus. Law § 349.

The question of what pleading standard should apply to the NYAG's claim under N.Y. Executive Law § 63(12) is less clear cut.  New York Executive Law § 63(12) empowers the New York Attorney General to seek injunctive relief and other remedies against persons or entities that "engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business" in New York.  N.Y. Exec. Law § 63(12).  The statute defines the word "fraudulent" as including "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."  Id.  The terms "persistent fraud" or "illegality" are defined to "include continuance or carrying on of any fraudulent or illegal act or

60

conduct." Id. Thus, while a claim under Section 63(12) may allege fraud and necessitate a showing of knowledge or reliance as an element of the claim, the NYAG may equally assert a cause of action under Section 63(12) that alleges "deception" or some other non-fraudulent conduct that does not include scienter as an element. See People v. Am. Motor Club, 582 N.Y.S.2d 688, 692 (N.Y. App. Div. 1992) (explaining that, under statute, "scienter is not required and false promises are sufficient" where pleadings amount to illegality under § 63(12), not fraud under § 63(12)).

Applying the same logic that the Court of Appeals has employed in determining that claims under N.Y. GBL § 349 are not subject to Rule 9(b)'s heightened pleading standards where the underlying conduct is not premised on a fraudulent scheme, the Court concludes that NYAG's claim under N.Y. Executive Law § 63(12) is also not subject to this heightened pleading standard because the underlying conduct is premised on deceptive acts or practices that do not include intent or reliance as an element of those claims. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). Accordingly, the Court applies Rule 8(a) in evaluating the Government's pleading of its claim under N.Y. GBL § 349.

1. "Substantial Assistance" Claims Under the

   CFPA

In each of the CFPA deceptive or abusive acts or practices claims brought against Defendants, the Government alleges that Roni Dersovitz, the RD Entities' owner and founder, is liable for substantially assisting the RD Entities in carrying out these purported acts.

Under 12 U.S.C. § 5536(a)(3), it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title [including unfair, deceptive or abusive acts or practices]."  Defendants argue that Rule 9(b)'s heightened pleading standard should apply to all of the Government's claims because they are all "premised on an alleged scheme to defraud consumers."  (Def. Br. 24.)

The Court concludes that the knowledge requirement for individual liability under the CFPA does not trigger Rule 9(b)'s heightened pleading requirement.  As discussed, the primary violation of unfair, deceptive, or abusive acts or practices underlying the CFPA claims against Dersovitz in his individual capacity do not constitute fraud claims.  See Navient, 2017 WL 3380530, at *24 ("[C]onsumer protection claims are not claims of fraud, even if there is a deceptive dimension to them").  In addition, the scienter requirements of "knowingly or recklessly"

62

do not implicate automatically Rule 9(b)'s heightened pleading requirements.  Courts in this Circuit have defined "reckless" as behavior that is "highly unreasonable" or represents "an egregious refusal to see the obvious, or to investigate the doubtful."  SEC v. Yorkville Advisors, LLC, ___ F. Supp. 3d ___, 2018 WL 1725555, at *14 (S.D.N.Y. Mar. 29, 2018).  Such standard is distinguishable from the scienter associated with fraud, which "encompasses a particular state of mind, an element of intent or deception" that is lacking in the Complaint's allegations.  Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 191-92 (D. Mass. 2012) (internal quotation marks and citation omitted).  Furthermore, the one other case that the Court has identified evaluating "substantial assistance" claims under the CFPA, 12 U.S.C. 5536(a)(3), applied Rule 8(a) in evaluating those claims on a motion to dismiss.  CFPB v. Universal Debt & Payment Solutions, LLC, 15-cv-00859-RWS, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015).

Accordingly, the claims for individual liability against Dersovitz pursuant to 12 U.S.C. 5536(a)(3) are not subject to Rule 9(b)'s heightened pleading standard.

2. Specificity of Allegations Against Each
Defendant Under Rule 8(a)

Rule 8(a) requires that a defendant be given "fair notice of what the . . . claim is and the grounds upon which it rests."

63

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  This
threshold requirement allows an adverse party to "'answer the
complaint and prepare for trial.'"  Lazarek v. Ambit Energy
Holdings, LLC, 15-CV-6361-FPG, 2017 WL 4344557, at *3 (W.D.N.Y.
Sept. 28, 2017) (quoting Strunk v. U.S. House of
Representatives, 68 F. App'x 233, 235 (2d Cir. 2003)).

The RD Entities contend that the Complaint fails to comply
with Rule 8(a) because its allegations "lump" the three
corporate Defendants together without adequately differentiating
between and among them.  (Def. Br. 38.)  Defendants argue that
the Government's failure to parse the factual basis for each
claim as to each corporate Defendant deprives the RD Entities of
fair notice of the claims against each of them.  Id.; see Ochre
LLC v. Rockwell Architecture Planning & Design, P.C., No. 12
Civ. 2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012).  In
response, Plaintiffs assert that they refer to the Defendants
collectively because each Defendant engaged in the wrongdoing
alleged in the Complaint.  (Pl. Opp. 35.)

Although the Complaint is hardly a model of best pleading
practices, the Court concludes that its shortcomings do not
amount to fatal "lumping" together of Defendants such that the
Complaint warrants dismissal for failure to comply with Rule
8(a)'s pleading requirements.  First, the Court of Appeals has
held that dismissal pursuant to Rule 8 is proper when a

complaint is "unintelligible" and does not "explain[] what
conduct constituted the violations, which defendants violated
which statutes . . . or how the alleged violations harmed [the
plaintiff]." Vantone Grp. LLC v. Yangpu NGT Indus. Co., Ltd.,
No. 13-cv-7639 (LTS), 2015 WL 4040882, at *4 (S.D.N.Y. July 2,
2015) (quoting Strunk, 68 F. App'x. at 235) (internal quotation
marks omitted).

Here, the Complaint states the nature of the various types
of claims brought against the corporate defendants, including
alleged violations of state and federal consumer protection
statutes, and the conduct underlying those claims. Vantone,
2015 WL 4040882, at *4. At this stage of the proceedings, the
Government is not required to plead specific details as to which
entity did what during the alleged course of misconduct. See
id. (quoting Hudak v. Berkley Grp., Inc., No. 13CV0089-WWE, 2014
WL 354676, at *4 (D. Conn. Jan. 23, 2014)) ("[P]rior to
discovery, plaintiff need not explain the details of each
defendant's role in the planning, funding, and executing [of]
defendant's alleged joint [] scheme"). The Complaint also
states adequately which Defendants are accused of violating
which statutes because the Complaint avers that all three of the
corporate Defendants engaged in each of the alleged violations.
(Pl. Opp. 35) ("The three RD Defendants are referred to
collectively because each engaged in the wrongdoing alleged in

65

the Complaint"). "Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." Vantone, 2015 WL 4040882, at *4 (quoting Hudak, 2014 WL 354676, at *4). Therefore, the Complaint does not warrant dismissal under Rule 8(a) for impermissibly "lumping" together Defendants.

Defendants rely on Ochre LLC v. Rockwell Architecture Planning & Design, P.C., in arguing that the Complaint "impermissibly" lumps the corporate Defendants together. No. 12 Civ. 2837, 2012 WL6082387, at *6 (S.D.N.Y. Dec. 3, 2012). In Ochre, the court concluded that the complaint failed to state a copyright-infringement claim where the plaintiff brought claims against four entirely separate entities, "a design firm, an architect, a hotel, and a procurement agent," and failed to separate out "the key allegations against each defendant." Aghaeepour v. N. Leasing Sys., Inc., No. 14-CV-5449 (NSR), 2015 WL 7758894, at *3 (S.D.N.Y. Dec. 1, 2015) (quoting Ochre, 2012 WL 6082387, at *6). Unlike in Ochre, where the defendants were entirely separate entities, the Complaint here avers that the three corporate defendants' share significant characteristics: the corporate defendants share a principal places of business at the same address, (Compl. ¶¶ 15-17), Roni Dersovitz is the founder and owner of each corporate defendant, (Compl. ¶ 18),

all three corporate defendants acted in "swoop[ing] in with a
'deal'" while the Class Members and Eligible Claimants awaited
payment of their settlement awards (Compl. ¶ 5), and that, based
on the information in the Purchase Agreements, the ABA account
number for wiring money is the same on all of the Purchase
Agreements regardless of the corporate defendant named in the
Purchase Agreement, (Pl. Opp. 36.)  For these reasons, <u>Ochre</u> has
limited applicability to the instant situation.

Accordingly, because the Complaint provides each corporate
defendant with "fair notice of what the . . . claim is and the
grounds upon which it rests," dismissal under Rule 8 is not
warranted here.  <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007).

ii.   <u>"Substantial Assistance" Liability Under the CFPA</u>

In its Complaint, the Government brings five claims of
individual liability against Roni Dersovitz for "knowingly or
recklessly providing substantial assistance" to a "covered
person" under the CFPA – here, the RD Entities.  12 U.S.C.
§ 5536(a)(3); (Compl. ¶¶ 8, 69, 77, 84, 91, 98.)

The Court has identified only one case interpreting 12
U.S.C. § 5536(a)(3), and that decision does not bind this Court.
<u>See</u> <u>CFPB v. Univ. Debt & Payment Solutions, LLC, et al.</u>, 15-CV-
00859-RWS, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015).
Nevertheless, the Court finds the <u>Universal Debt & Payment
Solutions</u> court's analysis pertaining to the scienter

requirement under 12 U.S.C. § 5536(a)(3) instructive for its own analysis.

In Universal Debt & Payment Solutions, the court drew on the substantially similar requirements of individual aiding and abetting liability under federal securities laws and individual liability for providing "substantial assistance" under the CFPA, 12 U.S.C. § 5536(a)(3), in interpreting the CFPA's individual liability statute.  15 U.S.C. § 78t(e); 2015 WL 11439178, at *6. Section 20(e) imposes liability on "any person that knowingly or recklessly provides substantial assistance to another person in violation of [the securities laws]."  15 U.S.C. § 78t(e).[6]

The Court of Appeals has interpreted aiding and abetting liability under § 20(e) to require the Government to show "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3)

---

[6] Although the Federal Trade Commission Act ("FTCA") and the CFPA share structural characteristics that facilitate statutory interpretation under other CFPA provisions, the FTCA's substantial assistance provision does not contain an analogous scienter requirement and therefore has limited relevance here. See NDG Corp., 2016 WL 7188792, at *16 (noting that "courts have adopted the established meaning of other words in § 5536 [of the CFPA] from the FTCA, in acknowledgment of the two provisions' similarity" and that "the FTCA and CFPA were . . . enacted for similar purposes").  Under the FTCA, the Federal Trade Commission ("FTC") is authorized to prevent "persons, partnerships, or corporations . . . from using . . . unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(2).

'substantial assistance' by the aider and abettor in the achievement of the primary violation." SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009) (internal quotation marks and citation omitted).

To plead adequately the "substantial assistance" element, the Government must "establish that the aider and abettor 'in some sort associated himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed.'" SEC v. DiMaria, 207 F. Supp. 3d 343, 359 (S.D.N.Y. 2016) (quoting SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009)). Courts have recognized that "although 'a high degree of knowledge may lessen the [Government's] burden in proving substantial assistance,' awareness and approval, without more, do not constitute substantial assistance." DiMaria, 207 F. Supp. 3d at 359 (quoting SEC v. Apuzzo, 689 F.3d 204, 215 (2d Cir. 2012)).

As to § 20(e)'s knowledge requirement, "the plaintiff must at least demonstrate recklessness" to satisfy it. Yorkville Advisors, LLC 2018 WL 1725555 at *14. "Mere negligence does not suffice." Id. "Recklessness sufficient to establish scienter involves conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care." SEC v. China N.E. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

### iii.   Deceptive and Abusive Conduct Under the CFPA

#### 1. Counts I, III, IV, V:  Deceptive Acts or Practices Under the CFPA

The Complaint includes four claims of deceptive acts or practices under the CFPA against all of the named Defendants. To make a prima facie case of deceptive acts or practices under the CFPA, the Complaint must allege adequately "(1) a representation, omission or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), [that] the representation, omission, or practice is material." CFPB v. NDG Fin. Corp., 15-cv-5211 (CM), 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016) (quoting FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008)) (alteration in original).

In essence, the RD Entities argue that each of the Complaint's deceptive acts or practices claims under the CFPA must fail because each is based on the conclusory allegation that the transactions at issue are loans, not sales.  (Def. Br. 26.)  Because, as a matter of law, the Purchase Agreements were void and functioned plausibly as extensions of credit, the Court rejects this defense and finds that the Complaint plausibly alleges that Defendants engaged in deceptive acts or practices in violation of the CFPA.

a. Count I

Count I avers that the RD Entities violated the CFPA by
deceptively marketing the Purchase Agreements as sales when in
fact these transactions were properly characterized as loans.
(Def. Br. 25.)

As discussed earlier, federal and state law, as well as the
NCLSA's express terms, prohibit consumers from assigning any of
their interest in their settlement awards from the VCF and
NCLSA, respectively.  According to the Complaint, Defendants
made false representations to Consumers that its products were
valid assignments of Consumers' interests in their anticipated
settlement awards.  (Compl. ¶ 38-39.)  Defendants also labeled
the Purchase Agreements as "assignment and sale" agreements
when, in fact, the Purchase Agreements were not true sales.  See
FTC v. Verity Int'l, Ltd., 443 F.3d 48, 64 (2d Cir. 2006)
(holding that making a representation to consumers that is false
is sufficient to show that representation would likely mislead
consumers acting reasonably in alleging claim under Section
5(a)(1) of the Federal Trade Act, 15 U.S.C. § 45(a)(1)).  Such
statements, which are false, could objectively mislead a
consumer acting reasonably under the circumstances, thus
satisfying the claim's second element.

Finally, the Government also alleges adequately that the
misleading representation was material.  "Express

representations that are shown to be false are presumed material." Med. Billers Network, 543 F. Supp. 2d at 304 (citing FTC v. Patriot Alcohol Testers, Inc., 798 F. Supp. 851, 856 (D. Mass. 1992)). Because the Complaint alleges adequately that the Purchase Agreements were not valid sales, representations to the contrary would be material.

Accordingly, the Government alleges adequately that Defendants engaged in deceptive acts or practices in violation of the CFPA.

> i. "Substantial Assistance" Claim
> Against Roni Dersovitz Under
> Count I

The Court concludes that the Government has pleaded facts sufficient to show that Dersovitz had the requisite scienter to state a claim for individual liability under 12 U.S.C. § 5536(a)(3). As to the first element and as already established, the Government has alleged plausibly that the RD Entities engaged in deceptive acts or practices in violation of 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which in turn alleges adequately an "actual violation" of § 5531(a), by misrepresenting that it is entering into contracts with Consumers for valid and enforceable assignments. (Compl. ¶ 63.)

Turning to the scienter requirement, the Court concludes that the Complaint pleads facts sufficient to allege that

Dersovitz exhibited an "extreme departure from the standards of ordinary care" in offering to enter into the Purchase Agreements with Consumers that Dersovitz must have known were likely not valid.

The Complaint alleges that Dersovitz has "significant responsibility for establishing RD's policies and practices," "substantial control over RD's operations," and "responsibility to [sic] dictate all the terms of [C]onsumer contracts." (Compl. ¶¶ 18, 27.)  In addition, Dersovitz is the founder and owner of each RD Entity named as a Defendant in this action. (Compl. ¶ 18.)  Given Dersovitz's role as founder and owner of the RD Entities and his authority to "dictate the terms of [C]onsumer contracts," his conduct is at least "reckless" with respect to the NFL Settlement Agreement's anti-assignment clause and the Anti-Assignment Act's potential applicability to the VCF Purchase Agreements.  (Compl. ¶¶ 34-36.)

As to the NFL Purchase Agreements, the NCLSA contains clear and unambiguous anti-assignment language.  Dersovitz's failure to inform Class Members that this existed exhibits "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care."  Furthermore, the allegations suggest that Dersovitz was aware of the possibility that the assignments were impermissible but decided to go ahead with the transaction in spite of this.  The Purchase Agreements address

73

specifically the possibility that the assignments in the Purchase Agreements will be classified as loans by a court.

Similarly with the VCF Purchase Agreements, Dersovitz encountered several warning signs indicating a high risk that the RD Entities were misrepresenting the nature of these agreements to Consumers, specifically, that the VCF Claims Administrator refused to make payment directly to the RD Entities, in spite of its demands that it do so pursuant to the assignments, and the general disclaimer in the VCF Purchase Agreements that a court may find the sale to be a loan. In sum, the Complaint adequately alleges that Dersovitz acted recklessly in knowing that the assignments may well be invalid but holding them out as enforceable.

Finally, Dersovitz provided "substantial assistance" to the RD Entities in carrying out these CFPA violations.  Dersovitz "associated himself" with the RD Entities as their founder and owner and "participated in [the enterprise] as something he wished to bring about" by continuing to craft the RD Entities' policies and procedures and exercising authority over those Entities.  Furthermore, Dersovitz "sought by his action to make [the RD Entities] succeed" by making offers to enter into Purchase Agreements to Consumers, (Compl. ¶ 54), being responsible for "solicit[ing] funds from investors" for cash advance payments to Consumers, (Compl. ¶ 51), and "[making]

74

phone calls to at least one New York consumer to collect from
that consumer," (Compl. ¶ 54).

Accordingly, the Complaint alleges adequately a claim of
"substantial assistance" liability against Roni Dersovitz in his
individual capacity.  12 U.S.C. § 5536(a)(3).

### b. Count III

Count III of the Complaint avers that Defendants violated
the CFPA's prohibition on deceptive acts or practices by making
representations that Defendants could "cut through red tape" and
expedite payment of Consumers' settlement awards.  (Compl.
¶¶ 44-48.)  Defendants argue that this statement is not
misleading because, read in the context of the entire
advertisement or transaction, a reasonable Consumer would
understand this to mean that the RD Entities would disburse
funds more quickly than the settlement fund or claims
administrator would, not that the RD Entities would actually
expedite disbursements from the fund or the administrator.
(Def. Br. 34.)  The Court concludes that such a representation,
"without appropriate disclosures . . . could deceive reasonable
consumers" who are navigating a complex settlement landscape
with limited knowledge of the inner workings of a settlement
fund.  CFPB v. Siringoringo, SACV 14-01155 JVS (AJWx), 2016 WL
102435, at *5 (C.D. Cal. Jan. 7, 2016).  Such representation is
also material because it could "inform the consumer's decision

to engage" the Defendants in securing expedited payment. Id. (citing 12 C.F.R. § 1015.3(b)(2)). Given that Defendants target individuals who may be suffering financial hardship due to delays in payment of their settlement award, representations regarding the timing of procuring settlement award payments would undoubtedly be material to Consumers' engaging Defendants' services.

In sum, the Complaint alleges adequately a claim of deceptive acts or practices under the CFPA for the representations described in Count III regarding the timing of payments.

      i.  "Substantial Assistance" Claim Against Roni Dersovitz Under Count III

The Government alleges that Roni Dersovitz is individually liable under 12 U.S.C. § 5536(a)(3) for providing "substantial assistance" to the RD Entities in engaging in deceptive acts or practices, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), by misrepresenting on the RD Entities' website that Defendants could "speed[] up" disbursement of a Consumer's award and "cut through red tape" to get payment from the settlement administrator sooner. (Compl. ¶¶ 79, 84.)

Here, the Court has already determined that the Government alleged adequately that the RD Entities made material

76

misrepresentations to Consumers in violation of 12 U.S.C.
§ 5536(a)(1)(B).  Turning to the "knowing" or "reckless"
requirement of 12 U.S.C. § 5536(a)(3), the Court also concludes
that, based on the knowledge that Dersovitz had through his
authority over the RD Entities and Dersovitz's approval of the
contents of RD's website shows that he at least "recklessly"
made material misrepresentations that were likely to mislead a
reasonable consumer.  (Compl. ¶ 46.)  Futhermore, Dersovitz's
approval of a website intended to draw in business for the RD
Entities alleges adequately that he provided "substantial
assistance" to the RD Entities' venture by maximizing their
prospects for new business through their websites.

Accordingly, the Complaint alleges adequately facts
demonstrating that Dersovitz substantially assisted the RD
Entities in engaging in deceptive acts or practices in violation
of the CFPA.

### c. Count IV

Count IV, which alleges that the RD Entities acted
deceptively in violation of the CFPA by making misleading
statements as to when RD would pay Consumers, pleads adequately
facts demonstrating that the RD Entities engaged in deceptive
conduct under the CFPA.  (Compl. ¶¶ 86-89.)

"A claim is considered material if it involves information
important to consumers and, hence, is likely to affect their

choice of, or conduct regarding a product." Med. Billers
Network, 543 F. Supp. 2d at 304 (internal quotation marks and
citation omitted).  One of Consumers' main motivations in
entering into contracts with the RD Entities was to get their
money sooner than they otherwise would from their third-party
obligors.  (Compl. ¶¶ 86-88.)  Accordingly, the RD Entities'
failure to provide money to Consumers on certain dates as agreed
is misleading insofar as the RD Entities made statements that
turned out to be false, and those statements are also material
in that they "would influence the Consumer's decision" as to
whether to enter into the Purchase Agreement or not.   Med.
Billers Network, 543 F. Supp. 2d at 313.

    The RD Entities' argument that such grievances amount only
to a breach of contract claim is undercut by the fact that the
contracts do not speak to the timing of payment.  (Def. Br. 36);
(Pl. Opp. 27.)  Therefore, the Government need not "identify[]
which of the 27 contracts the RD Entities allegedly breached by
failing to make timely payment." (Def. Br. 36.)  As previously
noted, Rule 9(b)'s heightened pleading standard does not apply
to deceptive conduct claims under the CFPA, and therefore the
Government need not aver the "who," "what," "where," and "when"
that 9(b) requires at this stage.  The Complaint avers
adequately that Defendants made misleading statements, outside
the four corners of the Purchase Agreements, as to the timing of

payments that misled consumers.  Accordingly, the Government has
alleged plausibly that the RD Entities engaged in deceptive acts
or conduct under Count IV.

> i.   "Substantial Assistance" Claim
> Against Roni Dersovitz Under
> Count IV

The Court concludes that the Complaint alleges adequately a
claim against Roni Dersovitz for "substantially assisting" the
RD Entities in carrying out deceptive acts or practices by
making misstatements about when Consumers would receive payments
from the RD Entities.  12 U.S.C. §§ 5531(a), 5536(a)(1)(B);
(Compl. ¶¶ 51, 90-91.)  Having established that the Complaint
alleges adequately a claim for the underlying violation, the
Court also concludes that the Complaint alleges adequately that
Dersovitz at least "recklessly" provided substantial assistance
to the RD Entities in misrepresenting to Consumers when their
funds would be disbursed.  (Compl. ¶ 86.)  The Complaint alleges
that Dersovitz "has authority and responsibility to . . .
determine when funds for [C]onsumers would arrive."  (Compl.
¶ 51.)  As noted above, the timing of payments was crucial to
Consumers, who entered into these transactions for the sole
purpose of receiving expedited access to liquidity in the form
of a lump sum cash payment.  Incorrect statements as to the
timing of disbursement of Consumers' payments, if made, would

constitute an "extreme departure from the standards of ordinary care" given that Dersovitz had some element of authority over when funds would arrive and given the importance of the timing to payments to these particular Consumers.  (Compl. ¶ 51.)

Finally, for the reasons stated earlier, including Dersovitz's responsibility for the RD Entities' policies and practices and his role as founder and CEO of the RD Entities, the Complaint alleges adequately that Dersovitz sought ostensibly through these misstatements "to make [the RD Entities] succeed" by drawing in Consumers who were primarily concerned with the timing of their settlement payments. DiMaria, 207 F. Supp. 3d 343, 359 (S.D.N.Y. 2016) (quoting SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009)).  Accordingly, the Complaint alleges adequately a claim for "substantial assistance" liability against Dersovitz in his individual capacity.

### d. Count V

Under Count V, the Government alleges that the RD Entities engaged in deceptive acts or practices by "collecting on contracts that are void under state laws or, in the alternative, that function as loans with interest rates that exceed usury limits under state laws, and on which no payment is due." (Compl. ¶¶ 93-94.)

For the same reasons that the Court found the Government's factual allegations to plead adequately a claim of deceptive conduct under Count I, so too here.  Informing Consumers that they have an obligation to repay under a transaction in which the assignment is void or unenforceable clearly meets the materially misleading threshold under the CFPA.  Collecting on loans that are void is materially misleading because it gives Consumers the impression that "borrowers were obligated to repay" the RD Entities when in reality the loan agreements were void and the borrowers were not legally obligated to pay.  CFPB v. CashCall, Inc., CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016), appeal filed, No. 18-55479 (9th Cir. Apr. 12, 2018).  Accordingly, the Government has alleged plausibly that Defendants engaged in deceptive acts or conduct under Count V.

               i.    "Substantial Assistance" Claim
                     Against Roni Dersovitz Under
                     Count V

As explained above, the Court concludes that the Complaint alleges adequately that the RD Entities engaged in deceptive acts or practices in violation of the CFPA by indicating to Consumers that they had an obligation to repay the RD Entities when, in fact, the loans were usurious and therefore void under state law.  12 U.S.C. §§ 5531(a), 5536(a)(1)(B).  The

Government has also alleged adequately that Dersovitz
substantially assisted the RD Entities in carrying out these
deceptive acts and practices.  12 U.S.C. § 5536(a)(3).  At a
minimum, the Complaint and the Purchase Agreements themselves
contain facts adequate to allege that Dersovitz acted
"recklessly" in providing this assistance.  The entire premise
of the RD Entities' business model is labeling transactions that
look and function like loans as "sales" to circumvent the
regulatory restrictions that would otherwise govern these
transactions if they were loans.

     According to the Complaint, Dersovitz "has authority and
responsibility to dictate all the terms of consumer contracts"
and "makes decisions on the terms of the offers or extensions of
credit."  (Compl. ¶ 27.)  These allegations, coupled with the
fact that the Purchase Agreements reserve the right to file a
UCC Financing Statement in the event a court deems the
transaction a loan and Dersovitz's position as CEO and founder
of the RD Entities, allege facts sufficient to find that
Dersovitz exhibited "highly unreasonable" conduct in failing to
determine whether the assignments were valid before offering
Purchase Agreements to Consumers. The allegations, viewed
collectively, indicate that Dersovitz knew that the transactions
might not be valid assignments but proceeded with them in any
event in an "extreme departure from the standard of ordinary

care."  Finally, the Complaint alleges that Dersovitz

"substantially assisted" the RD Entities in carrying out this

deceptive conduct in light of his role as founder and CEO of the

RD Entities and his substantial involvement in the business,

such as collecting on loans, drafting policies, and having the

final word on the terms of the Purchase Agreements.

Accordingly, the Complaint pleads facts sufficient to state a

claim of individual liability against Dersovitz for

substantially assisting a "covered person" under the CFPA.

         2. <u>Count II: Abusive Acts or Practices Under</u>

            <u>the CFPA</u>

The Government alleges that the RD Entities engaged in

abusive conduct by undermining Consumers' understanding of the

Purchase Agreements through their misrepresentations that the

contracts are for valid and enforceable assignments.  (Compl.

¶¶ 72-73.)  Under the CFPA, conduct is "abusive" where it

"materially interferes with the ability of a consumer to

understand a term or condition of a consumer financial product

or service," "takes unreasonable advantage of . . . a lack of

understanding on the part of the consumer of the material risks,

costs, or conditions of the product or service," "takes

unreasonable advantage of . . . the inability of the consumer to

protect the interests of the consumer in selecting or using a

consumer financial product or service," or "takes unreasonable

83

advantage of . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."  12 U.S.C. § 5531(d).

Here, the Government has pleaded sufficient facts to state a claim for abusive acts or practices under the CFPA. Representations that a transaction is a sale when it does not, in fact, transfer validly any rights of ownership from the consumer to the RD Entities are materially misleading because such representations are false.  To that end, the Government is correct that these false representations prevent Consumers from evaluating accurately whether this transaction is in their best interest.  Defendants' contention that they disclose adequately the risks involved in the Purchase Agreements by labeling them "complex financial transaction[s]" does not neutralize other materially misleading information.  The repeated misrepresentations alleged, assuming they were made, would "create[] the 'net impression' that the [Purchase Agreements] were enforceable" even though that impression is "patently false" because the Purchase Agreements "were void."  CashCall, 2016 WL 4820635, at *10.

Accordingly, the Government has alleged plausibly that the RD Entities engaged in abusive practices under the CFPA.

a. "Substantial Assistance" Claim

Against Roni Dersovitz Under Count II

The Government alleges plausibly that Dersovitz knowingly or recklessly provided substantial assistance to the RD Entities in carrying out abusive acts or practices in violation of the CFPA.  12 U.S.C. § 5536(a)(3); 12 U.S.C. § 5531(d).

Aside from alleging plausibly that the RD Entities engaged in conduct sufficient to state a claim for abusive acts or practices under 12 U.S.C. § 5531(d), the Government also alleges plausibly that Dersovitz was "reckless" and provided "substantial assistance" to the RD Entities by enabling them to engage in this conduct.

As to the scienter requirement, the Complaint alleges adequately that Dersovitz knew, would have known, or acted recklessly with a high risk that the assignments in the Purchase Agreements were prohibited.  Universal Debt & Payment Solutions, 2015 WL 11439178, at *10.  At a minimum, a business premised on purchasing rights to structured settlement payments should know whether the future receivables are, in fact, assignable. According to the Complaint, Dersovitz has considerable control over the terms of the consumer contracts, (Compl. ¶ 27), and exercises considerable control over the RD Entities' practices and policies.  Given all of this, failure to conduct proper due diligence on whether the assignments in the Purchase Agreements

85

are permissible is "highly unreasonable" and amounts to an "an

extreme departure from ordinary standards of care." Id. at *9.

For the reasons stated earlier, Dersovitz also substantially

assisted the RD Entities through this conduct given his role as

CEO and founder of the RD Entities, (Compl. ¶ 18), his

involvement in dictating the terms of the Purchase Agreements,

(Comnpl. ¶ 27), and determining when to collect from Consumers,

(Compl. ¶ 54).  Such allegations taken together are adequate to

assert that Dersovitz "associate[d] himself with the venture"

and "participate[d] in it as something [he] wished to bring

about," and "[sought] to make it succeed" by taking unreasonable

advantage of the reasonable reliance by Consumers on the RD

Entities.  Id. at *13.

> iv.  State Law Claims

Defendants devote significant space in arguing that the

Complaint's CFPA claims should be dismissed because the CFPB is

unconstitutionally structured and thus lacks authority to bring

such claims.  (Def. Br. 9-14.)  Vexingly, Defendants do not

address the NYAG's independent authority to bring claims in

federal district court under the CFPA, without regard to the

constitutionality of the CFPB's structure.  12 U.S.C.

§ 5552(a)(1) (authorizing state attorneys general to bring

claims under the CFPA); (Pl. Opp. 7.)  The Government has

alleged adequately claims for deceptive and abusive acts or

practices under the CFPA, and therefore federal question subject matter jurisdiction over the CFPA claims exists regardless of the constitutionality of the CFPB's structure.

A federal district court may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). "Federal-law and state-law claims form part of the same case or controversy where they 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" Nguyen v. Am. Express Co., 282 F. Supp. 3d 677, 683 (S.D.N.Y. 2017) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349 (1988)). Review of the factual allegations in the Complaint makes clear that both the federal- and state-law claims derive from the same underlying conduct and transactions, namely, Defendants' conduct towards Consumers in offering the Purchase Agreements. These facts establish that the federal- and state-law claims "arise out of the same common nucleus of operative fact" such that the exercise of supplemental jurisdiction over the NYAG's state-law claims would be appropriate. 28 U.S.C. § 1367(a). Accordingly, the Court will exercise supplemental jurisdiction over the NYAG's New York state law claims for violations of civil and criminal usury

laws, New York General Obligations Law, deceptive practices, false advertising, and fraud.  28 U.S.C. § 1367(a).

          1. <u>NYAG's Jurisdiction Over the Purchase Agreements</u>

In a single footnote, Defendants argue that the Complaint pleads insufficiently NYAG's jurisdiction over the transactions at issue in this case because "the RD Entities' principal place of business is New Jersey" and "NYAG has not made any allegations regarding the residences of the customers who entered the transactions at issue."  (Def. Br. 38 n.14.)

As a preliminary matter, the Court pays minimal credence to an argument raised in a two-sentence footnote of a forty-page motion to dismiss regarding the NYAG's jurisdiction over certain Consumers.  See <u>Gramercy Advisors, LLC v. Ripley</u>, 13-cv-9070 (VEC), 2014 WL 5847444, at *3 (S.D.N.Y. Nov. 12, 2014) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks and citation omitted).  To the extent that Defendants challenge NYAG's assertion of jurisdiction over the transactions under New York General Business Law § 349 - the statute at issue in the two cases that they cite in support of this argument - NYAG has alleged adequately that the transactions have a sufficient nexus to New York under New York General Business Law § 349, because the Complaint makes

reference to "New York consumers," (Compl. ¶¶ 54) and loans made "in New York," (Compl. ¶ 57).  In addition, several of the contracts themselves indicate that the Consumer has a New York address,  (See, e.g., Dersovitz Aff. Ex. A-2 at 20) (listing consumer as having New York residence), and that certain of the Consumers used a New York agent to seek legal advice regarding the Purchase Agreement before entering into it, (Dersovitz Aff. Ex. A-1 at 18-19) (showing New York attorney sending letters on behalf of Consumer client to RD Legal Funding Partners, LP). For purposes of New York General Business Law § 349, the relevant inquiry is whether there are New York transactions that are deceptive or that occur as a result of out-of-state deceptive conduct.  New York v. Feldman, 210 F. Supp. 2d 294, 303 (S.D.N.Y. 2003).

Accordingly, the information in the Purchase Agreements as well as the allegations in the Complaint allege adequately that deceptive transactions took place in New York and, in the alternative, that these transactions took place in New York as a result of out-of-state deceptive conduct.

2. Count VI: Claims Under New York Civil and Criminal Usury Laws

The Complaint alleges adequately that Defendants have charged more than the maximum usury rate under New York Banking Law § 14-a, with respect to New York's civil usury laws, and

under New York Penal Law §§ 190.40 and 190.42, with respect to New York's criminal usury laws.  (Compl. ¶¶ 99-105, 106-110.) Defendants' sole argument in response to the Government's usury claims is that the transactions at issues are sales, not loans, and therefore are not subject to state usury laws.  (Def. Br. 37.)

As discussed supra, the Court has concluded that Plaintiffs have alleged adequately that the transactions at issue constitute loans, not sales, and therefore Defendants' argument here is without effect.  "In New York, the civil usury statute provides that '[t]he maximum interest rate permissible on a loan is 16% per annum, and any interest rate in excess of that amount is usurious.'"  Roopchand v. Mohammed, 62 N.Y.S.3d 514, 516 (N.Y. App. Div. 2017) (internal quotation marks and citation omitted) (citing N.Y. Gen. Obl. Law § 5-501[a]; N.Y. Banking Law § 14(a)).  Under New York's criminal usury law, it is a felony to "knowingly charge or collect interest on a 'loan or forbearance' at a rate above 25% annually."  Madden v. Midland Funding, LLC, 237 F. Supp. 3d 130, 141 (S.D.N.Y. 2017) (quoting N.Y. Penal Law § 190.40).  Furthermore, it is unlawful to collect interest on loans or forbearances that exceed the maximum allowable interest rate because such loans are void. (Compl. ¶¶ 101-03); N.Y. Gen. Obl. Law § 5-501; N.Y. Banking Law § 14-a.

Accepting the allegations in the Complaint as true and in the light most favorable to the NYAG at this stage of the proceedings, NYAG alleges facts demonstrating plausibly that at least certain of the Purchase Agreements functioned as loans that charged usurious interest rates in excess of New York's civil and criminal usury caps, respectively. (Compl. ¶¶ 29, 32.) Accordingly, NYAG's state law claims alleging violations of civil and criminal usury laws survive the instant motion.

3. <u>Count VIII: Violation of New York General Obligations Law § 13-101</u>

Defendants argue that the NYAG fails to state a claim under New York General Obligations Law § 13-101, which prohibits the sale or assignment of claims or demands to recover for personal injury, because the transactions transfer the rights to <u>proceeds</u> from claims for personal injury, not the personal injury claims themselves. N.Y. Gen. Oblig. Law § 13-101; (Def. Br. 37-38.)

Under N.Y. Gen. Oblig. Law § 13-101(1), a party may not transfer a "claim or demand" to "recover damages for a personal injury." With respect to the VCF Purchase Agreements, as discussed <u>supra</u>, Section IV(a)(i)(2), those transactions purport to transfer Eligible Claimants' claims for settlement proceeds under the VCF.

As discussed <u>supra</u>, the term "claim" is defined as "[t]he assertion of an existing right; any right to payment or to an

equitable remedy, even if contingent or provisional . . . [a] demand for money, property, or a legal remedy to which one asserts a right." Claim, Black's Law Dictionary (10th ed. 2014).  The plain language of the Purchase Agreements indicates that Defendants sought to obtain ownership of Eligible Claimants' "claims" to damages for injuries that they suffered following the September 11, 2001 terrorist attacks in that they sought to obtain the right to receive payment directly from the VCF.  In sum, the Complaint alleges adequately facts demonstrating that the Purchase Agreements transferred a "claim or demand" to "damages for personal injury" in violation of N.Y. GBL § 13-101(1).

Similarly, the NYAG has alleged facts sufficient to state a claim under Section 13-101(1) of N.Y. GBL as to the NFL Purchase Agreements.  For the reasons already explained supra, Section IV(a)(i)(1), the NFL Purchase Agreements purport to assign Class Members' full interest in a portion of their settlement proceeds, including the right to demand payment directly from the NFL Settlement Administrator.  As such, the Purchase Agreements purport to transfer a "claim or demand" to "recover damages for personal injury."  Accordingly, the NYAG has alleged facts sufficient to state a claim under N.Y. GBL § 13-101(a) regarding the NFL Purchase Agreements.

4. Count IX: Violation of New York General

Business Law § 349

"To state a claim for deceptive practices under section 349, a plaintiff must show: (1) that the act, practice, or advertisement was consumer-oriented; (2) that the act, practice, or advertisement was misleading in a material respect; and (3) that the plaintiff was injured as a result of the deceptive act, practice, or advertisement." Pelman ex rel. Pelman v. McDonald's Corp., 396 F. Supp. 2d 439, 444 (S.D.N.Y. 2005).

Under the first prong, "consumer oriented" conduct is that which "has a broad impact on consumers at large." Bennett v. State Farm Fire and Casualty Co., -- N.Y.S.3d --, 2018 WL 2225321, at *2 (N.Y. App Div. May 16, 2018) (citing Nafash v. Allstate Ins. Co., 28 N.Y.S.3d 381, 384 (N.Y. App. Div. 2016); JPMorgan Chase Bank, N.A. v. Hall, 996 N.Y.S.2d 309, 315 (N.Y. App. Div. 2014); Vescon Constr., Inc. v. Gerelli Ins. Agency, Inc., 948 N.Y.S.2d 636, 638 (N.Y. App. Div. 2012); Flax v. Lincoln Natl. Life Ins. Co., 864 N.Y.S.2d 559, 561 (N.Y. App. Div. 2008)).  A "single shot transaction" that is customized to meet the specific demands of a particular consumer is insufficient to show that the conduct had a "broad impact on consumers."  Hall, 996 N.Y.S.2d at 315 (quoting N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 953 N.Y.S.2d 96,

93

102 (N.Y. App. Div. 2012)).  Rather, the conduct must amount to a "standard practice that was [or is] routinely applied to all [consumers]" who engaged with the defendant.  N. State Autobahn, 953 N.Y.S.2d at 102.

Under the second prong, the New York Court of Appeals has defined the term "materially misleading" conduct using an objective standard under which "the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  Orlander v. Staples Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E. at 745 ("Such a test . . . may be determined as a matter of law or fact (as individual cases require)."  Koenig v. Boulder Brands, Inc., 995 F. Supp. 2d 274, 287 (S.D.N.Y. 2014) (quoting Oswego Laborers' Local 214 Pension Fund, 647 N.E.2d at 745).

Applying this framework to the facts of this case, NYAG has alleged facts sufficient to demonstrate that Defendants engaged in deceptive practices in violation of N.Y. GBL § 349.  As to the first element, the averments in the Complaint indicate that Defendants' conduct was "consumer-oriented" in that Defendants made similar statements and representations to all of the Consumers targeted.  Oswego Laborers' Local 214 Pension Fund, 623 N.Y.S.2d at 745 (holding conduct to be "consumer-oriented"

where defendant Bank interacted with plaintiffs' representative
the same as any other customer opening a savings account).
According to the Complaint, the RD Entities represent to
Consumers that the Purchase Agreements are assignments of
Consumers' interests in their anticipated settlement payments
and are not an offer of credit, (Compl. ¶ 38); label all of the
Purchase Agreements as "assignment and sale" agreements, (Compl.
¶ 39-40); and do not disclose interest rates for transactions to
Consumers, (Compl. ¶ 42).  These allegations show that
Defendants' conduct was not limited to any particular single
Consumer but rather was how Defendants interacted with all
Consumers.  Oswego Laborers' Local 214 Pension Fund, 623
N.Y.S.2d at 745 (citing Genesco Entm't v. Koch, 593 F. Supp.
743, 752 (S.D.N.Y. 1984) (finding that conduct was "consumer-
oriented" because it was "not unique" to the plaintiffs, was not
"private in nature" and not a "single shot transaction").
Accordingly, NYAG has pled adequately facts indicating the
conduct at issue was "consumer-oriented."

Turning to the second element of a claim under N.Y. GBL
§ 349, NYAG has also alleged adequately that the RD Entities
made misrepresentations that would be "materially misleading" to
a reasonable consumer.  All of the Purchase Agreements contain
numerous statements that the transaction is a "sale" that
transfers all of the rights of ownership in the Property Amount

to the RD Entities, but in reality, the Consumer is not entitled
to assign title and ownership over the Property Amount to
another.  Furthermore, the Purchase Agreements entail a rate of
interest that would violate New York civil and criminal usury
laws in some instances, rendering the transactions void under
New York law.  Such allegations, if true, are likely to mislead
a reasonable consumer as to the nature, terms, and obligations
of the contractual arrangement in front of him or her.
Accordingly, the NYAG has pleaded facts sufficient to state a
claim under N.Y. GBL § 349.

> 5. Count X: Violation of New York General
> Business Law § 350

"The standard for recovery under General Business Law
§ 350, while specific to false advertising, is otherwise
identical to Section 349." Austin v. Albany Law School of Union
Univ., 957 N.Y.S.2d 833, 843 (N.Y. Sup. Ct. 2013) (citing
Denenberg v. Rosen, 897 N.Y.S.2d 391, 394 (N.Y. App. Div. 2010),
lv. dismissed, 930 N.E.2d 762 (N.Y. 2010)).  N.Y. GBL § 350
makes unlawful false advertising "in the conduct of any
business, trade or commerce or in the furnishing of any service"
in New York.  N.Y. Gen. Bus. Law § 350.  Because of the
commonality in the elements of a claim under N.Y. GBL § 349 and
§ 350, the Court draws on its analysis of NYAG's Section 349

claim in concluding that the NYAG has alleged facts sufficient to state a claim under N.Y. GBL § 350 for false advertising.

In this Complaint, the NYAG alleges that Defendants falsely advertised their agreements as sales rather than loans and falsely advertised that they would be able to expedite Consumers' payment of their settlement awards. As discussed earlier, such advertising is "consumer-oriented" in that the Complaint alleges that these representations were made to all those who visited Defendants' website or transacted with Defendants through a Purchase Agreement. (Compl. ¶¶ 125-26.) Such statements are also material because they are likely to mislead a reasonable consumer into believing that the transactions are true sales or that Defendants had the ability to expedite payment from the settlement fund administrators when neither statement is true. Defendants also argue that these alleged statements pertain to the "source" of the payments, which is distinct from the timing of payments and would not be material to consumers. (Def. Br. 34.) The Court disagrees. Consumers are individuals who want their settlement awards quickly because they need access to liquidity. It does not take a grand leap of imagination to envision that Consumers may have strained relations with the claims administrators in seeking access to their settlement awards. Therefore, if Consumers were misled into believing that RD would act as a type of third-party

facilitator between the Consumer and the claims administrator, this information would be material to the Consumer.  Therefore, the Court concludes that Defendants' argument is without merit.

Accordingly, the NYAG alleges adequately facts demonstrating a claim under N.Y. GBL § 350.

### 6. Count XI: New York Executive Law § 63(12) Fraud

Executive Law § 63(12) empowers the Attorney General to seek injunctive and other relief whenever a person or business engages in "repeated . . . or . . . persistent fraud or illegality."  "Fraud" under § 63(12) is not common-law fraud but is statutorily defined broadly as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."  Conduct violates Executive Law § 63(12) if it "has the capacity or tendency to deceive" both the average consumer and "the ignorant, the unthinking, and the credulous."  Matter of People v. Applied Card Sys., Inc., 805 N.Y.S.2d 175, 176 (N.Y. App. Div. 2005) (internal quotation marks and citation omitted).  Several cases have also held that proof of intent to deceive or reliance are not required to state a claim under N.Y. Executive Law § 63(12).

Here, because the elements of a claim under Section 63(12) are entirely encompassed by the elements of deceptive acts or

practices under the CFPA or NY GOL § 349 that the Government has already pled adequately, the Complaint contains sufficient allegations to state a claim under N.Y. Executive Law § 63(12) as well.

c. Constitutional Claims

    i. History, Liberty, and Presidential Authority

In reaching the question of the constitutionality of Title X of Dodd-Frank, which established the CFPB as an "independent bureau" within the Federal Reserve System, 12 U.S.C. § 5491(a), the Court acknowledges the en banc holding of the Court of Appeals for the District of Columbia Circuit in PHH Corp. v. CFPB, 881 F.3d 75 (D.C. Cir. 2018), upholding the statute.  Of course, that decision is not binding on this Court.[7]

---

[7] Other courts have also addressed this question.  CFPB v. TCF Nat'l Bank, No. 17-166 (RHK/DTS), 2017 WL 6211033 (D. Minn. Sept. 8, 2017); CFPB v. Seila Law, LLC, No. 17-CV-01081-JLS-JEM, 2017 WL 6536586 (C.D. Cal. Aug. 25, 2017), appeal filed, No. 17-56324 (9th Cir.); CFPB v. Navient Corp., No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017); CFPB v. Future Income Payments, LLC, 252 F. Supp. 3d 961 (C.D. Cal. 2017), appeal filed, No. 17-55721 (9th Cir.); CFPB v. D & D Mktg., Inc., No. CV 15-9692 PSG (EX), 2017 WL 5974248 (C.D. Cal. Mar. 21, 2017), interlocutory appeal granted, No. 17-55709 (9th Cir.); CFPB v. CashCall, Inc., No. CV-15-7522-JFW-RAOx, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016), appeal filed, 18-55479 (9th Cir.); CFPB v. NDG Fin. Corp., No. 15-CV-5211 (CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016), mot. reconsideration denied, No. 15-CV-5211 (CM), 2016 WL 7742784 (S.D.N.Y. Dec. 19, 2016); CFPB v. ITT Educ. Servs., Inc., 219 F. Supp. 3d 878 (S.D. Ind. 2015), appeal dismissed for lack of jurisdiction, 15-1761 (7th Cir. 2016); CFPB v. Frederick J. Hanna & Assocs., P.C., 114 F. Supp. 3d 1342 (N.D. Ga. 2015); CFPB v. Morgan Drexen, Inc., 60 F. Supp. 3d 1082 (C.D. Cal. 2014).

Respectfully, the Court disagrees with the holding of the <u>en banc</u> court and instead adopts Sections I-IV of Judge Brett Kavanaugh's dissent (joined in by Senior Circuit Judge A. Raymond Randolph), where, based on considerations of history, liberty, and presidential authority, Judge Kavanaugh concluded that the CFPB "is unconstitutionally structured because it is an independent agency that exercises substantial executive power and is headed by a single Director." <u>Id.</u> at 198.

Also most respectfully, the Court disagrees with Section V of Judge Kavanaugh's opinion wherein he determined the remedy to be to "invalidate and sever the for-cause removal provision and hold that the Director of the CFPB may be supervised, directed, and removed at will by the President." <u>Id.</u> at 200.  Instead, the Court adopts Section II of Judge Karen LeCraft Henderson's dissent wherein she opined that "the presumption of severability is rebutted here.  A severability clause 'does not give the court power to amend' a statute.  Nor is it a license to cut out the 'heart' of a statute.  Because section 5491(c)(3) is at the heart of Title X [Dodd Frank], I would strike Title X in its entirety." <u>Id.</u> at 163-64 (citations omitted).

                ii.   <u>CFPB's Notice of Ratification</u>

On May 11, 2018, the CFPB filed a Notice of Ratification ("Ratification") with the Court in response to Defendants' constitutional challenge to the for-cause removal provision of

the CFPB's enabling statute.  In the Ratification, the CFPB
attempts to ratify its decision to file this enforcement
decision prior to the appointment of the CFPB's Acting Director,
Mick Mulvaney, on November 24, 2017.  (Notice of Ratification
(hereinafter, Ratification) 1.)  Because the President may
remove Mr. Mulvaney at will, the CFPB asserts that Defendants
may not obtain dismissal on the grounds that the instant action
was initially filed by a Director at the CFPB removable only for
cause.  (Ratification 3.)

As Defendants note, ratification is a principle of agency
law.  (Defendants' Opp'n to Ratification ("Ratif. Opp'n") 2, ECF
No. 79.)  Ratification addresses situations in which an agent
was without authority at the time he or she acted and the
principal later approved of the agent's prior unauthorized acts.
See GDG Acquisitions LLC v. Government of Belize, 849 F.3d 1299,
1310 (11th Cir. 2017) (noting that ratification assumes that the
agent "did not have actual authority at the time he acted");
Wilkes-Barre Hosp. Co. v. NLRB, 857 F.3d 364, 371 (D.C. Cir.
2017) (explaining role of principal that ratifies prior
unauthorized acts of agent).

The Court agrees with Defendants that the CFPB's
Ratification does not address accurately the constitutional
issue raised in this case, which concerns the structure and
authority of the CFPB itself, not the authority of an agent to

101

make decisions on the CFPB's behalf.  See CFPB v. Gordon, 819
F.3d 1179, 1192 (9th Cir. 2016) (holding, after invalidation of
CFPB Director's recess appointment, that the Director's
"ratification, done after he was properly appointed as Director,
resolves any Appointments Clause deficiencies"); Wilkes-Barre
Hosp. Co. v. NLRB, 857 F.3d 364, 371 (D.C. Cir. 2017) (holding,
after invalidation of Board members' recess appointments, that
NLRB properly ratified the appointment of its Regional Director
who, in turn, ratified his prior unauthorized actions); Advanced
Disposal Servs. East, Inc. v. NLRB, 820 F.3d 592, 605-06 (3d
Cir. 2016) (same).

     Here, the constitutional issues presented by the structure
of the CFPB are not cured by the appointment of Mr. Mulvaney.
As Defendants point out, the relevant provisions of the Dodd-
Frank Act that render the CFPB's structure unconstitutional
remain intact.  (Ratification 4.)  Furthermore, Mr. Mulvaney
cannot serve past June 22, 2018 (210 days after the vacancy
arose), unless the President nominates a new Director, and then
only until the new Director is appointed.  Thus, there will
likely be a new Director appointed in the coming months who will
be subject to the for-cause removal provision.  Therefore, the
Ratification does not cure the constitutional deficiencies with
the CFPB's structure as the CFPB argues.  Accordingly, the Court
rejects the Notice of Ratification (ECF No. 78) to the extent

the CFPB argues that the Ratification renders Defendants'
constitutional arguments moot.

Accordingly, the Court finds that the CFPB "lacks authority
to bring this enforcement action because its composition
violates the Constitution's separation of powers," and thus the
CFPB's claims are dismissed.   Fed. Election Comm'n v. NRA
Political Victory Fund, 6 F.3d 821, 822 (D.C. Cir. 1993).

d. Conclusion

For the foregoing reasons, Defendants' motion (ECF No. 39) is DENIED.  Because Plaintiff Consumer Financial Protection Bureau is unconstitutionally structured and lacks authority to bring claims under the CFPA, the Clerk of Court shall terminate Plaintiff Consumer Financial Protection Bureau as a party to this action.

Counsel shall confer and inform the Court by letter no later than July 9 how they propose to proceed.


SO ORDERED.

Dated:    New York, New York
          June 21, 2018




_____
LORETTA A. PRESKA
Senior United States District Judge

104